**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| American Municipal Power, Inc. | ) | |
| American Public Power Association | ) | |
| Delaware Division of the Public Advocate | ) | |
| Maryland Office of People's Counsel | ) | Case No. <u>21-1117</u> |
| New Jersey Division of Rate Counsel | ) | |
| Office of the People's Counsel for the | ) | |
| District of Columbia | ) | |
| Pennsylvania Office of Consumer Advocate | ) | |
| PJM Industrial Customer Coalition, | ) | |
| Petitioners, | ) | |
| v. | ) | |
| Federal Energy Regulatory Commission, | ) | |
| Respondent. | ) | |

## PETITION FOR REVIEW

Pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*, and Rule 15(a) of the Federal Rules of Appellate Procedure ("FRAP"), American Municipal Power, Inc., the American Public Power Association, the Delaware Division of the Public Advocate, the Office of the People's Counsel for the District of Columbia, the Maryland Office of People's Counsel, the New Jersey Division of Rate Counsel, the Pennsylvania Office of Consumer Advocate, and the PJM Industrial Customer Coalition (collectively, "Petitioners"), hereby petition the Court for judicial review of the following orders issued by Respondent, Federal Energy Regulatory Commission ("Commission"):

1. *PJM Interconnection, L.L.C.*, Order on Compliance, Docket No. EL19-58-002, -003, 173 FERC ¶ 61,134 (Nov. 12, 2020) ("November 12 Order on Compliance");

2. *PJM Interconnection, L.L.C.,* Notice of Denial of Rehearings by Operation of Law and Providing for Further Consideration, Docket No. EL19-58-005, 174 FERC ¶ 62,027 (Jan. 14, 2021) ("Denial Notice"); and

3. *PJM Interconnection, L.L.C.,* Order Addressing Arguments Raised on Rehearing, Docket No. EL19-58-005, 174 FERC ¶ 61,180 (Mar. 9, 2021) ("March 9 Order Addressing Rehearing").

Copies of the November 12 Order on Compliance, the Denial Notice, and the March 9 Order Addressing Rehearing are attached hereto as **Exhibit A**, **Exhibit B**, and **Exhibit C**, respectively. The Court should note that on December 14, 2020, Petitioners timely filed a request for rehearing of the November 12 Order on Compliance.[1]

On September 18, 2020, as amended on November 24, 2020, Petitioners petitioned the Court in Case No. 20-1372, *et al*., for judicial review of the following orders:

1. *PJM Interconnection, L.L.C.,* Order on Proposed Tariff and Operating Agreement Revisions, Docket Nos. EL19-58-000 and ER19-1486-000, 171 FERC ¶ 61,153 (May 21, 2020);

2. *PJM Interconnection, L.L.C.,* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket Nos. EL19-58-001 and ER19-1486-001, 172 FERC ¶ 62,029 (July 20, 2020); and

---

[1] *Norwood v. FERC*, 906 F.2d 772, 775 (D.C. Cir. 1990) (requiring an aggrieved party to file a request for rehearing at FERC prior to a petition for review in appellate court).

3. *PJM Interconnection, L.L.C.*, Order Addressing Arguments Raised on Rehearing, Docket Nos. EL19-58-001 and ER19-1486-001, 173 FERC ¶ 61,123 (Nov. 3, 2020).

To achieve the most efficient use of the Court's resources, as well as to maintain consistency in its decisions, this Court will generally consolidate "all petitions for review of agency orders entered in the same administrative proceeding," as well as "cases involving essentially the same parties or the same, similar, or related issues."[2]  The administrative proceedings under FERC Docket Nos. EL19-58 and ER19-1486 concern PJM Interconnection, L.L.C.'s proposal to effectuate enhanced price formation in the reserve markets.  Petitioners hereby request consolidation of all appeals of Respondent's Orders under these administrative dockets to promote efficiency and consistency.

Respectfully submitted,

*/s/ Robert A. Weishaar, Jr.*
Robert A. Weishaar, Jr.
McNees Wallace & Nurick LLC
1200 G. Street, NW, Suite 800
Washington, DC 20005
202-898-0688
bweishaar@mcneeslaw.com

Kenneth R. Stark
McNees Wallace & Nurick LLC
100 Pine Street
Harrisburg, PA 17101
717-237-5378

---

[2] D.C. Cir. Handbook of Practice and Internal Procedures at 24 ("Handbook"); *see also*, Fed. R. App. P. 3(b)(2).

kstark@mcneeslaw.com

Counsel for the PJM Industrial Customer Coalition, and on behalf of other Petitioners

Gerit F. Hull
Deputy General Counsel
for Regulatory Affairs
American Municipal Power, Inc.
1111 Schrock Rd, Suite 100
Columbus, OH 43229
(614) 540-0852
ghull@amppartners.org

Counsel for American Municipal Power, Inc.

Delia Patterson
Senior Vice President, Advocacy & Communications and General Counsel
John E. McCaffrey
Senior Regulatory Counsel
American Public Power Association
2451 Crystal Drive
Suite 1000
Arlington, VA 22202
(202) 467-2900
dpatterson@publicpower.org
jmccaffrey@publicpower.org

Counsel for the American Public Power Association

Regina A. Iorii (De. Bar No. 2600)
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 4th Floor
Wilmington, DE 19801
(302) 577-8159
regina.iorii@delaware.gov

In the Capacity of Counsel to the Delaware Division of the Public Advocate Only

William F. Fields
Deputy People's Counsel
Maryland Office of People's Counsel
6 St. Paul St., Suite 2102
Baltimore, MD 21202
410-767-8150
William.fields@maryland.gov

Maryland Office of People's Counsel

Stefanie Brand
NEW JERSEY DIVISION OF RATE
COUNSEL
240 East Front Street, 4th Floor
P.O. Box 003
Trenton, NJ 08625

Scott H. Strauss
Stephen C. Pearson
Amber L. Martin Stone
SPIEGEL & MCDIARMID LLP
1875 Eye Street NW
Suite 700
Washington, DC 20006

Attorneys for the New Jersey
Division of Rate Counsel

Tanya J. McCloskey
Acting Consumer Advocate
555 Walnut St.
5th Floor Forum Place
Harrisburg, PA 17101-1923
717-783-5048
tmccloskey@paoca.org

Pennsylvania Office of Consumer
Advocate

Dated:  May 7, 2021

Karen R. Sistrunk
Deputy People's Counsel
Anjali G. Patel
Assistant People's Counsel
Office of the People's Counsel for
  the District of Columbia
1133 15th Street, N.W., Suite 500
Washington, DC 20005-2710
202-261-1182
apatel@opc-dc.gov

Office of the People's Counsel for the
District of Columbia

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| American Municipal Power, Inc. | ) | |
| American Public Power Association | ) | |
| Delaware Division of the Public Advocate | ) | |
| Maryland Office of People's Counsel | ) | Case No. <u>21-1117</u> |
| New Jersey Division of Rate Counsel | ) | |
| Office of the People's Counsel for the | ) | |
|   District of Columbia | ) | |
| Pennsylvania Office of Consumer Advocate | ) | |
| PJM Industrial Customer Coalition | ) | |
|       Petitioners, | ) | |
| v. | ) | |
| Federal Energy Regulatory Commission, | ) | |
|       Respondent. | ) | |

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure ("FRAP") and D.C. Circuit Rule 26.1, Petitioners hereby submit their respective corporate disclosure statements. Petitioners represent a broad array of consumer-side stakeholders, including official state consumer advocates, cooperatives, municipals, and industrials located within the service territory of PJM Interconnection, L.L.C. ("PJM"). Petitioners were active participants in the Commission proceedings in which the orders subject to review were issued and sought rehearing of the Commission's November 12 Order on Compliance. Petitioners and/or the stakeholders they represent are subject to, and will be affected by, the orders under review.

6

## CORPORATE DISCLOSURE STATEMENT OF
## AMERICAN MUNICIPAL POWER, INC.

American Municipal Power, Inc. ("AMP") is a non-profit Ohio corporation organized in 1971. AMP has 135 members, including 134 member municipal electric systems in the states of Ohio, Pennsylvania, Michigan, Virginia, Kentucky, West Virginia, Indiana, and Maryland, and the Delaware Municipal Electric Corporation, a joint action agency with nine members that is headquartered in Smyrna, Delaware. AMP provides wholesale energy supply and related services to its members. AMP issues no stock, has no parent corporation, and is not owned in whole or in part by any publicly held corporation.

## CORPORATE DISCLOSURE STATEMENT OF
## THE AMERICAN PUBLIC POWER ASSOCIATION

The American Public Power Association ("APPA") has no parent corporation or publicly traded stock.  APPA is the national trade association representing the interests of not-for-profit, state, municipal, and other locally owned electric utilities in the United States.

## CORPORATE DISCLOSURE STATEMENT OF
## THE DELAWARE DIVISION OF THE PUBLIC ADVOCATE

The Delaware Division of the Public Advocate is a governmental entity that does not issue any stock and is therefore not subject to the corporate disclosure statement requirement of Rule 26.1 of the Federal Rules of Appellate Procedure.

## CORPORATE DISCLOSURE STATEMENT OF
## THE MARYLAND OFFICE OF PEOPLE'S COUNSEL

The Maryland Office of People's Counsel ("MD OPC") is a governmental entity that does not issue any stock and is therefore not subject to the corporate disclosure statement requirement of Rule 26.1 of the Federal Rules of Appellate Procedure.

## CORPORATE DISCLOSURE STATEMENT OF
## THE NEW JERSEY DIVISION OF RATE COUNSEL

The New Jersey Division of Rate Counsel is a governmental entity that does not issue any stock and thus is not subject to the corporate disclosure statement requirement of Rule 26.1 of the Federal Rules of Appellate Procedure.

## CORPORATE DISCLOSURE STATEMENT OF THE
## OFFICE OF THE PEOPLE'S COUNSEL FOR THE DISTRICT OF
## COLUMBIA

The Office of the People's Counsel for the District of Columbia ("DC OPC"), is a governmental entity that does not issue any stock and is therefore not subject to the corporate disclosure statement requirement of Rule 26.1 of the Federal Rules of Appellate Procedure.

## CORPORATE DISCLOSURE STATEMENT OF
## THE PENNSYLVANIA OFFICE OF CONSUMER ADVOCATE

The Pennsylvania Office of Consumer Advocate ("PA OCA") is a governmental entity that does not issue any stock and thus is not subject to the corporate disclosure statement requirement of Rule 26.1 of the Federal Rules of Appellate Procedure.

## CORPORATE DISCLOSURE STATEMENT OF
## THE PJM INDUSTRIAL CUSTOMER COALITION

The PJM Industrial Customer Coalition ("PJMICC") is an *ad hoc* association of large industrial and commercial end-users of electricity in the PJM Interconnection, L.L.C., region operated for the purposes of representing the interests of large energy consumers.  PJMICC is not a corporation.  PJMICC does not issue securities to the public and is not owned by any publicly held company.

Respectfully submitted,

McNEES WALLACE & NURICK LLC

/s/  Robert A. Weishaar, Jr.

By: _____

Robert A. Weishaar, Jr.
1200 G Street, NW, Suite 800
Washington, D.C. 20005
Phone: (202) 898-0688
Fax: (717) 260-1765
E-mail: bweishaar@mcneeslaw.com

Counsel for the PJM Industrial Customer Coalition, and on behalf of other Petitioners

Dated:  May 7, 2021

# CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2021, a copy of the foregoing Petition for Review was served by e-mail upon each person designated on the official service list maintained by the Secretary of the Federal Energy Regulatory Commission in the proceedings below.  A file-stamped copy of the Petition for Review will be served upon Respondent, pursuant to 18 C.F.R. § 385.2012 (1995), as follows:

Honorable Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First St., NE
Washington, DC 20426

Robert H. Solomon, Solicitor
Office of the Solicitor
Federal Energy Regulatory Commission
888 First St., NE, Room 9A-01
Washington, DC 20426

/s/  Robert A. Weishaar, Jr.

By: _____

Robert A. Weishaar, Jr.
1200 G Street, NW, Suite 800
Washington, D.C. 20005
Phone:  (202) 898-0688
Fax:  (717) 260-1765
E-mail: bweishaar@mcneeslaw.com

Counsel for the PJM Industrial Customer Coalition, and on behalf of other Petitioners

Dated:  May 7, 2021

## SERVICE LIST

Abraham Silverman. Assistant
General Counsel
Neal Fitch, Dir. East Regulatory
Affairs
Jennifer Hsia
NRG Power Marketing LLC
NRG Energy, Inc.
Midwest Generation
211 Carnegie Center Drive
Princeton, NJ 08540

abe.silverman@nrg.com
neal.fitch@nrgenergy.com
jennifer.hsia@nrg.com

Abram Klein, Managing Partner
Appian Way Energy Partners
25 Mount Auburn Street, Suite 400
Cambridge, MA 02138

aklein@appianwayenergy.com

Adrienne Clair
Rebecca Shelton
Thompson Coburn LLP
Old Dominion Electric Cooperative
1909 K Street NW, Suite 600
Washington, DC 20006

aclair@thompsoncoburn.com
rshelton@thompsoncoburn.com

Andrea Maucher, Public Utilities
Analyst
Delaware Division of the Public
Advocate
29 South State Street
Dover, DE 19904

andrea.maucher@delaware.gov

Andrew C. Slater, Delaware Public
Advocate
Delaware Division of the Public
Advocate
29 S. State Street
Dover, DE 19901

andrew.slater@delaware.gov

Arnold G Simpson, Utilities
Finance Manager
City of Manassas, Virginia
Virginia Municipal Electric
Association No. 1
8500 Public Works Dr.
Manassas, VA 20110

gsimpson@manassasva.gov

Arthur Iler, Deputy Consumer
Counsel – Fede
Indiana Office of Utility Consumer
Counselor
115 W Washington St.
Ste 1500 South
Indianapolis, IN 46204

ailer@oucc.in.gov

Aspassia Staevska, Assistant
Counsel
Pennsylvania Public Utility
Commission
400 North Street
Harrisburg, PA 17120

astaevska@pa.gov

Ben Norris, Senior Counsel
American Petroleum Institute
200 Massachusetts Ave., NW
Washington, DC 20001

norrisb@api.org

Brian Kauffman, Manager of
Regulatory Affairs
Enel X North America, Inc.
One Marina Park Drive, Suite 400
Boston, MA 02210

brian.kauffman@enel.com

Brian Vayda, Executive Director
PPANJ
1 Ace Road
Butler, NJ 07405

bvayda@ppanj.net

Casey Roberts, Senior Attorney
Sierra Club
1536 Wynkoop St, Suite 200
Denver, CO 80202

casey.roberts@sierraclub.org

Charles Bayless, Associate General
Counsel
Brenda Lynam, Legal
North Carolina Electric
Membership Corporation
3400 Sumner Boulevard
PO Box 27306
Raleigh, NC 27611-7306

charlie.bayless@ncemcs.com
brenda.lynam@ncemcs.com

Chloe Cromarty, Compliance
Manager
Mercuria Energy America, Inc.
20 E. Greenway Plaza, Suite 650
Houston, TX 77046

ccromarty@mercuria.com

Christine Ericson, Special Assistant
Attorney General
William VanderLaan
Illinois Commerce Commission
160 N. LaSalle St., Suite C-800
Chicago, IL 60601

Christine.Ericson@illinois.gov
bill.vanderlaan@illinois.gov

Christopher Wilson, Director,
Federal Regulatory A
Carrie H Allen, Assistant General
Counsel
Exelon Corporation
101 Constitution Ave, NW
Suite 400E
Washington, DC 20001

FERCe-filings@exeloncorp.com
carrie.allen@exeloncorp.com

Chuck Dugan, Director, Federal
and RTO Regu
East Kentucky Power Cooperative,
Inc.
4775 Lexington Road
Winchester, KY 40391

chuck.dugan@ekpc.coop

Craig Glazer, V.P., Federal Gov't
Policy
Ryan Collins, Attorney
Paul Michael Flynn
Wright & Talisman, PC
PJM Interconnection, L.L.C.
1200 G Street, N.W., Suite 600
Washington, DC 20005

CRAIG.GLAZER@PJM.COM
collins@wrightlaw.com
flynn@wrightlaw.com

Cynthia Holland
Joseph DeLosa, III, FERC
Specialist
New Jersey Board of Public
Utilities
44 South Clinton Avenue
Trenton, NJ 08625-0350

Cynthia.Holland@bpu.nj.gov
joseph.delosa@bpu.nj.gov

Damon Xenopoulos, Principal
Laura W Baker
Stone Mattheis Xenopoulos &
Brew, PC
Steel Producers
1025 Thomas Jefferson Street NW
Suite 800 West
Washington, DC 20007

dex@smxblaw.com
lwb@smxblaw.com

Daniel Frank, Partner
Allison Speaker
Eversheds Sutherland (US) LLP
East Kentucky Power Cooperative,
Inc.
700 Sixth Street NW, Suite 700
Washington, DC 20001-3980

DanielFrank@eversheds-sutherland.com
AllisonSpeaker@eversheds-sutherland.com

David Evrard, Assistant Consumer
Advocate
Pennsylvania Office of Consumer
Advocate
555 Walnut St Fl 5
Harrisburg, PA 17101

devrard@paoca.org

Debra Raggio, Sr. VP, Regulatory
Talen Energy Corporation
Talen Energy Marketing, LLC
117 Oronoco Street
Alexandria, VA 22314

debra.raggio@talenenergy.com

Denise Goulet, Partner
Sean Beeny, Attorney
McCarter & English, LLP
North Carolina Electric
Membership Corporation
1301 K Street N.W
Suite 1000 West
Washington, DC 20005

dgoulet@mccarter.com
sbeeny@mccarter.com

Elise Caplan, EMRI Coordinator
American Public Power Association
8119 Lilly Stone Drive
Bethesda, MD 20817-4570

ecaplan@eliseenergy.com

Eugene Grace, Regulatory Attorney
American Wind Capital Company,
LLC
American Wind Energy Assoc.
1501 M St NW, Ste 1000
Washington, DC 20005

ggrace@awea.org

Evan Dean, Attorney
Morgan Parke, Attorney
Sharon Noewer
The FirstEnergy Utility Companies
76 S. Main St.
Akron, OH 44224

edean@firstenergycorp.com
mparke@firstenergycorp.com
slnoewer@firstenergycorp.com

Frederick Heinle, Assistant
People's Counsel
Anjali G Patel
Office of the People's Counsel for
the District of Columbia
1133 15th Street, N.W., Suite 500
Washington, DC 20111

fheinle@opc-dc.gov
apatel@opc-dc.gov

George Cannon
John White
J. Porter Wiseman, Attorney
Akin Gump Strauss Hauer & Feld
LLP
First Energy Solutions Corp.
1333 New Hampshire Ave. NW
Washington, DC 20036

ccannon@akingump.com
whitej@akingump.com
jwiseman@akingump.com

Glen Thomas
Diane L. Slifer
PJM Power Providers Group
1060 First Avenue, Suite 400
King of Prussia, PA 19406

gthomas@gtpowergroup.com.
dslifer@gtpowergroup.com

Gregory Carmean, Executive
Director
Organization of PJM States, Inc.
249 East Main Street
Newark, DE 19711

greg@opsi.us

Hesser McBride, Jr.
Cara Lewis, Managing Counsel,
Federal Regulation
PSEG Companies
80 Park Plaza
Newark, NJ 07102

hesser.mcbride@PSEG.com
cara.lewis@pseg.com

Bobby Lipscomb, Staff Attorney
West Virginia Consumer Advocate
Consumer Advocate Div / WV
Public Serv. Comm.
300 Capitol Street, Suite 810
Charleston, WV 25306

blipscomb@cad.state.wv.us

James G Davis, Electric Market
Policy Consult
Dominion Energy & Dominion
Generation
701 East Cary Street
OJRP 5th Floor
Richmond, VA 23219

james.g.davis@dominionenergy.com

James Horwood, Partner
Stephen C. Pearson, Attorney
E-Service
Spiegel & McDiarmid LLP
Virginia Municipal Electric
Association No. 1
1875 Eye Street, N.W., Suite 700
Washington, DC 20006

james.horwood@spiegelmcd.com
steve.pearson@spiegelmcd.com
eService@spiegelmcd.com

Jason C Barker, ESQ, VP, Energy
Policy
Exelon Corporation
Constellation Energy Group Inc.
111 Market Place, Suite 500
Baltimore, MD 21202

jason.barker@constellation.com

Jay Kumar, Economics and
Technical Consultants, Inc.
Delaware Municipal Electric
Corporation, Inc.
6241 Executive Blvd.
Rockville, MD 20852

jkumar@etcinc.biz

Jeffery Dennis, General Counsel,          jdennis@aee.net
Regulatory Affairs
Advanced Energy Economy
1000 Vermont Ave. NW, Suite 300
Washington, DC 20005

Jeffrey Mayes, General Counsel            jeffrey.mayes@monitoringanalytics.com
Suzette N Krausen, Executive              Suzette.Krausen@monitoringanalytics.com
Assistant                                 Joseph.Bowring@monitoringanalytics.com
Joseph Bowring
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Valley Forge Corporate Center
Eagleville, PA 19403

Jennifer Tribulski, Senior Counsel        jennifer.tribulski@pjm.com
Thomas DeVita                             thomas.devita@pjm.com
PJM Interconnection, L.L.C.
2750 Monroe Boulevard
Audubon, PA 19403

Jessica Cano, Senior Counsel              jacano@aep.com
AEP Service Corporation
1 Riverside Plaza
Columbus, OH 43215

Jessica Miller, Managing Counsel          jessica.miller@vistracorp.com
Amanda Frazier                            Amanda.Frazier@vistraenergy.com
Vistra Energy Corp.
Dynegy Marketing and Trade, LLC
1005 Congress Avenue, Suite 750
Austin, TX 78701

Jill Barker, Counsel                      jmb@bettsandholt.com
Betts & Holt LLP
PPANJ
1101 Connecticut Ave., NW
Suite 450
Washington, DC 20036

John Brodbeck, Sr. Manager
Transmission
EDP Renewables North America
LLC
202 W Park Ave
Langhorne, PA 19047

john.brodbeck@edpr.com

John McCaffrey, Regulatory
Counsel
Delia D. Patterson, Esq., General
Counsel
American Public Power Association
2451 Crystal Drive, Suite 1000
Arlington, VA 22202

jmccaffrey@publicpower.org
dpatterson@publicpower.org

John Rohrbach
Aces Power Marketing
Southern Maryland Electric Coop.,
Inc.
4140 West 99th Street
Carmel, IN 46032

JRohrbach@acespower.com

John W Horstmann
Dayton Power and Light Company,
The
315 Buckwalter Rd
Phoenixville, PA 19460

john.horstmann@aes.com

Jonathan Rund, Associate General
Counsel
Matthew Crozat, Senior Director,
Business Poli
Nuclear Energy Institute
1201 F Street, NW, Suite 1100
Washington, DC 20004

jmr@nei.org
mpc@nei.org

Joseph Nelson, Member                jbn@vnf.com
Darshana Singh, Attorney             dxs@vnf.com
Van Ness Feldman LLP
Long Island Power Authority and
its Operating Subsidiary, Long
Island Lighting Company d/b/a
LIPA
1050 Thomas Jefferson Street, NW
Washington, DC 20007


Katherine Hamilton, Principal        katherine@38northsolutions.com
Advanced Energy Management
Alliance
1200 18th Street, NW, Suite 700
Washington, DC 20036


Kenneth Irvin, Partner               kirvin@sidley.com
Christopher Polito                   cpolito@sidley.com
Sidley Austin LLP
Vistra Energy Corp.
Dynegy Marketing and Trade, LLC
1501 K St., NW
Washington, DC 20005


Kenneth R Stark                      kstark@mcneeslaw.com
Susan E Bruce                        sbruce@mcneeslaw.com
Lauren Huff, Paralegal               lhuff@ mcneeslaw.com
McNees Wallace & Nurick LLC
PJM Industrial Customer Coalition
100 Pine St
Harrisburg, PA 17101


Larry Cook                           larry.cook@ky.gov
Kentucky Attorney General
700 Capitol Ave.
Frankfort, KY 40601

Laura Chappelle                                        laurac@chappelleconsulting.net
PJM Power Providers Group
4218 Jacob Meadows
Okemos, MI 48864

Leah Buchanan, Duke Energy                             e-tariff@duke-energy.com
eTariff Account
Duke Energy Corporation
550 South Tryon Street
Charlotte, NC 28202

Lisa McAlister, Deputy General                         lmcalister@amppartners.org
Counsel - FERC/                                        cnorton@amppartners.org
Christopher J Norton, Director of
Market Regulatory
American Municipal Power, Inc.
1111 Schrock Road, Suite 100
Columbus, OH 43229

Lori Sternisha                                         lori.sternisha@puco.ohio.gov
Public Utilities Commission of OH
180 East Broad Street, 3rd Floor
Columbus, OH 43215

Margaret Comes, Senior Attorney                        comesm@coned.com
Consolidated Edison Company of
New York, Inc.
Rockland Electric Company
4 Irving Place - Room 1815-S
New York, NY 10003

Marjorie Philips, VP, Wholesale                        mphilips@lspower.com
Market Policy
Direct Energy Business, LLC
1700 Broadway, 38th Floor
New York, NY 10019

Mark MacDougall, Sr. VP and
Gene
Eugene Bradford, VP, Rates and
Energy
Southern Maryland Electric Coop.
Inc.
15035 Burnt Store Rd.
PO Box 1937
Hughesville, MD 20637

mark.macdougall@smeco.coop
Eugene.Bradford@smeco.coop

Matthew Picardi, Vice President
Shell Energy North America (US),
L.P.
36 Pinewood Ave.
Saratoga Springs, NY 12866

Matthew.Picardi@shell.com

Miles Mitchell, Deputy General
Counsel
Maryland Public Service
Commission
6 St. Paul Street
16th Floor, William Donald
Schaefer Tower
Baltimore, MD 21202

miles.mitchell@maryland.gov

Molly Suda
Duke Energy Corporation
1301 Pennsylvania Ave NW
Suite 200
Washington, DC 20004

molly.suda@duke-energy.com

Nancy Bagot, Vice President
Electric Power Supply Association
1401 New York Ave. NW, 11th Fl
Washington, DC 20005

NancyB@epsa.org

Neil Levy
LS Power Associates, L.P.
500 North Capitol Street, NW
Washington, DC 20001

nlevy@mwe.com

Noha Sidhom
Energy Trading Institute
600 Pennsylvania Ave, Suite 300
Washington, DC 20001

noha@tpcenergyfund.com

Pamela Owen, Attorney General
Paul Youchak
Attorney General of the State of
New Jersey
New Jersey Board of Public
Utilities
25 Market Street
Trenton, NJ 08611

pamela.owen@law.njoag.gov
paul.youchak@law.njoag.gov

Patrick E McCullar, President/CEO
Delaware Municipal Electric
Corporation, Inc.

pmccullar@demecinc.net

Randall Griffin, Chief Regulatory
Counsel
Dayton Power and Light Company,
The
1065 Woodman Drive
Dayton, OHIO 45432

randall.griffin@aes.com

Randolph Elliott, Partner
National Rural Electric Cooperative
Association
1301 K Street N.W.
Washington, DC 20005

relliott@mccarter.com

Randy Rismiller, Assistant
Director, Policy
Illinois Commerce Commission
527 East Capitol Avenue
Springfield, IL 62701

Randy.Rismiller@illinois.gov

Regina Iorii, Deputy Attorney
General
Ruth A. Price, Delaware Deputy
Public Advocate
Delaware Division of the Public
Advocate
Delaware Department of Justice
820 N. French Street, 4th Floor
Wilmington, DE 19801

regina.iorii@delaware.gov
ruth.price@state.de.us

Richard S Herskovitz
D.C. Public Service Commission
1333 H Street, N.W.
7th Floor, East Tower
Washington, DC 20005

rherskovitz@psc.dc.gov

Robert O'Connell, Director,
Regulatory Affairs
Panda Power Funds
1033 Squires Drive
West Chester, PA 19382

boconnell@pandafunds.com

Robert Weishaar
McNees Wallace & Nurick LLC
PJM Industrial Customer Coalition
1200 G Street, NW, Suite 800
Washington, DC 20005

bweishaar@mcneeslaw.com

Sarah Novosel, Senior VP and
Managing Counsel
Calpine Corporation
805 15th Street, NW, Suite 708
Washington, DC 20005

snovosel@calpine.com

Stefanie A. Brand, Director, NJ  sbrand@rpa.nj.gov
Division of Rate  blipman@rpa.state.nj.us
Brian Lipman, Litigation Manager  fthomas@rpa.nj.gov
Felicia Thomas-Friel, Deputy Rate  hogden@rpa.nj.gov
Counsel
Henry M. Ogden, Asst. Dep. Rate
Counsel
New Jersey Division of Rate
Counsel
140 East Front St., 4th Floor
P.O. Box 003
Trenton, NJ 08625

Stephen C. Pearson, Attorney  steve.pearson@spiegelmcd.com
Amber L Martin Stone, Associate  amber.martin@spiegelmcd.com
Scott Strauss  Scott.Strauss@spiegelmcd.com
E-Service  eService@spiegelmcd.com
Spiegel & McDiarmid LLP
New Jersey Division of Rate
Counsel
1875 Eye Street NW, Suite 700
Washington, DC 20006

Thomas Rudebusch, Partner  tlr@dwgp.com
Roberta Rothschild, Legal Assistant  RR@dwgp.com
Bhaveeta Mody  bkm@dwgp.com
Duncan, Weinberg, Genzer &
Pembroke PC
Delaware Municipal Electric
Corporation, Inc.
1667 K Street, NW, Suite 700
Washington, DC 20006

Tom Hoatson  thoatson@lspower.com
LS Power Associates, L.P.
1 Tower Center
East Brunswick, NJ 08816

Tom Rutigliano, Sr. Advocate
NRDC/FERC Project
1124 15th St. NW, Suite 300
Washington, DC 20005

trutigliano@nrdc.org

Troy Fodor
Illinois Municipal Electric Agency
3400 Conifer Drive
Springfield, IL 62711

tfodor@imea.org

Tyson Slocum, Director
Public Citizen's Energy Program
Public Citizen, Inc.
215 Pennsylvania Ave SE
Washington, DC 20003

tslocum@citizen.org

Wesley Walker, Assistant General
Counsel
Dominion Energy Services
Company, Inc.
PO Box 25615
Richmond, VA 23260-5615

wesley.walker@dominionenergy.com

William Fields, Deputy People's
Counsel
Maryland Office of People's
Counsel
6 St. Paul St., Ste 2102
Baltimore, MD 21202

william.fields@maryland.gov

# EXHIBIT A

173 FERC ¶ 61,134
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  James P. Danly; Chairman
                       Neil Chatterjee and Richard Glick.

PJM Interconnection, L.L.C.                    Docket Nos.  EL19-58-002
                                                           EL19-58-003

ORDER ON COMPLIANCE

(Issued November 12, 2020)

1.      On May 21, 2020, the Commission issued an order finding unjust and
unreasonable provisions of PJM Interconnection, L.L.C.'s (PJM) Open Access
Transmission Tariff (Tariff) and the Amended and Restated Operating Agreement of
PJM Interconnection, L.L.C. (Operating Agreement) governing PJM's market for
reserves, establishing the just and reasonable replacement rate, and directing PJM to
make a compliance filing to implement that replacement rate.[1]  The May 2020 Order also
found unjust and unreasonable provisions of the Tariff governing the determination of the
energy and ancillary services offset (E&AS Offset) used in PJM's capacity market,
established a forward-looking E&AS Offset as the just and reasonable replacement rate,
and directed PJM to make a compliance filing to implement that replacement rate.[2]

2.      PJM submitted two filings to comply with the Commission's directives in the May
2020 Order.  On July 6, 2020, PJM submitted a compliance filing containing revisions to
its Tariff and Operating Agreement detailing rules for resource eligibility to provide
reserves, the determination of reserve capability for certain types of resources, and the
removal of caps on demand response resource participation in reserve markets, as well as

---

[1] *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,153, at P 2 (2020) (May 2020
Order).  *PJM Interconnection, L.L.C.*, Notice of Denial of Rehearings by Operation of
Law and Providing for Further Consideration, 172 FERC ¶ 62,029 (2020), issued in
accordance with *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).
The Commission subsequently issued an order addressing arguments on rehearing in
*PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,123 (2020) (modifying the discussion in
the May 2020 Order and reaching the same result).  A number of petitions for review
have been filed in the U.S. Court of Appeals for the District of Columbia Circuit relating
to the Commission's prior orders in this proceeding.

[2] *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,153 at P 2.

Document Accession #: 20201112-3074   Filed Date: 11/12/2020

proposing an implementation schedule.[3]  On August 5, 2020, PJM submitted a compliance filing containing revisions to its Tariff to incorporate a forward-looking E&AS Offset beginning with the Base Residual Auction (BRA) for the delivery year that commences June 1, 2022.[4]

3.      In this order, we accept PJM's First Compliance Filing and establish an effective date of May 1, 2022, for PJM's reserve market reforms that were accepted in the May 2020 Order and those that are accepted herein, as discussed below.  We also accept PJM's Second Compliance Filing, to be effective as of the date of this order, and require PJM to file, within 15 days of the date of this order, a revised tariff to include revisions to its methodology to model the energy revenues of nuclear resources, with resource outages based on class averages, as shown in Appendix B of this order.

## I.    **Background**

4.      On March 29, 2019, PJM submitted filings pursuant to Federal Power Act (FPA) sections 205 and 206,[5] asserting that the reserve market provisions of its Tariff and Operating Agreement are unjust and unreasonable, and proposing revisions to the Tariff

---

[3] PJM Interconnection, L.L.C., First Compliance Transmittal, Docket No. EL19-58-002 (Jul. 6, 2020) (PJM First Compliance Transmittal or First Compliance Filing).  For purposes of this filing, capitalized terms not defined herein shall have the meaning as contained in the Tariff and the Operating Agreement.  All references to the Tariff provisions shall be meant to reference the identical provisions in the Operating Agreement, sched. 1.

[4] PJM Interconnection, L.L.C., Second Compliance Transmittal, Docket No. EL19-58-003 (Aug. 5, 2020) (PJM Second Compliance Transmittal or Second Compliance Filing); *see also* PJM, Informational Filing with Indicative Values for Energy & Ancillary Serv. Offset, Transmittal, Docket No. EL19-58-003, at 1 (filed Aug. 19, 2020) (PJM Informational Transmittal).

[5] 16 U.S.C. §§ 824d-824e.  PJM filed the proposed revisions to the PJM, Intra-PJM Tariffs, Operating Agreement, pursuant to section 206 of the FPA in Docket No. EL19-58-000 and filed pursuant to section 205 of the FPA to include the same revisions to the PJM, Intra-PJM Tariffs, Tariff, Attach. K-App., in Docket No. ER19-1486-000.  16 U.S.C. §§ 824d-824e.  Because PJM does not have unilateral authority to file revisions to its Operating Agreement pursuant to section 205, its section 205 filing was subject to the requirements of section 206 of the FPA.  16 U.S.C. §§ 824d-824e.  *See* PJM Interconnection, L.L.C., Enhanced Price Formation in Reserve Markets of PJM, Docket No. EL19-58-000 (Mar. 29, 2019) (PJM March 2019 Transmittal); *see also* PJM Interconnection, L.L.C., Enhanced Price Formation in Reserve Markets of PJM, Docket No. ER19-1486-000 (Mar. 29, 2019).

Document Accession #: 20201112-3074      Filed Date: 11/12/2020

and Operating Agreement as a just and reasonable replacement rate.[6] PJM explained that reliable electric service requires sufficient reserves to be procured to meet the minimum reserve requirements (MRR) established by the North American Electric Reliability Corporation (NERC) Reliability Standard BAL-002[7] and to adequately prepare for real-time operational uncertainties, such as deviations of load, resource availability and performance, and interchange from forecast values.[8] PJM provided evidence that because it is consistently and regularly unable to procure sufficient reserves within-market, its operators must procure additional reserves outside the market or bias the inputs to market software as a result of serious design flaws and shortcomings in PJM's reserve market.[9] Although the actions of PJM's operators reduce potential threats to reliability of the bulk-power system, PJM stated that market prices do not reflect the marginal cost of providing reserves.[10]

5.      Specifically, PJM provided record evidence that its existing reserve market design and reserve rates are unjust and unreasonable because: (1) the Synchronized Reserve product definition leads to under-compensation and poor performance as it is subdivided into Tier 1[11] and Tier 2[12] reserve products with disparate rules for commitment, compensation, and non-performance penalties; (2) the Operating Reserve Demand Curves (ORDCs) fail to address uncertainties around load, wind and solar forecasts, and unanticipated supply resource outages, which require PJM operators to frequently bias their scheduling of supply resources and take out-of-market actions not reflected in market prices to preserve reliability; (3) reserve market clearing prices do not reflect the

---

[6] May 2020 Order, 171 FERC ¶ 61,153 at P 1.

[7] *Id.* PP 4, 6-7 (citing PJM Transmittal, Docket No. EL19-58-000 *et al.* at 2-3). N. Am. Elec. Reliability Corp., Standard BAL-002 – Disturbance Control Performance (2019). NERC BAL-002 requires a responsible entity, such as PJM, to maintain sufficient reserves to respond to the loss of the largest single contingency on its system within 15 minutes. May 2020 Order, 171 FERC ¶ 61,153 at P 3 & n.3.

[8] May 2020 Order, 171 FERC ¶ 61,153 at PP 3, 35.

[9] *Id.* PP 35, 77, 79-80.

[10] *Id.* P 81.

[11] Tier 1 reserves represent the headroom on an online resource that could be converted to energy within 10 minutes based on the resource's current dispatch point and ramp rate. *Id.* at P 4.

[12] Tier 2 reserves are provided by resources that, absent the need for additional reserves, would be dispatched to their profit-maximizing output for energy. *Id.* P 4.

PJM system's true demand for reserves and do not reflect the operational value of flexibility; (4) the Reserve Penalty Factor of $850/MWh for Synchronized Reserves is below the legitimate opportunity cost some resources could face in shortage or near-shortage conditions, as a result of the $2,000/MWh energy offer price cap; and (5) the misalignment of reserve products between the day-ahead and real-time markets leads to inadequate procurement of forward reserves and inefficient commitment and pricing outcomes.[13]

6.      PJM proposed a replacement rate design that would:  (1) consolidate the Tier 1 and Tier 2 reserve products into one Synchronized Reserve product with uniform commitment, compensation, and non-performance penalty structures; (2) establish Reserve Penalty Factors of $2,000/MWh to align with the maximum price-setting energy offer cap of $2,000/MWh to better reflect the marginal cost of providing reserves and send appropriate price signals to Market Sellers; (3) revise the shape of the ORDCs to be based on a probabilistic calculation of the risk of a reserve shortage due to operational uncertainties; and (4) align reserve procurement in the day-ahead and real-time markets by establishing two 10-minute Reserve requirements (Synchronized Reserve Requirement and Primary Reserve Requirement) and one 30-minute Reserve requirement (30-minute Reserve Requirement) in each market.[14]

7.      In the May 2020 Order, the Commission found that PJM's existing reserve market design set forth in its Tariff and Operating Agreement is unjust and unreasonable because it is "systematically failing to acquire within-market the reserves necessary to operate its system reliably, to yield market prices that reasonably reflect the marginal cost of procuring necessary reserves, and to send appropriate price signals for efficient resource investment."[15]  The Commission also found that PJM also demonstrated "that the reserve products it procures in the day-ahead and real-time markets produce poor incentives for resource performance and inhibit efficient procurement of the types of reserves needed to address various operational uncertainties."[16]

8.      The Commission accepted PJM's proposed replacement rate, subject to a compliance filing, and directed PJM to include additional language in its Tariff and Operating Agreement to provide clarity on the process by which PJM determines reserves, including how PJM will determine resource eligibility to provide reserves, provide for a process whereby Market Sellers can work with PJM to establish reserve

---

[13] *Id.* P 8.

[14] *Id.* P 9.

[15] *Id.* P 74.

[16] *Id.*

capability for resources that use different configuration types or duct burners and remove the existing cap on demand response resource participation in the reserve markets.[17]

9.    In addition, the Commission found that an aspect of PJM's capacity market—the backward-looking E&AS Offset—was unjust and unreasonable as a result of the reforms implemented in the PJM reserve market. The Commission established a forward-looking E&AS Offset as the just and reasonable replacement rate and directed PJM to submit a compliance filing.[18]

10.    The Commission directed PJM to propose an effective date to implement the revisions accepted in the May 2020 Order and the revisions that are the subject of this order. The Commission stated that the effective date should take into account necessary software changes, and it should be harmonized with ongoing revisions in Docket Nos. EL16-49-000, et al.[19] The Commission determined it would set the effective date for the Tariff and Operating Agreement revisions in this order.[20]

## II.    **Notice of Filings and Responsive Pleadings**

11.    On June 25, 2020, PJM submitted a request for a 30-day extension until August 5, 2020, to submit a forward-looking E&AS Offset.[21] On July 1, 2020, the Commission granted PJM's request.[22]

12.    On July 6, 2020, PJM submitted, in accordance with the May 2020 Order, reserve market modifications to its Tariff and Operating Agreement. PJM proposed an effective date of May 1, 2022, for both the reserve market changes accepted in the May 2020 Order and the revisions set forth in its July 6, 2020, compliance filing.[23] PJM further

---

[17] *Id.* PP 2, 22, 272-273, 278.

[18] *Id.* PP 2, 22, 308.

[19] *Id.* P 2.

[20] *Id.*

[21] PJM, Motion for Extension of Time and Shortened Comment Period, Docket Nos. EL19-58-000, et al. (filed Jun. 25, 2020).

[22] PJM, Notice of Extension of Time, Docket Nos. EL19-58-000, et al. (Ju1. 1, 2020).

[23] PJM, First Compliance Transmittal, Docket No. EL19-58-002, at 1 (filed Jul. 6, 2020).

proposed to implement the directed forward-looking E&AS Offset beginning in the BRA for the delivery year starting June 1, 2022.[24]

13.    Notice of PJM's First Compliance Filing was published in the *Federal Register*, 85 Fed. Reg. 43,577 (Jul. 17, 2020), with protests and interventions due on or before July 27, 2020.

14.    Timely filed motions to intervene were submitted by Calpine Corporation, NRG Power Marketing LLC and Midwest Generation LLC, and the Monitoring Analytics, LLC in its capacity as the Independent Market Monitor for PJM (the IMM).[25]  Comments and/or protests were timely filed by PJM Power Providers Group and Electric Power Supply Association (P3/EPSA); in addition, PSEG[26] and the IMM submitted late-filed comments and/or protests.  Answers to comments and protests were filed by the Organization of PJM States, Inc. (OPSI), the PJM Load/Customer Coalition (PJM Load Coalition),[27] and PJM.  The IMM filed an answer to PJM's answer.

15.    On August 5, 2020, PJM submitted revisions to its capacity market to incorporate a forward-looking E&AS Offset, consistent with the 30-day extension granted by the Commission.[28]

---

[24] *Id.*

[25] For a listing of previously granted interventions in this proceeding, *see* May 2020 Order, 171 FERC ¶ 61,153 at App. B.

[26] PSEG is comprised of PSEG Power LLC, PSEG Energy Resources & Trade LLC, and Public Service Electric and Gas Company.

[27] The PJM Load Coalition is comprised of the following:  American Municipal Power, Inc., American Public Power Association, District of Columbia Office of the People's Counsel, District of Columbia Public Service Commission, Indiana Office of Utility Consumer Counsel, Kentucky Office of the Attorney General, Maryland Office of People's Counsel, New Jersey Board of Public Utilities, New Jersey Division of Rate Counsel, Pennsylvania Office of Consumer Advocate, PJM Industrial Customer Coalition, Public Power Association of New Jersey, Southern Maryland Electric Cooperative, Inc., and Delaware Division of the Public Advocate.

[28] PJM Second Compliance Transmittal, Docket No. EL19-58-003 (filed Aug. 5, 2020).

16.     Notice of PJM's Second Compliance Filing was published in the *Federal Register*, 85 Fed. Reg. 50,018 (Aug. 17, 2020) with interventions and protests due on or before August 26, 2020.

17.     On August 18, 2020, the Public Interest Organizations[29] filed a request for an extension of time to file comments.  On August 25, 2020, the comment date was extended to and including September 2, 2020.

18.     Comments and/or protests were filed in the proceeding by EPSA, Exelon Corporation (Exelon), P3, Clean Energy Associations (CEA),[30] the Public Interest and Customer Organizations (PICOs),[31] PSEG, and the IMM.

19.     Answers to comments and protests were filed by PJM, Exelon, jointly by PSEG and Exelon, and the IMM.

20.     On August 19, 2020, PJM filed indicative E&AS Offset and Net Cost of New Entry (Net CONE) values for various resource types.  According to PJM, these values are indicative based on the latest published and publicly available forward prices at that time. PJM further stated these values would be revised using updated forward prices, consistent with its proposed methodology, prior to the upcoming BRA for the 2022/2023 Delivery Year, so that the projected E&AS Offset would reflect the most up-to-date forward prices.[32]

---

[29] This filing was submitted by the Sierra Club, the Natural Resources Defense Council, the Sustainable FERC Project, the Office of the People's Counsel for the District of Columbia, the Maryland Office of the People's Counsel, and the Delaware Division of the Public Advocate.

[30] CEA members include the American Wind Energy Association, the Solar Energy Industries Association, and the Solar Council.

[31] PICOs' members include the Sierra Club, NRDC, the Sustainable FERC Project, the Office of the People's Counsel for the District of Columbia, the Maryland Office of the People's Counsel, the Delaware Division of the Public Advocate, the PJM Industrial Customer Coalition, the Pennsylvania Office of Consumer Advocate, and the New Jersey Division of Rate Counsel.

[32] PJM Informational Transmittal at 1.

## III.    Discussion

### A.    Procedural Matters

21.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2020), the timely, unopposed motions to intervene serve to make the entities that filed them parties to the proceedings in which they were filed.

22.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2020), prohibits an answer to a protest or answer unless otherwise ordered by the decisional authority. We accept the answers filed by OPSI, the PJM Load Coalition, PJM, and the IMM in Docket No. EL19-58-002 and the answers of Exelon, PJM, and PSEG/Exelon in Docket No. EL19-58-003 because they have provided information that assisted us in our decision-making process. We reject the answer of the IMM in Docket No. EL19-58-003.

### B.    Substantive Matters

23.    We accept PJM's First Compliance Filing, as discussed below. We also accept PJM's Second Compliance filing, subject to a modification to the methodology to model the energy revenues of nuclear resources. In PJM's answer to the Second Compliance Filing, PJM agreed that it could revise its methodology to model the energy revenues of nuclear resources, with resource outages based on class averages. We conclude that such an approach will better reflect nuclear refueling schedules and direct PJM to make a further compliance filing within 15 days of the date of this order to effectuate this revision, as explained below.

24.    We accept PJM's First Compliance Filing and establish an effective date of May 1, 2022, for PJM's reserve market reforms that were accepted in the May 2020 Order and those that are accepted herein, as discussed below. We also accept PJM's Second Compliance Filing, to be effective as of the date of this order, and require PJM to file, within 15 days of the date of this order, a revised tariff to include the changes regarding the nuclear refueling issue in Appendix B of this order.

25.    We address each of the contested issues below.

#### 1.    Reserve Eligibility

##### a.    Commission Directives

26.    In accepting PJM's proposed replacement rate in the May 2020 Order, the Commission directed PJM to revise its Tariff to contain clear provisions on "(1) resource classes that PJM has designated as incapable of providing reserves, for each reserve product; (2) the exemption process PJM will use to determine reserve eligibility if a

resource is automatically deselected from providing reserves; and (3) the process by which PJM will communicate this information and determination to the Market Seller."[33]

### b.      Default Rule

### i.      PJM's Compliance Filing

27.      PJM has updated its Tariff and Operating Agreement[34] to describe which resources may provide Synchronized Reserves,[35] Non-Synchronized Reserves,[36] and Secondary Reserves.[37] PJM has established a default rule that "nuclear, wind or solar unit[s] are

---

[33] May 2020 Order, 171 FERC ¶ 61,153 at P 272.

[34] PJM First Compliance Transmittal at 3.

[35] *Id.*; *see also* Proposed Operating Agreement, sched. 1, § 1.7.19A(a) ("*Synchronized Reserve can be supplied from generation resources and/or Economic Load Response Participant resources* located within the metered boundaries of the PJM Region. *A resource is not eligible to provide Synchronized Reserve if its entire output has been designated as emergency energy* or if the resource is a nuclear, wind, or solar unit, unless the Market Seller of such a resource has obtained written approval from the Office of the Interconnection to provide Synchronized Reserves.").

[36] PJM First Compliance Transmittal at 3; *see also* Proposed Operating Agreement, sched. 1, § 1.7.19A.01(a) ("Non-Synchronized Reserve shall be supplied from generation resources located within the metered boundaries of the PJM Region. A resource is not eligible to provide Non-Synchronized Reserve if Resources, the (i) its entire output of which has been designated as emergency energy, (ii) it is , and resources that are not available to provide energy, or (iii) it is a nuclear, wind, or solar unit, unless the Market Seller of such a resource has obtained written approval from the Office of the Interconnection to provide Non-Synchronized Reserves, are not eligible to provide Non-Synchronized Reserve.").

[37] PJM First Compliance Transmittal at 3; *see also* Proposed Operating Agreement, sched. 1, § 1.7.19A.02(a) ("*Secondary Reserve can be supplied from synchronized and non-synchronized generation resources and/or Economic Load Response Participant resources located within the metered boundaries of the PJM Region, as specified in the PJM Manuals. A resource is not eligible to provide Secondary Reserve if* (i) *its entire output has been designated as emergency energy,* (ii) *or if the resource* it *is not available to provide energy,* or (iii) it is a nuclear, wind, or solar unit, unless the Market Seller of such a resource has obtained written approval from the Office of the Interconnection to provide Secondary Reserves.").

Document Accession #: 20201112-3074     Filed Date: 11/12/2020

ineligible to provide these reserve products."[38]  According to PJM, these resources typically do not include a dispatchable range in their energy offers due to their inherent operating characteristics; as a result, PJM's market engines do not see any reserve capability present.  PJM states that these resources sometimes include a dispatchable range, but the resources cannot or do not intend to follow PJM's dispatch instruction.  As a result of the default categorical exclusion, PJM's market clearing engines will not consider these nuclear, wind, or solar resource offers with a dispatchable range.[39]

## ii.    Comments, Protests, and Answers

28.    The IMM argues that PJM's First Compliance Filing does not adequately define Synchronized Reserve capability.  The IMM states that, currently, some resources are either automatically or manually deselected from providing Tier 1 reserves while they are testing, released by PJM for shutdown, or providing Regulation.  The IMM argues that PJM's First Compliance Filing does not provide Tariff language for these situations, which, according to the IMM, should be documented in the rules.  The IMM also argues that PJM should explain whether these reasons for deselection will remain after the consolidation of the Tier 1 and Tier 2 reserve products.[40]

29.    In its answer to the IMM, PJM counters the IMM's argument that rules governing when resources may be deemed ineligible for providing reserves during transient operational events must be included in the Tariff.  PJM argues that because resources providing Regulation or shutting down are incapable of providing reserves, no ineligibility rules are required for such transient, operational events.  PJM states that the Commission has long recognized that there are "innumerable, reliability-related reasons to deselect a generating resource [from providing reserves] for any given hour, and all of those specific, reliability-related reasons are not 'realistically susceptible of specification'

---

[38] PJM First Compliance Transmittal at 3.

[39] *Id.* at 3-4.

[40] PJM Interconnection, L.L.C., Comments of the Independent Market Monitor for PJM, Docket No. EL19-58-002, at 6-7 (filed Jul. 28, 2020) (IMM Protest of First Compliance Filing).

in a tariff."[41]  PJM argues that the IMM's request to include these reasons in the Tariff falls into this category.[42]

30.    In its answer to PJM, the IMM reiterates that under PJM's new rules, reserve eligibility and ineligibility should be clearly defined in the Operating Agreement to ensure accurate pricing and compliance.[43]  According to the IMM, neither the PJM March 2019 Transmittal nor the First Compliance Filing includes or references any additional rules for defining exceptions to the must-offer rule for reserves.  The IMM also clarifies its position with respect to the Commission's holding in *Big Sandy*.  The IMM counters that although it supported PJM's position in the cited case, PJM's citation of that order misses the point relevant to the instant proceeding.[44]  The IMM contends that while the cited case relates to specifying a large number of rules addressing specific circumstances of individual units, the instant proceeding involves issues related to the must-offer rule, exemption from the must-offer rule, and PJM's discretion to treat resources in an "inconsistent and arbitrary" manner for the purpose of defining reserves.[45]  The IMM urges the Commission to require PJM to establish clear and transparent rules in the Tariff rather than in the PJM Manuals.[46]

### iii.    **Commission Determination**

31.    The question before the Commission in reviewing PJM's compliance filing is whether PJM justly and reasonably implements the determinations in the May 2020 Order.[47]  We find that PJM has justly and reasonably complied with the directives of the

---

[41] PJM Interconnection, L.L.C., Motion for Leave to Answer and Answer of PJM, Docket No. EL19-58-002, at 6-7 (Aug. 21, 2020) (PJM Answer to First Compliance Filing) (quoting *Big Sandy Peaker Plant, LLC v. PJM Interconnection, L.L.C.*, 154 FERC ¶ 61,216, at P 50 (2016) (*Big Sandy*)).

[42] PJM Answer to First Compliance Filing at 7.

[43] PJM Interconnection, L.L.C., Answer and Motion for Leave to Answer the Independent Market Monitor for PJM, Docket No. EL19-58-002, at 2 (Sept. 8, 2020) (IMM Answer to First Compliance Filing).

[44] IMM Answer to First Compliance Filing at 3.

[45] *Id.* at 3.

[46] *Id.*

[47] *Midcontinent Independent System Operator, Inc.*, 167 FERC ¶ 61,128, at P 12 (2019) (rejecting proposed revisions that were not necessary to comply with the remedy required by the underlying proceeding); *PJM Interconnection, L.L.C.*, 155 FERC

Document Accession #: 20201112-3074    Filed Date: 11/12/2020

May 2020 Order to revise its Tariff to contain clear provisions on resource classes that PJM has designated as incapable of providing reserves, for each reserve product. Specifically, PJM has described which resources may provide Synchronized Reserves, Non-Synchronized Reserves, and Secondary Reserves. PJM also has established a default rule that nuclear, wind or solar units are ineligible to provide these reserve products.

32.    In addition, we find that PJM has complied with the directives of the May 2020 Order to revise its Tariff to contain clear provisions on the exemption process that PJM will use to determine reserve eligibility if a resource is automatically deselected from providing reserves and the process by which PJM will communicate this information and determination to the Market Seller.[48]

33.    We reject as beyond the scope of the compliance filing the IMM's request to require PJM to include additional information in the Tariff to specify automatic or manual deselection of resources from providing reserves due to testing, shutdown, or providing Regulation.[49]  We did not require PJM to modify its existing Tariff to address all bases for deselection. Rather, the May 2020 Order directed PJM to establish categorical exclusions for certain resource types that, historically, have not provided reserves due to the inflexible nature of their operating limitations, which PJM has done on compliance.

### c.    Exemption Process and the IMM's Role

#### i.    PJM's Compliance Filing

34.    Recognizing that in some circumstances nuclear, wind, and solar resources may be able to provide reserves, PJM has developed an exemption process by which such

---

¶ 61,157, at PP 303-304 (2016) (rejecting arguments as beyond the scope of the compliance filing, "which is limited to whether PJM complied with the directives in the" underlying order); *Midwest Indep. Transmission Sys. Operator, Inc.*, 125 FERC ¶ 61,156, at P 57 n.51 (2008) ("The Commission has previously held that compliance filings must be limited to the specific directives order by the Commission. The purpose of the compliance filing is to make the directed changes and the Commission's focus in reviewing them is whether or not they comply with the Commission's previously-stated directives.").

[48] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 272.

[49] *See supra* note 47.

resources may obtain written approval from PJM to provide reserves.  The Tariff and Operating Agreement have been revised, as follows:

> To obtain such approval, the Market Seller must submit to the Office of the Interconnection and the Market Monitoring Unit a written request for exemption . . . .  The Office of the Interconnection and the Market Monitoring Unit shall review, in an open and transparent manner as between the Market Seller, the Market Monitoring Unit, and the Office of the Interconnection, the information and documentation in support of the request for approval to provide reserves . . . .  [T]he Office of the Interconnection shall determine, with the advice and input of the Marketing Monitoring Unit, whether the resource will be permitted to provide reserves and provide written notification to the Market Seller of such determination.[50]

35.    As a result, the written request must be submitted to PJM and the IMM and include documentation to support the resource's ability to follow PJM's dispatch directions in order to provide reserves to meet system demand.  PJM explains that supporting documentation includes historical operating data showing voluntary response to reserve events and/or technical information about the resource that demonstrates the resource is capable of adjusting its energy output upon instruction from PJM — i.e., ramp down output to provide reserves or ramp up output to provide energy.[51]

36.    PJM states that the IMM also will be a part of the review process as the Market Seller will submit information to both PJM and the IMM in order to keep the review process "open and transparent" as between the IMM, PJM and the Market Seller, to allow PJM and the IMM to be apprised of each other's review and to maximize the sharing of information, analysis and dialogue between PJM, the IMM and the Market Seller.[52]

---

[50] *See* Proposed Operating Agreement, sched. 1, §§ 1.7.19A(a), 1.7.19A.01(a), & 1.7.19A.02(a).

[51] PJM First Compliance Transmittal at 4-6.  PJM states that additional technical information will be included in PJM Manuals regarding a resource's ability to provide reserves.  PJM First Compliance Transmittal at 5; *see also* Proposed Operating Agreement, sched. 1, §§ 1.7.19A(a), 1.7.19A.01(a), & 1.7.19A.02(a).

[52] PJM First Compliance Transmittal at 6; *see also* Proposed Operating Agreement, sched. 1, §§ 1.7.19A(a), 1.7.19A.01(a), & 1.7.19A.02(a).

37.     PJM states that, after consulting with the IMM, it will respond to the Market Seller in writing within 30 days of receiving the request for reserve eligibility.  According to PJM, if it denies the request, it will provide a written notice of explanation.[53]

### ii.     Comments, Protests, and Answers

38.     The IMM states that the First Compliance Filing imposes inappropriate limitations on its role as the market monitor.  First, the IMM objects to the extent PJM is seeking to be included in written and oral communications between the IMM and market participants.  Second, the IMM states that it is inappropriate to constrain the communications of PJM or the IMM as proposed, as there may be a need to engage in confidential communications with market participants or each other.  Third, the IMM states that it already has a defined role and responsibility to reach and explain its decisions and will do so without PJM's proposed language.  Fourth, the IMM argues the rules should not "suggest that PJM monitors communications between [the IMM] and market participants" and that it is "not PJM's role to shield participants from oversight or arbitrate disputes over [the IMM] information requests."  The IMM states that if it or a participant has a complaint about a request or response in the review process, it can raise the complaint with the Commission.  Finally, the IMM notes that it has exclusive authority to implement the Market Monitoring Plan, Attachment M to the Tariff, which consolidates all core functions of the IMM.  The IMM asserts the proposed revisions violate Commission rules that require consolidation of all core market functions for which the IMM is responsible on one place.[54]  According to the IMM, PJM did not explain the need for this language and did not discuss it with the IMM.[55]

39.     PJM states that the IMM misinterprets the proposed Tariff language related to the reserve eligibility review process by characterizing the language as an attempt for PJM to monitor communications between the IMM and the Market Seller.  PJM contends that the IMM asserts, without evidence, that the language would somehow constrain communication of PJM or the IMM.  PJM contends that the IMM's assertion is not a reasonable reading of the proposed Tariff language.  Rather, PJM states, it is proposing Tariff language in order for PJM and the IMM to keep each other apprised of its respective review.  PJM explains this is intended to ensure transparency between PJM,

---

[53] *Id.*

[54] IMM Protest of First Compliance Filing at 13-14, referencing 18 C.F.R. § 35.28(g)(3)(i)(F); *see also* Proposed Operating Agreement, sched. 1, §§ 1.7.19A(a), 1.7.19A.01(a), & 1.7.19A.02(a).

[55] IMM Protest of First Compliance Filing at 13; *see also* Proposed Operating Agreement, sched. 1, §§ 1.7.19A(a), 1.7.19A.01(a), & 1.7.19A.02(a).

Document Accession #: 20201112-3074    Filed Date: 11/12/2020

the IMM, and the Market Seller and is appropriate coordination and communication between parties.[56]

40.    PJM further notes that the IMM's contention[57] that all the Tariff rules pertaining to the IMM should be located in Attachment M ignores the numerous places throughout the Tariff in which the IMM is called upon to play a role.  PJM states that it modeled the reserve exemption process, including the IMM's role, on the process for obtaining an exception to an approved parameter limited schedule detailed in Operating Agreement, schedule 1, section 6.6(h), which specifies the IMM's role in the process.[58]

41.    The IMM states that it independently performs its functions to review a resource's ability to provide reserves, as well as the technical capabilities of a resource or offer behavior of a resource.[59]  The IMM argues that PJM's proposal to mandate communications between PJM and the IMM would impede the independence of the market monitoring function and should not be permitted.  The IMM urges the Commission to reject PJM's proposed "open and transparent" manner of interaction among PJM, the IMM, and Market Sellers, included in the First Compliance Filing.[60]

### iii.    Commission Determination

42.    We disagree with the IMM's argument that PJM's proposed Tariff language requiring open and transparent communication among the IMM, PJM, and the Market Seller violates the Commission's regulations.  The Commission's regulations require that the IMM's core functions be consolidated into one section of PJM's Tariff.[61]  The core functions are defined in the Commission's regulations as:  (a) evaluating existing and proposed market rules, Tariff provisions and design elements, (b) reviewing and reporting on wholesale markets, and (c) identifying and notifying the Office of Enforcement staff of behavior warranting investigation, none of which are at issue in PJM's revisions.[62]  Those functions remain in Attachment M of PJM's Tariff.  By

---

[56] PJM Answer to First Compliance Filing at 10-11.

[57] IMM Protest at 14.

[58] PJM Answer to First Compliance Filing at 11 & n.48.

[59] IMM Answer to First Compliance Filing at 3-4.

[60] *Id.*

[61] 18 C.F.R. § 35.28(g)(3)(i)(F) (2020).

[62] *Id.* § 35.28(g)(3)(ii)(A)-(C).

Document Accession #: 20201112-3074          Filed Date: 11/12/2020

contrast, we find that the language at issue, which addresses the reserve eligibility exemption process described above, is not a core function of the IMM as defined by the Commission's regulations and, therefore, is not required to be included in Attachment M.

43.     As PJM notes, other language in the PJM Tariff (not contained in Attachment M of the Tariff) also sets forth a role of the IMM that does not involve a core function of its market monitoring role.[63]  As a result, we disagree with the IMM's argument that it is inappropriate to have this Tariff language outside of Attachment M.  For example, language governing the role of the IMM in evaluating resource-specific offers exists in Attachment DD, section 5.14(h)(5).[64]  We find PJM's proposed Tariff language is a clarification of, and not a change in, the IMM's role.  Therefore, it is appropriate to include it in Attachment K-Appendix, section 1.7.[65]

44.     We also disagree with the IMM's argument that PJM's proposed Tariff language interferes with or constrains the IMM's independence or monitoring responsibilities.  We agree with PJM that it is appropriate to include Tariff language to memorialize a review process that includes PJM, the IMM, and the relevant Market Seller of any analysis or decision to be able to provide reserves.  We do not view PJM's proposed Tariff language as limiting communication between the IMM and a Market Seller.  The Tariff language merely requires that the IMM be open and transparent about its findings and methodology with the Market Seller and PJM.  This neither changes the IMM's role nor exceeds the scope of the compliance directive.  The IMM generally should be open and transparent with the Market Seller and PJM regarding the IMM's evaluation of the resource's eligibility to provide reserves.  The proposed Tariff language merely clarifies this role, which is squarely within the scope of the May 2020 Order compliance directive.

---

[63] While PJM cites Operating Agreement, schedule 1, section 6.6(h) as containing the process for obtaining an exception to an approved parameter limited schedule, the exception process is set forth in Operating Agreement, schedule 1, section 6.6(i).  *See* PJM Answer to First Compliance Filing at 11 & n.48.

[64] *See, e.g.*, Attach. DD, § 5.14(h)(5)(iv) ("The Market Monitoring Unit shall review the information and documentation in support of the request and shall provide its findings whether the proposed Sell Offer is acceptable, in accordance with the standards and criteria hereunder, in writing, to the Capacity Market Seller and the Office of the Interconnection by no later than ninety (90) days prior to the commencement of the offer period for such auction.").

[65] Proposed Operating Agreement, sched. 1, §§ 1.7.19A(a), 1.7.19A.01(a), and 1.7.19A.02(a).

Document Accession #: 20201112-3074       Filed Date: 11/12/2020

## 2.    Reserve Capability Determination

### a.    Compliance Directives

45.    Recognizing the difficulties in predicting reserve capability "for certain resource types, based on configurations or whether they contain duct burners," the Commission determined that "Market Sellers should work with PJM to determine how these values should be submitted, given current software limitations."[66]  The Commission directed PJM to "provide a mechanism, within the Tariff, to help guide the determination of reserve capability that PJM will use as an input when determining the Synchronized Reserve maximum" and "a process whereby Market Sellers can work with PJM to establish reserve capability for resources" for which reserve capability is not easily measured.[67]

### b.    Reserve Capability Updates

### i.    PJM's Compliance Filing

46.    PJM explains that, since its original proposal submitted on March 29, 2019, PJM and its stakeholders have developed a means to address, through a Tariff mechanism, the difficulty associated with predicting reserve capability for resources with unique configurations or that rely on duct burners.[68]  PJM explains that the Commission has accepted its filing in Docket No. ER20-1414,[69] which allows Market Sellers to specify hourly differentiated segmented ramp rates in both the day-ahead and real-time markets, which will allow resources to describe more accurately their capability and performance in energy offers (Segmented Ramp Rate Order).[70]  PJM states that the exception process it has proposed and the Segmented Ramp Rate process will allow PJM and Market

---

[66] May 2020 Order, 171 FERC ¶ 61,153 at P 273.

[67] *Id.*

[68] PJM First Compliance Transmittal at 7-8.

[69] *Id.*  PJM Interconnection, L.L.C., Inclusion of Hourly Differentiated Segmented Ramp Rates in Resource Offers Transmittal, Docket No. ER20-1414-000 (filed Mar. 27, 2020).

[70] PJM First Compliance Transmittal at 7-8; *see also PJM Interconnection, L.L.C.*, 172 FERC ¶ 61,055, at PP 11, 13 (2020).

Sellers to accurately determine the reserve capability for resources with unique configurations or that rely on duct burners.[71]

47.     PJM states that resources transitioning to a different state would be able to reflect any changes in energy and reserve capability in energy offer updates.[72]  PJM also states that the ability to update the ramp rates intraday allows certain resource types, such as combined cycles, to account for the effects that changing ambient temperature may have on their duct burner transition point.[73]  In light of the revisions accepted in Docket No. ER20-1414, PJM requests that the Commission consider these revisions to comply with the directives in the May 2020 Order.[74]

### ii.     Comments, Protests, and Answers

48.     The IMM argues that the Segmented Ramp Rates Order does not resolve the issues that the IMM has identified.[75]  The IMM generally argues that the First Compliance Filing does not define clear and accurate calculations of reserve capability. The IMM explains most resources in PJM use a change-of-equipment configuration to produce additional power which the PJM software used to dispatch energy and reserves does not explicitly model.  According to the IMM, combined-cycle plants use multiple combustion turbines (CTs), steam turbines, duct burners, and power augmentation.  CTs use over-firing and fuel switching.  Coal-fired resources use varying mill configuration and oil topping.  Hydroelectric and reciprocating engine generators combine multiple generation units into one market resource.  The IMM states that the real-world ramping capability is discontinuous, and that resource-submitted ramp rate curves fail to capture the timing required to transition between configurations.  The IMM states that transition timing cannot be adequately modeled using ramp rates alone.  The IMM asserts that, as a result, resources cannot and do not follow PJM dispatch instructions to provide energy and reserves.[76]

---

[71] PJM First Compliance Transmittal at 7.

[72] *Id.* at 8 and nn.25-26.

[73] *Id.* at 8.

[74] *Id.* at 7-11.

[75] IMM Protest to First Compliance Filing at 1-2.

[76] *Id.* at 2.  The IMM provides an example of a low Area Control Error (ACE) during October 2019 when PJM declared a synchronized event resulting from the failure of 79 units to achieve the output level that PJM dispatched them; collectively, they failed, on average, to produce 872 MW and together failed to produce 1,184 MW due to ambient

Document Accession #: 20201112-3074          Filed Date: 11/12/2020

49.    The IMM argues that PJM fails to address real-world discontinuities in ramping capabilities and argues that correctly measuring reserve capability and joint optimization with energy dispatch requires software changes, which the IMM argues must be developed and implemented in order for PJM to comply with the applicable directives in the May 2020 Order.[77]

50.    The IMM explains some of the challenges with modeling transitions, including potential inaccuracies with different ramp rates at different transition points and how RT SCED uses different ramp rates.  The IMM argues that if expected LMPs are high enough to cover the cost of running a resource at a high output, the resource will ramp up beyond the slower ramp rate but will not respond if LMPs are not high enough.  The IMM argues that resource owners face weak or nonexistent incentives to increase output into the next configuration, which are further attenuated by the fact that the transition is not smoothly bidirectional.  The IMM states that, as a result, resource operators frequently do not have an incentive to shift the plant to a higher output configuration and the only accurate way to dispatch energy and reserves is explicitly to model the configuration transition.[78]

51.    In its answer, PJM argues that it has satisfied the Commission's directive in the May 2020 Order because Segmented Ramp Rate Order,[79] allows PJM to better determine the resource's reserve capability and assign an accurate reserve commitment.  PJM explains that the resource's ability to provide hourly differentiated segmented ramp rates and to update those ramp rates intra-day in its energy offer would address the difficulty associated with predicting reserve capability for resources with unique configurations or that rely on duct burners.  According to PJM, these changes enable resources to more accurately describe their capability and performance in their offers.[80]

52.    In its answer, PJM argues that the IMM's request for additional software changes is beyond the scope of the Commission's compliance directive in the May 2020 Order.  PJM asserts that the Commission directed it to make revisions that took into account current software limitations.  PJM notes that the IMM does not show that PJM's proposal

---

conditions and power augmentation issues. *Id.* at 2-3.  The IMM notes that another low ACE event that involved similar circumstances occurred on February 7, 2020. *Id.* at 4 & n.6 (citing IMM Report, IMM presentation to the Members Committee Webinar (May 26, 2020).

[77] *Id.* at 4.

[78] *Id.* at 5.

[79] *See supra* note 69.

[80] PJM Answer to First Compliance Filing at 3.

of relying on hourly differentiated segmented ramp rates and associated intraday updates is not a just and reasonable means for meeting the compliance directive.[81]

53.    PJM explains that it had considered modifying the existing system to include transitional modeling, but decided that spending the time and money developing, testing, and implementing the software upgrades would be unnecessary and wasteful given that the Next Generation Markets (nGEM) project would render it obsolete.  PJM states that even with nGEM, transitional modeling will need hourly differentiated segmented ramp rates to determine reserve capability.  Therefore, PJM argues that this software will not significantly improve PJM's ability to determine reserve capability over hourly differentiated segmented rate rates.[82]

54.    In its answer to PJM's answer, the IMM notes that PJM's nGEM and long-term RT SCED changes are ongoing, but argues that these efforts do not resolve the issues that the IMM has identified.[83]  The IMM responds that PJM's answer asserts an unreasonably limited scope of compliance.[84]  The IMM reiterates that an accurate "calculation of reserves for determining energy and reserve prices resulting from the introduction of the extended [ORDC]" is "within the scope of compliance."[85]  The IMM states that because the extended ORDC will not be implemented until May 2022, PJM should not plan "to implement it incorrectly when correct implementation is feasible."[86]  The IMM concludes that the costs to consumers of the higher prices associated with PJM's ORDC implementation are substantial, and that those costs should not be defined or imposed based on PJM's proposed models if better models and processes are available.[87]

### iii.    Commission Determination

55.    We find that PJM's proposals regarding reserve capability establish a just and reasonable rate and comply with the May 2020 Order as discussed below.  While the IMM criticizes aspects of these proposals, the IMM's assertions and requests are beyond

---

[81] *Id.* at 5.

[82] *Id.* at 5-6.

[83] IMM Answer to First Compliance Filing at 1-2.

[84] *Id.* at 1.

[85] *Id.*

[86] *Id.* at 2.

[87] *Id.*

the scope of this proceeding, which is limited to complying with the May 2020 Order to establish a just and reasonable reserve rate to replace the one found unjust and unreasonable.[88]  Recognizing some of the challenges associated with measuring reserve capability given current software limitations, we find PJM's proposals provide a just and reasonable method of measuring such capability.[89]

56.     We find that PJM's First Compliance Filing, along with the Commission's acceptance of PJM's Segmented Ramp Rate proposal in Docket No. ER20-1414[90] establish a just and reasonable measurement of reserve capability.  As PJM notes, the Commission accepted as just and reasonable its proposal to allow for hourly differentiated segmented ramp rates to better capture the unique challenges associated with resources that use different configuration types or duct burners.[91]  This filing was intended to, and did, correct the deficiencies with the pre-existing Tariff identified in the May 2020 Order to help guide the determination of reserve capability.

57.     Under the new reserve market rules, PJM will rely on submitted offer data from Market Sellers in order to determine reserves capability.  A key factor in this determination is the resource's ramping capability, which is reflected in the ramp rate submitted to PJM.  By allowing resources to include hourly differentiated segmented ramp rates and to update those ramp rates intra-day, PJM will have the necessary visibility to determine the reserve capability of resources, including operating limitations such as duct-firing, peaking modes and changing mill configurations.[92]  Currently, the

---

[88]  *See supra* note 47.  Moreover, the IMM does not suggest a just and reasonable alternative means of addressing the problems it raises, consistent with the directives in the May 2020 Order.

[89]  *Colo. Interstate Gas Co. v. FPC*, 324 U.S. 581, 589 (1945) ("Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts.  It has no claim to an exact science;" *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1171 (D.C. Cir. 1996) ("There is no 'neutral' or inherently 'fair' allocation of fixed costs, as the history of rate design amply demonstrates.") (unattributed quotations in original).

[90]  *See supra* note 69.

[91]  *Id.*

[92]  PJM Interconnection, L.L.C., Inclusion of Hourly Differentiated Segmented Ramp Rates in Resource Offers, Docket No. ER20-1414-000 (filed Mar. 27, 2020), Transmittal at 5.  PJM states that "[t]he proposed revisions will also allow Market Sellers with combined cycle units to better describe to PJM the point at which they enter duct firing or other peaking modes, and how those points can change intraday with changes in ambient temperature.  Similarly, Market Sellers with coal-fired units will be better able to describe hold points for putting mills into and out of service.  More broadly, the proposed

PJM Tariff permits Market Sellers to submit price-quantity pairings to PJM which, taken together, represent a resource's Incremental Offer curve.[93]  Each of these price-quantity pairings may have a different ramp rate, which in turn communicates to PJM the resource's capabilities.  Resources run the risk of nonperformance penalties if submitted offer data misrepresents their ramping capability.[94]  We find that this approach creates a just and reasonable method of determining reserve capability under the reserve construct adopted in the May 2020 Order.[95]

58.     We find that PJM complied with the May 2020 Order, which required PJM to act within the current software limitations.  The IMM requests that PJM implement new modeling and software changes, even though it recognizes that PJM's long-term RT SCED and nGEM efforts are ongoing.  We find that the IMM's arguments as to modeling and software changes are beyond the scope of the Commission's compliance directives in this proceeding.[96]

59.     We also disagree with the IMM that the ramp rate method, which it recently supported,[97] is unjust and unreasonable under the new reserve construct.  To the extent that Market Sellers believe that this existing provision, which allows submission of offers consisting of price-quantity pairs, limits or otherwise fails to reflect the different ramp rates associated with different MW output levels, PJM and stakeholders should discuss in the stakeholder process and consider any necessary revisions.

_____

revisions give Market Sellers greater flexibility in describing any operational limitations they have to PJM." *Id.*

[93] *See* Tariff, Definitions I-J-K.

[94] The ability to provide hourly differentiated segmented ramp rates and update those ramp rates intra-day that were accepted July 16, 2020, along with the ability to impose penalties for non-performance will address the concerns the IMM identified in the low ACE events of October 1, 2019 and February 7, 2020 discussed by the IMM.  *See supra* note 69.

[95] May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[96] *See supra* note 47.

[97] PJM Interconnection, L.L.C., Comments of the Independent Market Monitor for PJM, Docket No. ER20-1414-000 (filed Apr. 20, 2020) ("[a]pproving the . . . filing will allow PJM to dispatch generating units, and model units, based on more accurate information, improving the efficiency of PJM markets").

### c.     Synchronized Reserve Maximum Parameter

#### i.     PJM's Compliance Filing

60.    PJM asserts that the implementation of hourly differentiated segmented ramp rates generally will avoid the need for the Synchronized Reserve Maximum MW offer parameter; however, it will remain a usable parameter for Market Sellers and will provide an additional means for them to communicate to PJM when they cannot provide any additional reserves.[98]  In light of the revisions accepted in Docket No. ER20-1414, PJM requests that the Commission consider these revisions to sufficiently comply with the directives in the May 2020 Order.[99]

#### ii.     Comments, Protests, and Answers

61.    The IMM argues that the First Compliance Filing does not provide rules for the determination of Synchronized Reserve Maximum.  The IMM argues that the Synchronized Reserve Maximum parameter is not an acceptable substitute for modeling configuration transitions.  According to the IMM, use of this parameter ignores actual capability of units and their must-offer MW, allows resources to withhold capacity from the reserve market, and incorrectly represents the actual reserve capability of resources. The IMM argues that PJM has failed to explain how the hourly differential segmented ramp rates obviate the need for the Synchronized Reserve Maximum.[100]

62.    The IMM further states that PJM has failed to explain how it solves the issues of (1) understating reserve capability for resources, and (2) failing to require outages when resources cannot meet their ICAP output levels.[101]  The IMM argues that PJM did not provide any mechanism for the determination of Synchronized Reserve Maximum or Secondary Reserve Maximum, as required by the May 2020 Order directive that PJM "provide a mechanism, within the Tariff, to help guide the determination of reserve capability that PJM will use as an input when determining the Synchronized Reserve maximum."[102]

---

[98] PJM First Compliance Transmittal at 8-9.

[99] *Id.* at 7-9.

[100] IMM Protest of First Compliance Filing at 5-6.

[101] *Id.*

[102] *Id.* at 6.

63.     PJM states that, as a result of its implementation of hourly differentiated segmented ramp rates, the need for the Synchronized Reserve Maximum offer parameter will be generally obviated and thus used in limited circumstances. PJM explains that it will only allow use of this offer parameter when the Market Seller submits a justification to the Office of the Interconnection that the resource has an operating configuration that prevents it from reliably providing Synchronized Reserves above the Synchronized Reserve Maximum MW level.[103]

64.     PJM further states that the IMM ignores the fact that it did provide a Tariff mechanism, which the IMM supported, that provides for hourly differentiated segment ramp rates.[104]

### iii.     Commission Determination

65.     We disagree with the IMM's argument that PJM's First Compliance Filing does not provide just and reasonable rules for the determination of Synchronized Reserve Maximum. The hourly differentiated segmented ramp rate filing largely obviates the need for this parameter. However, PJM still will allow use of this offer parameter when the Market Seller submits a justification to the Office of the Interconnection that the resource has an operating configuration that prevents it from reliably providing Synchronized Reserves above the Synchronized Reserve maximum MW level. The submission and approval of the Office of Interconnection provides sufficient review in the few cases in which this parameter is used. Therefore, we find that PJM's proposal is just and reasonable and complies with the May 2020 Order.[105]

### d.     Timing of PJM's Dispatch Process

### i.     Comments, Protests, and Answers

66.     The IMM states that PJM uses the RT SCED software to clear reserves, which determines the optimal clearing of both energy and reserves for a target point in time that is 14 minutes in the future, based on a 10-minute resource ramp time. The IMM argues that it is rare that a resource is dispatched based on the dispatch signal for the full 10 minutes, which results in PJM overriding the dispatch signal before the ramping is complete. The IMM argues that this process does not ensure that resources following dispatch will ever achieve the cleared reserve target. As a result of recently approved stakeholder changes, the IMM states that PJM would settle reserves from five to 10

---

[103] PJM Answer to First Compliance Filing at 4.

[104] *See supra* note 97.

[105] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 320.

minutes after sending the dispatch instruction. The IMM argues that PJM would pay a resource that cleared reserves while that resource follows a new dispatch signal in which it may not have cleared reserves or cleared a different quantity of reserves. The IMM argues that the incorrect compensation extends to the five-minute uplift payments that PJM will pay under the new reserve market rules. The IMM states that it is not clear which resources PJM expects to perform: (1) those cleared by the new dispatch case that are following the dispatch signal that indicates reserves at the time of a Synchronized Reserve Event, or (2) those cleared on the previous dispatch case that is priced and settled at the time of the event. The IMM proposes that PJM's dispatch timeframe should be reduced from 10 minutes to five minutes to prevent unmatched dispatch and pricing signals. The IMM argues that a correct five-minute market timeline, with a reduced ramp time of five minutes, would eliminate the overlapping dispatch periods. Noting that PJM has identified this as a long-term issue, the IMM states PJM must resolve this issue in order for the reserve market changes to work as intended.[106]

67.    PJM argues that these changes are beyond the scope of this proceeding and states that the Commission should avoid expanding the scope of this proceeding to adjudicate other issues that should be raised with PJM and/or the Commission more directly.[107]

## ii.    Commission Determination

68.    We disagree with the IMM's arguments that PJM did not comply with the Commission's directives in the May 2020 Order because PJM did not change the timing of its dispatch process. The Commission's directives in the May 2020 Order did not require PJM to make this change. Therefore, we find that the IMM's arguments are beyond the scope of the Commission's compliance directives in this proceeding.[108] In addition, the Commission recently accepted Tariff revisions submitted by PJM under FPA section 205 to address the mismatch between dispatch and pricing.[109]

---

[106] IMM Protest of First Compliance Filing at 7-10.

[107] PJM Answer to First Compliance Filing at 12 & n.52.

[108] *See supra* note 47.

[109] *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,028 (2020); *see also PJM Interconnection, L.L.C.*, Errata to Fast-Start Compliance Filing, Docket No. ER19-2722-001 (filed May 28, 2020).

Document Accession #: 20201112-3074     Filed Date: 11/12/2020

### e.  Degree of Generator Performance

### i.  Comments, Protests, and Answers

69.    The IMM states that PJM has not proposed to eliminate the use of degree of generator performance (DGP) for calculating dispatchable energy and reserves. According to the IMM, the continued use of DGP will alter the real-time submitted ramp rates from the values submitted by Market Sellers.  The IMM states this is inconsistent with (1) Operating Agreement requirements that unit owners are exclusively responsible for their own offers, and (2) the goal to use the most current ramp rate information to model resources.[110]

70.    In its answer, PJM responds that the IMM request to direct the use of the DGP are beyond the scope of this proceeding.  PJM argues that the IMM's concerns do not relate to PJM's compliance filing proposal, and the IMM has not made a claim that they are related.  PJM states that the Commission should avoid expanding the scope of this proceeding to adjudicate other issues that should be raised with PJM and/or the Commission more directly.[111]

### ii.  Commission Determination

71.    We disagree with the IMM's arguments that PJM failed to comply with the May 2020 Order because PJM did not clarify how it will use the DGP for calculating dispatchable energy and reserves in RT SCED.  The Commission's directives in the May 2020 Order did not require further clarifications from PJM on the use of DGP.  In fact, in the May 2020 Order, the Commission found that "the consolidation of the Tier 1 and Tier 2 reserve products into a single product eliminates the need to adjust market data.  Based on the record, and our acceptance of PJM's proposed replacement rate noted above, we reject the IMM's concern as moot."[112]  In addition, we dismiss the IMM's argument as an

---

[110] IMM Protest of First Compliance Filing at 11.

[111] PJM Answer to First Compliance Filing at 12 & n.52.

[112] May 2020 Order, 171 FERC ¶ 61,153 at P 275.

impermissible request for rehearing of the May 2020 Order[113] and beyond the scope of the Commission's compliance directives in this proceeding.[114]

### f.     Multi-unit Modeling

### i.     Comments, Protests, and Answers

72.     The IMM argues that generator modeling results in inaccurate reserve assignments when multiple physical units are aggregated as one resource in the energy and reserve market, such as aggregate hydro units, multiple CTs, or multiple diesel engines at a single location, which will cause PJM to "over calculate Synchronized Reserves and under count NonSynchronized Reserves by treating offline units as if they were online units." The IMM argues that PJM should eliminate multi-unit modeling when the operation of each unit is physically independent.[115]

73.     In its answer, PJM responds that the IMM request to change multi-unit modeling when the operation of each unit is physically independent is beyond the scope of this proceeding.  PJM argues that the IMM's concerns related to multi-unit modeling do not relate to PJM's compliance filing proposal, and the IMM has not made a claim that they are related.  PJM states that the Commission should avoid expanding the scope of this proceeding to adjudicate other issues that should be raised with PJM and/or the Commission more directly.[116]

### ii.     Commission Determination

74.     We disagree with the IMM's arguments that PJM did not comply with the Commission's directives in the May 2020 Order because PJM does not include or address multi-unit modeling concerns when multi-units are located at the same physical location but are modeled by PJM as a single resource.  The Commission's directives in the May

---

[113] May 2020 Order, 171 FERC ¶ 61,153 at P 275; *see also PJM Interconnection, L.L.C.*, 158 FERC ¶ 61,124, at P18 (2017); *PJM Interconnection, L.L.C.*, 133 FERC ¶ 61,277, at P 34 (2010) ("Protests to compliance filings are limited to whether the filing meets the Commission's compliance directive and cannot properly function as late rehearings of the initial order."); *Cal. Indep. Sys. Operator Corp.*, 120 FERC ¶61,147, at P 15 (2007) (rejecting certain protests to a compliance filing that should have been raised as a request for rehearing).

[114] *See supra* note 47.

[115] IMM Protest of First Compliance Filing at 10-11.

[116] PJM Answer to First Compliance Filing at 12 & n.52.

2020 Order did not require PJM to make this change to PJM's existing practice. Therefore, we find that the IMM's arguments are beyond the scope of the Commission's compliance directives in this proceeding.[117]

### g.    Offline Reserve Capability

#### i.    Comments, Protests, and Answers

75.    The IMM states that PJM's First Compliance Filing does not clarify how PJM will choose a schedule to calculate offline reserve capability.[118]

76.    In its answer, PJM responds that the IMM's request to make changes regarding offline reserve capability is beyond the scope of this proceeding.  PJM argues that the IMM's concerns do not relate to PJM's compliance filing proposal, and the IMM has not made a claim that they are related.  PJM states that the Commission should avoid expanding the scope of this proceeding to adjudicate other issues that should be raised with PJM and/or the Commission more directly.[119]

#### ii.    Commission Determination

77.    We disagree with the IMM's arguments that PJM did not comply with the Commission's directives in the May 2020 Order because PJM did not clarify how it will choose a schedule to calculate offline reserve capability.  The Commission's directives in the May 2020 Order did not require PJM to specify how PJM selects an offer for calculating offline reserve capability.  Therefore, we find that the IMM's arguments are beyond the scope of the Commission's compliance directives in this proceeding.[120]

### h.    VACAR Reserves

#### i.    Comments, Protests, and Answers

78.    The IMM states that PJM's First Compliance Filing fails to account for reserves dedicated to VACAR,[121] under the VACAR reserve sharing agreement.  The IMM contends that PJM should be required to revisit the arrangements with Dominion and

---

[117] *See supra* note 47.

[118] IMM Protest of First Compliance Filing at 11-12.

[119] PJM Answer to First Compliance Filing at 12 & n.52.

[120] *See supra* note 47.

[121] VACAR is the Virginia-Carolinas subregion of SERC Reliability Corporation.

Document Accession #: 20201112-3074   Filed Date: 11/12/2020

VACAR to determine whether Dominion is able to provide reserves to both entities from the same resources and to address issues if Dominion cannot do so. The IMM argues that explicit and enforceable rules are needed to make clear that PJM capacity resources are reserves for PJM and not for any other area.[122]

79.    In its answer, PJM responds that the IMM request to make changes regarding the VACAR reserve sharing agreement is beyond the scope of this proceeding. PJM argues that the IMM's concerns do not relate to PJM's compliance filing proposal, and the IMM has not made a claim that they are related. PJM states that the Commission should avoid expanding the scope of this proceeding to adjudicate other issues that should be raised with PJM and/or the Commission more directly.[123]

### ii.    Commission Determination

80.    We disagree with the IMM's arguments that PJM should revisit the arrangements it has with Dominion and VACAR to determine whether Dominion is able to provide reserves to PJM and VACAR from the same resource. We also dismiss the IMM's argument that PJM capacity resources are reserves for PJM and no other area. First, the Dominion Zone is subject to the SERC requirements based on the VACAR Reserve Sharing Agreement; the May 2020 Order did not amend any provisions within that agreement. Second, the Commission's compliance directives in the May 2020 Order did not require further specification in the PJM Tariff of whether Dominion is able to provide reserves to both PJM and VACAR from the same resource. Thus, we find these requests are beyond the scope of the Commission's compliance directives in this proceeding.[124]

### 3.    Removal of Caps on Demand Response Participation in Reserve Markets

### a.    Compliance Directives

81.    In the May 2020 Order, the Commission directed PJM to remove the caps on the percentage of MRRs that can be met by demand response resources.[125]

---

[122] IMM Protest of First Compliance Filing at 12.

[123] PJM Answer to First Compliance Filing at 12 & n.52.

[124] *See supra* note 47.

[125] May 2020 Order, 171 FERC ¶ 61,153 at P 278.

### b.    PJM's Compliance Filing

82.    In compliance with the May 2020 Order's directives, PJM proposes revisions to its Operating Agreement to remove any written limitation on the amount of demand response resources that may be counted toward meeting reserve requirements.  PJM explains that, with this language, Economic Load Response Participant resources may comprise up to 100% of the minimum Synchronized Reserve Requirement or minimum 30-Minute Reserve Requirement.  In addition, PJM is removing the limitation that Batch Load Economic Load Response Participant resources may only provide certain percentages of total system-wide reserves requirements.[126]

### c.    Comments, Protests, and Answers

83.    The IMM argues that, by removing the cap on demand response resources clearing as Synchronized Reserve, PJM creates an inconsistent use of emergency resources because PJM did not remove the prohibition on 30-minute pre-emergency and emergency demand response resources' clearing as Secondary (30-minute) Reserve.  The IMM argues that PJM should clarify and document whether emergency capacity can clear in the reserve markets and apply the same standard to all resources.[127]

84.    PJM notes that the prohibition on 30-minute pre-emergency and emergency demand response resources' clearing in the Secondary Reserve market does not relate to PJM's compliance filing, and the IMM has not made a claim that the prohibition is related.  PJM argues that these changes are beyond the scope of this proceeding and requests that the Commission avoid expanding the scope of this proceeding to adjudicate other issues that should be raised with PJM and/or the Commission more directly.[128]

### d.    Commission Determination

85.    We find that PJM has complied with the May 2020 Order by removing the caps on the percentage of MRRs that can be met by demand response resources.[129]

86.    We reject the IMM's arguments that PJM should be required to allow pre-emergency and emergency demand response resources to provide 30-minute Reserves

---

[126] PJM First Compliance Transmittal at 12-13.  PJM notes that with these revisions, PJM is renumbering Operating Agreement, sched. 1, § 1.5A.8(c) as 1.5A.8(b); *see* Proposed Operating Agreement, sched. 1, §§ 1.5A.8, 1.11.4A, & 1.11.4C.

[127] IMM Protest of First Compliance Filing at 12.

[128] PJM Answer to First Compliance Filing at 12.

[129] May 2020 Order, 171 FERC ¶ 61,153 at P 278.

because such arguments re-litigate issues already determined by the Commission.  In the May 2020 Order, the Commission found that PJM cannot rely on pre-emergency and emergency demand response resources to maintain reserves outside of PJM-declared pre-emergency events and emergency events because those are the periods in which these resources are available for dispatch.  However, sellers of demand response resources that wish to participate in PJM reserve markets can do so through PJM's economic program.[130]  We therefore dismiss the IMM's argument as an impermissible request for rehearing of the May 2020 Order[131] and as beyond the scope of this proceeding.[132]

### 4.    Energy and Ancillary Services Offset Data Inputs

#### a.    Compliance Directives

87.    The Commission ordered PJM to propose modifications to its Tariff to implement a forward-looking E&AS Offset that reasonably estimates expected future energy and ancillary services revenues for all Tariff provisions that rely on a determination of the E&AS Offset.  The Commission found that a forward-looking methodology would allow changes to energy and ancillary services revenues stemming from energy market design modifications to be more readily incorporated into capacity market parameters and prices.[133]

88.    The May 2020 Order also found unjust and unreasonable provisions of the Tariff governing the determination of the E&AS Offset used in PJM's capacity market, established a forward-looking E&AS Offset as the just and reasonable replacement rate, and directed PJM to make a compliance filing to implement that replacement rate.[134]

#### b.    Proposal Overview

89.    To meet the Commission's compliance directive, PJM proposes to estimate net energy and ancillary services revenue based on forward-looking electricity and fuel prices at liquid trading hubs for the subject delivery year.  PJM argues that the use of forward prices is appropriate because at any point in time they will reflect anticipated changes in market design.  PJM proposes to use these prices in a Projected E&AS

---

[130] *Id.* P 255.

[131] *Id.*; *see also supra* note 113.

[132] *See supra* note 47.

[133] May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[134] *Id.*

Dispatch Model to estimate the energy and ancillary services net revenue earned by resources.[135]

### i.     **Commission Determination**

90.     Subject to a compliance filing as discussed below, we find that PJM has complied with the Commission's directive to implement a forward-looking E&AS Offset in accordance with the May 2020 Order.[136] Specifically, PJM has submitted a compliance filing, PJM's Second Compliance Filing, containing revisions to its Tariff to incorporate a forward-looking E&AS Offset beginning with the BRA for the delivery year that commences June 1, 2022.[137] We accept PJM's Second Compliance Filing, to be effective as of the date of this order, and require PJM to file, within 15 days of the date of this order, a revised tariff to include the changes regarding the nuclear refueling issue in Appendix B of this order.[138]

91.     We address contested issues as to PJM's Second Compliance Filing, below.

### c.     **Number of Electricity Futures Trading Hubs**

### i.     **PJM's Compliance Filing**

92.     PJM proposes that the E&AS Offset methodology rely on futures markets prices from established futures markets.  PJM asserts that liquid futures markets (i.e., those with many buyers and sellers) produce forward prices that better reflect expectations about future conditions.  Therefore, PJM states that its affiants, The Brattle Group (Brattle) and Sargent & Lundy (S&L), recommend that PJM rely on electricity market hubs and products that trade with sufficient liquidity.[139]

93.     PJM states that Brattle and S&L considered the liquidity at each of the trading hubs and transmission Zones in PJM that are reported by Intercontinental Exchange, Inc. (ICE).  PJM states that the consultants used "open interest" to gauge liquidity.  PJM explains that open interest in a futures market trading contract (i.e., a particular product for delivery at a particular place and time) reflects the cumulative number of contracts

---

[135] PJM Second Compliance Transmittal at 4-5.

[136] May 2020 Order, 171 FERC ¶ 61,153 at P 320; *see also* PJM Second Compliance Transmittal at 4-5.

[137] *See* Second Compliance Transmittal at 1.

[138] *See infra* Appendix B.

[139] PJM Second Compliance Transmittal at 9-11.

that have been opened but not yet closed out or offset.  PJM states that Brattle reviewed prices for 2024 because PJM typically will undertake its pre-auction analyses roughly four years before the relevant delivery year.  PJM states that the liquidity for these PJM energy products in 2024 is substantial for the three traded PJM Region hubs but minimal to non-existent for the 20 traded PJM Region Zones.  PJM also states that liquidity at the 20 traded PJM Region Zones is inconsistent from year to year.[140]  Thus, PJM states that Brattle and S&L recommend using electric futures settlement prices at the three traded PJM Region hubs:  PJM Western Hub, AEP-Dayton Hub, and Northern Illinois Hub (Selected Hubs).[141]

94.     PJM also proposes to use the day-ahead product's futures prices at the Selected Hubs.  PJM states that, according to Brattle and S&L, the day-ahead and real-time futures prices "are nearly equivalent, such that relying on either will have little to no impact on the estimated [energy and ancillary services] net revenues."[142]  PJM states that the end result of this step of the analysis is forward day-ahead energy prices for each of the Selected Hubs, and for each month, on-peak period, and off-peak period in the delivery year.[143]

95.     PJM states that high correlations in historic prices between each hub and specific PJM Zones enable the ready mapping of Zones to hubs.  PJM states that Brattle and S&L analyzed the correlation of historical prices between the three PJM hubs and the 20 PJM Zones, using monthly average peak and off-peak data for 2015 to 2019, and found that for each Zone, the hub with highest price correlation is that which is geographically closest.  PJM states that this correlation persisted for both peak and off-peak prices.[144]

### ii.     Comments, Protests, and Answers

96.     P3 asserts that PJM's proposed Tariff provisions related to the E&AS Offset meet the just and reasonable standard and requests that the Commission approve PJM's

---

[140] *Id.* at 12-13 (citing Attach. C, Aff. of Samuel A. Newell, James A. Read Jr., and Sang H. Gang on behalf of PJM (Brattle Aff.) ¶¶ 47-48, 51).

[141] *Id.* at 13-14 (citing Brattle Aff. ¶ 14).

[142] *Id.* (citing Brattle Aff. ¶ 16; proposed Tariff, Attach. DD, § 5.10(a)(v-1)(C)(2)).

[143] *Id.* at 14.

[144] *Id.* at 15 (citing Brattle Aff. ¶ 53 & tbl. 5).

proposal as submitted.[145] P3 argues that PJM's approach to estimating energy revenues, including the use of publicly available forward energy price projections at liquid trading hubs, represents a reasonable framework for using the best available information at the time of the BRA to project energy prices three years in advance.[146]

97.     The IMM protests PJM's proposed Selected Hubs.  The IMM argues that PJM instead should use only the most liquid hub, the PJM Western Hub, because it is the most reflective of market fundamentals and is the least likely to be subject to manipulation. The IMM explains that in a well-functioning market, the price differentials between any liquid trading hub and a generator Zone should result in the same forward price at the Zone.  The IMM argues that there is no reason for PJM to use multiple hubs.[147]  The IMM contends that PJM's Zone-to-hub correlation analysis is not enough to support the choice of significantly less-liquid hubs.  The IMM notes that the analysis is missing the statistical significance of correlation differences and missing a comparison for all hub-to-Zone combinations.[148]

98.     The IMM also argues that PJM should use real-time futures instead of day-ahead futures.  The IMM states that the data presented by Brattle shows that liquidity for real-time futures at the PJM Western Hub is about twice that of comparable measures, real-time or day-ahead, at the next most liquid hub, and that liquidity at the PJM Western Hub for real-time prices is about five times higher than the liquidity for day-ahead prices at that hub.[149]  The IMM contends that the liquidity for the PJM Western Hub real-time products, peak and off-peak, significantly exceeds the liquidity for all day-ahead products at all hubs.  The IMM claims that the liquidity for day-ahead futures prices at the AEP

---

[145] PJM Interconnection, L.L.C., Comments of the PJM Power Providers Group, Docket No. EL19-58-003, at 4 (filed Sept. 2, 2020) (P3 Comments on Second Compliance Filing).

[146] P3 Comments on Second Compliance Filing at 5.

[147] *PJM Interconnection, L.L.C.*, Comments of the Independent Market Monitor for PJM, Docket No. EL19-58-003, at 8 (filed Sept. 2, 2020) (IMM Protest of Second Compliance Filing).

[148] IMM Protest of Second Compliance Filing at 17 (citing PJM Second Compliance Transmittal at 17, tbl. 5).

[149] *Id.* at 9 (citing PJM Second Compliance Transmittal, Brattle Aff., Attach. C).

Dayton Hub, the hub with the most day-ahead activity, is approximately one-third the liquidity for the real-time futures prices at the PJM Western Hub.[150]

99.     In its answer, PJM disputes the IMM's contention that only futures prices from the PJM Western Hub should be used.  PJM argues that given that sufficient liquidity is also observed in the AEP Dayton and Northern Illinois hubs, it is appropriate to include futures prices from these hubs to better align the electricity and natural gas prices and avoid potential errors in forecasting the E&AS margins.[151]

100.    In its answer, Exelon contends that PJM's use of the Selected Hubs is in line with Exelon's real-world market experience of systemic differences in price correlations between ComEd nodal prices and Northern Illinois and PJM Western Hub prices, respectively.  Specifically, in its answer, Exelon states that it analyzed recent weighted-average day-ahead hourly price correlations involving the ComEd bus used by 10 nuclear units over the past five years.  Exelon states that the results show a 96% correlation between the movement of the Northern Illinois Hub prices and the nodal unit prices, and a 76% correlation between the PJM Western Hub prices and the nodal prices.  Exelon states that ComEd prices thus are more closely correlated to the proximate Northern Illinois Hub than to the distant PJM Western Hub, demonstrating that the Northern Illinois Hub is a better reflection of market fundamentals.[152]

101.    Exelon also argues that IMM's argument for use of only the most liquid trading hub (i.e., the PJM Western Hub) is premised on the assumption of perfect market efficiency where there are no systematic price differentials between trading hubs.  Exelon

---

[150] *Id.*  The IMM also states that for the 2023/2024 Delivery Year, the total open interest for the PJM Western Hub contracts exceeds the open interest for the AEP Dayton and Northern Illinois hubs by 80% and 146.9%, respectively.  *Id.* at 15 (citing ICE End of Day report).

[151] PJM Interconnection, L.L.C., Motion for Leave to Answer and Answer of PJM, Docket No. EL19-58-003, at 12 (Sept. 17, 2020) (PJM Answer to Second Compliance Filing) (citing Attach. A, Supp. Aff. of Samuel A. Newell and James A. Read Jr. on behalf of PJM (Brattle Supp. Aff.) ¶ 19).

[152] PJM Interconnection, L.L.C., Motion for Leave to Answer and Answer of Exelon Corporation, Docket No. EL19-58-003, at 11-12 (Sept. 17, 2020) (Exelon Answer to Second Compliance Filing).  Using average daily prices instead, Exelon states that the results show a 93% correlation between Northern Illinois Hub price and the ComEd nodal unit prices, and a 76% correction between the PJM Western Hub prices and the ComEd nodal unit prices.  Exelon states this demonstrates the Northern Illinois Hub is a better reflection of market fundamentals affecting estimation of forward energy prices for generators in ComEd.  *Id.* at 13.

Document Accession #: 20201112-3074    Filed Date: 11/12/2020

argues that the IMM fails to provide any evidence of such market efficiency and does not demonstrate that PJM's proposal is unjust and unreasonable.[153]  Exelon states that the IMM's proposal to use the PJM Western Hub would result in a forward E&AS Offset that is not accurate for units in the ComEd Zone.  Because PJM has committed to update the trading hubs it uses, Exelon urges the Commission to accept its proposal as just and reasonable.[154]

### iii.    Commission Determination

102.    We find PJM's proposal to use in its E&AS Offset methodology publicly available futures prices from liquid trading hubs to be just and reasonable and compliant with the May 2020 Order.[155]  Prices from liquid futures markets (i.e., those with many buyers and sellers, as determined by open interest) produce forward prices that reflect expectations about future conditions.  We find that PJM's proposal to use day-ahead futures prices just and reasonable as the day-ahead and real-time futures prices are nearly equivalent, so using one or the other will have little to no impact on the estimated energy and ancillary services net revenues.  We also find PJM's proposal to map the liquid trading hubs to specific PJM Zones to be just and reasonable due to the high correlations in historic prices between each hub and specific PJM Zones, and find that it complies with the Commission's May 2020 Order.[156]

103.    We disagree with the IMM's argument that PJM has not sufficiently supported its proposal to use the Selected Hubs and day-ahead futures at those hubs.  The IMM argues that PJM should instead use only the PJM Western Hub and real-time futures because of the greater liquidity in the PJM Western Hub and real-time futures in comparison with other hubs and day-ahead prices.  The IMM argues that PJM's Zone-to-hub correlation analysis does not support the use of less liquid hubs because PJM does not report whether the correlation differences are statistically significant.  Even without this information, we find it reasonable for PJM to assume that the geographical distance between a hub and Zone could affect the correlation between prices at the hub and Zone.  We disagree with the IMM's argument that in a well-functioning market, the price differentials between any liquid trading hub and Zone should result in the same forward price at the Zone.  Rather, we agree with Exelon that the IMM's argument is premised on the unreasonable assumption of perfect market efficiency.

---

[153] Exelon Answer to Second Compliance Filing at 11.

[154] *Id.* at 14.

[155] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[156] *Id.*

104.    We find PJM's proposal to use day-ahead prices instead of real-time prices is just and reasonable and complies with the May 2020 Order.[157]  We agree with Brattle and S&L that the day-ahead and real-time futures prices "are nearly equivalent, such that relying on either will have little to no impact on the estimated [energy and ancillary services] net revenues."[158]

105.    Based on the record, we find PJM's proposal to use the Selected Hubs and day-ahead futures at those hubs is just and reasonable and complies with the May 2020 Order.[159]

### d.    Use of ICE Data

#### i.    PJM's Compliance Filing

106.    With respect to the electricity futures trading hubs, PJM proposes to rely on ICE pricing data.[160]

#### ii.    Comments, Protests, and Answers

107.    The IMM argues that PJM already calculates the pricing data needed to implement a forward-looking EA&S Offset.  The IMM explains that the IMM and PJM for years have used such data in the calculation of certain opportunity costs.  The IMM explains that the opportunity cost calculator uses Platts' data on the prices associated with the PJM Western Hub real-time futures to develop hourly bus LMPs.[161]  The IMM argues that PJM should explain why it no longer will use Platts' data but rather will use ICE data, and the IMM states PJM must show it is making an explicit choice between the two data sources based on rational criteria.  The IMM recommends use of Platts' data until a better option can be established.[162]

---

[157] *Id.*

[158] PJM Second Compliance Transmittal at 14 (citing Brattle Aff. ¶ 16; proposed Tariff, Attach. DD, sec. 5.10(a)(v-1)(C)(2)).

[159] May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[160] PJM Second Compliance Transmittal at 12 (citing Brattle Aff. ¶ 50).

[161] IMM Protest of Second Compliance Filing at 6-7 (citing PJM Manual 15:  Cost Development Guidelines, Rev. 35 (April 24, 2020), § 12.7).

[162] *Id.* at 4.  The IMM also suggests that PJM should explain why it relies on ICE's shaping of prices for some purposes but not for other purposes.  *Id.*

108.   In its answer, PJM responds to the IMM by arguing that according to Brattle, ICE
pricing data is more transparent because ICE makes settlement prices for recent trading
days publicly available, whereas Platts' pricing data is available only to subscribers.  In
addition, PJM argues, Platts uses ICE pricing data as the starting point for its
determination of forward price curves, and thus both companies rely on the same
underlying data sets.  According to PJM, Brattle has concluded that "Platts-reported
forward prices and ICE futures settlement prices are virtually identical for the relevant
delivery points and delivery months."[163]   PJM argues that based on the foregoing, PJM's
proposed use of ICE pricing data is reasonable.[164]

### iii.    Commission Determination

109.   We find PJM's proposal to use ICE pricing data to be just and reasonable and
compliant with the May 2020 Order.[165]   While PJM uses Platts' data when calculating
certain opportunity costs, we find nevertheless that PJM's decision to use ICE pricing
data on electricity futures is reasonable, contrary to the IMM's arguments.  PJM explains
that both Platts and ICE use the same underlying data sets; that is, "Platts-reported
forward prices and ICE futures settlement prices are virtually identical for the relevant
delivery points and delivery months."[166]   As PJM also explains, ICE data, unlike Platts'
data, makes settlement prices for recent trading days publicly available, which provides
additional transparency into prices at electricity futures trading hubs.  We therefore
conclude that PJM's proposal, which provides reasonably equivalent pricing data with
greater transparency, is just and reasonable.

### e.    Time Window for Averaging

### i.    PJM's Compliance Filing

110.   PJM proposes to average the forward settlement prices reported for the 30 most
recent trading days.  PJM states that this approach balances the benefit of the most recent
market information with potential vulnerability to market manipulation from indexing to

---

[163] PJM Answer to Second Compliance Filing at 17-18 (citing Brattle Supp. Aff.
¶¶ 8-9).

[164] *Id.* at 18.

[165] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[166] PJM Answer to Second Compliance Filing at 17-18 (citing Brattle Supp. Aff.
¶¶ 8-9).

a single day.[167]  To implement the 30-day averaging, PJM plans to retrieve, 180 days before the start of each BRA, forward pricing data for each month of the future delivery year, and average the daily settlement data from the 30 trading days prior to that date. PJM states that this will provide it enough time to calculate the E&AS Offsets for the CT Reference Resources prior to having to post the preliminary default Minimum Offer Price Rule (MOPR) Floor Offer Prices at 150 days prior to the auction[168]

## ii.    **Comments, Protests, and Answer**

111.    The IMM protests PJM's proposal to use forward prices averaged over the 30-day period that ends 180 days before the BRA, arguing that there is no reason to average the results over 30 days.  The IMM contends that PJM should instead calculate the forward prices as close as possible to the auction date and over as short a period as possible to reduce the possibility of manipulation.  The IMM argues that PJM's goal should be to ensure the use of the most current forward information about market prices.  The IMM therefore recommends use of forward prices averaged over the week that ends 134 days prior to the BRA.[169]  Noting that offers are due 120 days prior to the BRA, the IMM contends that 14 days gives auction participants time to include the latest offset results in offers.  The IMM argues that the same timing should apply to natural gas forward data.[170]

112.    PJM responds to the IMM by arguing that price averages using fewer than 30 days results in a smaller sample size of the settlement data and could be more susceptible to market manipulation.  Nevertheless, PJM states that it would not object to shortening the window to a one-week period if the Commission finds a shorter window to be appropriate.[171]

113.    PJM, however, objects to retrieving such data 134 days prior to the BRA.  PJM states that the proposed language in Tariff, Attachment DD, section 5.14(h-1)(3)(A), requires PJM to "post, by no later than one hundred fifty (150) days prior to the commencement of the offer period for the relevant RPM Auction, a preliminary estimate

---

[167] PJM Second Compliance Transmittal at 14 (citing Brattle Aff. ¶ 16; proposed Tariff, Attach. DD, § 5.10(a)(v-1)(C)(2)).  PJM notes that the daily interval here refers to settlement price updating.  The underlying product is monthly (e.g., delivering energy at the specified location every day for the month of July 2024).  *Id*. at 14 n.38.

[168] *Id.* at 14 n.40.

[169] IMM Protest of Second Compliance Filing at 14.

[170] *Id.*

[171] PJM Answer to Second Compliance Filing at 8-9.

for the relevant delivery year of the default Minimum Floor Offer Prices." To accomplish this, PJM states it will need to obtain data sufficiently in advance of 150 days prior to the BRA; thus it would be impossible to use data from 134 days prior to the BRA. In addition, PJM states that using data from 134 days prior to the BRA would provide only two weeks for the calculation and posting of the E&AS Offsets, as well as the market participants' review of such values. PJM states that the various simulation runs take several days to complete before the standard E&AS Offset values can be posted. In turn, PJM states, Capacity Market Sellers also need time to review and determine whether to seek a resource-specific exception upon reviewing the E&AS Offset values. Finally, PJM states that in the event a Capacity Market Seller decides that it needs to seek a resource-specific MOPR exception request, sufficient time must be afforded for the seller to submit the necessary documentation used to demonstrate the resource-specific values no later than 120 days prior to the BRA.[172]

### iii.    Commission Determination

114.    Under FPA section 206, whether initiated by a complaint or sua sponte, the Commission has the burden to establish a just and reasonable rate to replace the rate it has found unjust and unreasonable.[173] We find PJM's proposal to use forward prices averaged over the 30-day period that ends 180 days before the BRA to be just and reasonable.

115.    The IMM argues that PJM's proposal is not just and reasonable because it averages futures prices over 30 days and thus, the IMM asserts, does not use sufficiently current data. We disagree. Averaging futures prices over 30 days provides a larger sample size of futures prices that is likely both to be influenced less by any short-term price volatility and to make the futures price average less susceptible to manipulation.[174]

---

[172] *Id.*

[173] *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 353 (D.C. Cir. 2014); *Md. Pub. Serv. Comm'n v. FERC*, 632 F.3d 1283, 1285 n.1 (D.C. Cir. 2011).

[174] *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 955 (D.C. Cir. 2007) (finding, in a complaint under the ICA, that "[w]e need not decide whether the Commission has adopted the best possible policy as long as the agency has acted within the scope of its discretion and reasonably explained its actions."); *Cities of Batavia v. FERC*, 672 F.2d 64, 84 (D.C. Cir.1982) ("[T]he billing design need only be reasonable, not theoretically perfect."); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,216, at P 34 n.48 (2013) (in a section 206 complaint case, finding that "that there may be many just and reasonable methods of cost allocation that the Commission could adopt . . . [however] we need only select a just and reasonable methodology and we find that the postage-stamp methodology is just and reasonable.").

We recognize that the IMM's proposal could account for real shifts in market expectations that may occur closer to when an auction is run. However, we find that the asserted benefit of capturing these effects is outweighed by the benefit of PJM's approach. We think that PJM's approach will better represent longer-term trends for forward energy prices and provide a more robust average because it is less susceptible to being skewed by potential random price volatility that may occur within a shorter time period.

116.    The IMM also proposes an alternative to use forward prices averaged over the week that ends 134 days prior to the BRA because, the IMM asserts, that still provides participants time to include the latest offset results in offers, which are due 120 days prior the auction. We do not find the difference between 134 and 180 days to be particularly meaningful and, as discussed above, find that PJM's month-long average as compared to a weeks-long average does provide the benefit of a larger sample size. PJM also points out difficulties it and the auction participants would encounter if the Commission required a shorter period.

117.    For these reasons, we adopt PJM's proposal and find it to be just and reasonable and compliant with the May 2020 Order.[175]

### f.    **Mapping from Electricity Futures Trading Hubs to Zones**

### i.    **PJM's Compliance Filing**

118.    PJM asserts that high correlations in historic prices between each of the Selected Hubs and specific PJM Zones enable ready mapping of Zones to hubs. PJM states that this mapping defines the appropriate sources and sinks for determining locational basis differentials between each of the Zones and its mapped hub. PJM explains that adding these differentials to the mapped hub price determines the corresponding Zone price.[176] PJM proposes to use long-term FTR auction results, along with historic data on marginal losses, to calculate forward monthly peak and off-peak prices for each Zone. PJM explains that this approach is not novel because Brattle and S&L's standard practice for

---

[175] *See United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1169 (D.C. Cir. 1996) (per curiam) ("FERC correctly counters that the fact that AEPCO may have proposed a reasonable alternative to SFV rate design is not compelling. The existence of a second reasonable course of action does not invalidate an agency's determination."); *see also* May 2020 Order, 171 FERC ¶ 61,153 at P 320. Because PJM may make a section 205 filing to revise these Tariff provisions, we find it reasonable to accept PJM's proposal over alternatives if PJM's proposal is just and reasonable.

[176] PJM Second Compliance Transmittal at 15-16 (citing Brattle Aff. ¶¶ 51, 53 & tbl. 5).

estimating future congestion differentials a few years out is to use differences in congestion prices between each Zone and the hub, from the latest long-term FTR auction.[177] PJM explains that the longest-term FTRs traded in PJM's auctions are three years forward. PJM states that even allowing for the fact that the latest long-term FTR auction results available at the time of PJM's E&AS Offset calculations will be for the delivery year prior to that for which the BRA is being run, the long-term FTRs are a reasonable indicator of the market's view of future congestion applicable in the delivery year and will reflect shifting patterns much more quickly than, for example, relying on historical congestion differentials from four to six years before the delivery year.[178]

119.    To support its decision to use FTR data, PJM states that Brattle and S&L found the long-term FTR auctions to be competitive, with ownership unconcentrated.[179] PJM states that the consultants also analyzed how well historical long-term FTR prices align with realized congestion in the day-ahead market between the trading hubs and Zones during the same time period for the 2011/2012 to 2019/2020 Delivery Years. PJM states that the consultants concluded that, although long-term FTRs do not accurately predict the realized congestion in the delivery year, FTR prices do incorporate trends; therefore, using FTR prices to forecast basis differentials incorporates such shifts sooner than using trailing historical prices to forecast basis differentials.[180]

120.    PJM states that it must adjust the long-term annual FTR prices to obtain monthly values for the E&AS Offset estimates. PJM proposes to shape the annual FTR prices by month using the congestion component of monthly average day-ahead price differentials between the Zone and relevant hub from the past three years.[181]

121.    PJM states that, in addition to the congestion differences, zonal prices also need to incorporate the marginal losses expected between the hub and its mapped Zones. PJM proposes to perform this adjustment using historical zonal day-ahead loss prices scaled by

---

[177] *Id.* at 16 (citing Brattle Aff. ¶ 17; proposed Tariff, Attach. DD, § 5.10(a)(v-1)(C)(3)).

[178] *Id.* at 16 (citing Brattle Aff. ¶ 17).

[179] *Id.* at 16-17 (citing Brattle Aff. ¶ 54).

[180] *Id.* at 17 (citing Brattle Aff. ¶ 55).

[181] *Id.* (citing Brattle Aff. ¶ 17). PJM proposes to add "for each month of the year, the difference between (a) the historical monthly average day-ahead congestion price differentials between the Zone and relevant hub and (b) the historical annual average day-ahead congestion price differentials between the Zone and hub." *Id.* at 17 n.54 (citing proposed Tariff, Attach. DD, sec. 5.10(a)(v-1)(C)(3)).

the relationship between the forward price at the hub and the historic day-ahead LMPs for the hub.[182]  PJM states that the end result of this step of the analysis is forward day-ahead energy prices for each of the 20 PJM Zones, and for each month, on-peak period, and off-peak period in the delivery year.[183]

### ii.    **Comments, Protests, and Answers**

122.   The IMM argues that PJM does not provide a substantive reason why it proposes to use long-term FTR prices to estimate part of the locational differences to apply to the forward prices at the Selected Hubs.  The IMM argues that PJM should instead shape forward prices using the historical distribution of LMPs by hour and location, consistent with opportunity cost calculations.  The IMM explains that the long-term FTR auction prices will not be available for two years after they are needed due to a mismatch between the timings of the FTR auction and the BRA.[184]  In addition, the IMM states, because the FTR data are reflective of congestion but not losses and do not capture monthly and hourly price variation, this approach requires additional adjustments based on historical LMPs.[185]  The IMM contends that a simpler process would be to shape the forward energy prices using only historical LMPs, which are a more reliable and more transparent method of calculating locational price differences.[186]

123.   In its answer, PJM recognizes the timing mismatch between FTR and capacity auctions[187] but finds that any detriment is well outweighed by the facts that (1) long-term

-----

[182]  *Id.* at 17-18 (citing Brattle Aff. ¶ 18).  PJM proposes to calculate the added loss differential "as the average of the difference between the loss components of the historical on peak or off peak day-ahead LMPs for the Zone and relevant hub in that month across the three year period scaled by the ratio of the forward monthly average on-peak or off-peak day-ahead LMP at such hub to the average of the historical on-peak or off-peak day-ahead LMPs for such hub in that month across the three year period."  *Id.* at 18 n.56 (citing Brattle Aff. ¶ 18 and proposed Tariff, Attach. DD, § 5.10(a)(v-1)(C)(4)).

[183]  *Id.* at 18.

[184]  IMM Protest of Second Compliance Filing at 10-12.  The IMM argues that both Brattle and PJM ignore this timing mismatch.  IMM Protest of Second Compliance Filing at 12-13.

[185]  *Id.* at 10.

[186]  *Id.* at 10-11.

[187]  PJM Answer to Second Compliance Filing at 6.  PJM notes that the IMM contends that the timing mismatch is two years, not one year as Brattle recognized.  PJM states that the difference appears to be due to the IMM's implicit assertion that only the

FTR auction results reflect the market's expectation of future conditions; and (2) it is "standard practice" for market participants to rely on the "differences in congestion prices between each [Z]one and the hub, from the latest long-term FTR auction."[188]  PJM states its approach is thus consistent with the Commission's directives in the May 2020 Order.[189]

124.    PJM argues that the IMM's alternative of using historical LMPs exacerbates the timing mismatch, does not reflect the market's expectation of future conditions, and would unnecessarily make this component of the forward-looking analysis backward-looking.  PJM argues that the timing mismatch between long-term FTR auction data and the applicable delivery year is one to two years, while the mismatch in using historical data is no less than three years (given that the delivery year generally is three years in the future) and would extend to six years if three years of historical data were used.  Furthermore, PJM notes that the IMM does not provide any analysis to support its argument that historical LMPs yield a more accurate basis differential than long-term FTR auction data.[190]  Making similar arguments, Exelon also argues that IMM's approach, unlike PJM's, does not account for material topology changes that will impact congestion in forward delivery years.[191]

125.    PICOs argue that the data provided by PJM shows that the monthly pattern in the FTR data does not align with the pattern in forward prices.[192]

---

prices determined in the fifth and final round of a long-term FTR auction for a given year are useful.  PJM contends that prices need not be set in stone for them to reflect participants' expectations.  PJM argues that the FTR prices at the time closest to the capacity auction are appropriate to use even if they are not final because they represent current expectations of future congestion.  *Id.* at 6 n.25 (citing IMM Protest to Second Compliance Filing at 12; PJM Second Compliance Filing, Brattle Aff. ¶ 17).

[188] *Id.* at 6-7 (citing Second Compliance Filing, Brattle Aff. ¶ 17).

[189] *Id.* at 7 (citing May 2020 Order, 171 FERC ¶ 61,153 at P 320).

[190] PJM Answer to Second Compliance Filing at 7.

[191] Exelon Answer to Second Compliance Filing at 14-16.

[192] PJM Interconnection, L.L.C., the Public Interest and Customer Organizations' Partial Protest of and Comments on Second Compliance Filing, Docket No. EL19-58-003, at 18 (filed Sept. 2, 2020) (citing Ex. A, Aff. of James F. Wilson on behalf of PICOs (Wilson Aff.) ¶¶ 39-42) (PICOs' Partial Protest of Second Compliance Filing).

126.    PJM responds to PICOs' claim by arguing that PICOs' affiant, James F. Wilson, uses a false comparison and flawed analysis.[193]  PJM states that after correcting for these errors, Brattle shows that the basis differentials using the proposed approach closely align with the forward pricing data.[194]  Moreover, Brattle states, "[i]t is the delivered price at any given location, not the basis differential, that determines the net energy revenues of a resource."[195]  Thus, PJM argues, the proposed methodology to use congestion expectations from FTR data is a just and reasonable approach for constructing zonal price forecasts.[196]

127.    The IMM argues that annual prices from the long-term FTR auction are not a reasonable substitute for the actual distribution of LMPs in the calculation of the E&AS Offset.  The IMM claims that participation levels of the long-term FTR auctions are about half the participation levels of the annual FTR auctions.  The IMM states that the long-term FTRs involving the Selected Hubs are less than 10% of all long-term FTRs for the 2017/2020 through 2020/2023 auctions, so broad assertions about the nature of the FTR market are irrelevant.  The IMM states that the long-term FTR auction was moderately concentrated at two of the Selected Hubs and highly concentrated at the remaining Selected Hub for at least one of the last four auction planning years.[197]  In addition, the IMM notes that even Brattle acknowledges that long-term FTR prices are a demonstrably poor estimate of actual congestion.[198]

---

[193] PJM Answer to Second Compliance Filing at 13.  Specifically, Brattle states that "the Wilson affidavit compares the basis differentials from PJM Western Hub to PJM Eastern Hub implied by forward prices, to the basis differentials from PJM Western hub to PSEG, based on shaped FTR prices.  However, PSEG and PJM Eastern Hub are not equivalent; they represent electrically different locations.  Further, PJM states it appears that PICOs' affiant, Mr. Wilson, neglected to include losses in the calculation of the basis from 'shaped FTR prices,' even though our recommended approach for forecasting zonal prices includes both an FTR component and a historical losses component."  PJM Answer Second Compliance Filing at 13 (citing Brattle Supp. Aff. ¶ 21).

[194] *Id.* (citing Brattle Supp. Aff., fig. 2).

[195] *Id.* (citing Brattle Supp. Aff. ¶ 22).

[196] PJM Answer to Second Compliance Filing at 13.

[197] IMM Protest of Second Compliance at 11.

[198] *Id.* (citing *2020 Q. State of the Mkt. Rep. for PJM:  Jan. through Jun.*, § 13: FTRs and ARRs, fig. 13-33, at 683; Brattle Aff. ¶ 55 ("Long-term FTRs of course do not

128.    In regard only to PJM's derivation of unit-specific forward energy revenue, Exelon takes issue with PJM's proposed two-step calculation of the basis differential between futures trading hubs and generator busses:  (1) using FTR data to perform hub-to-Zone adjustments and then (2) using historical price correlations to perform Zone-to-bus adjustments.  Exelon states that although PJM's approach is appropriate for calculating forward prices at the CT Reference Resource node due to the lack of market information regarding the relationship between prices at the hypothetical CT Reference Resource's location and the hub, the same does not hold true for existing units because FTR market data exists for every bus.  Exelon argues that each step of PJM's proposed two-step process introduces potential error and inaccuracy, so PJM should instead use only FTR auction results to derive unit-specific forward energy revenue.[199]

129.    Exelon also argues that PJM's adoption of a one-step approach would resolve another problem with PJM's proposal.  Exelon notes that PJM's two-step approach assumes that the appropriate Zone for an existing unit is the Zone in which it is located.[200]  Exelon argues that this assumption is wrong if a unit has an electrical tie to a neighboring Zone that is stronger.  Exelon claims that PJM's assumption does not hold true for at least one major generation station, the Salem Nuclear Station, which is in the Atlantic City Electric Zone but is electrically closest to the PSEG Zone.  Exelon argues that PJM should revise the proposed Tariff to state that it will map generator busses to Zones not based on geographic proximity, as the proposed Tariff suggests, but based on electrical proximity, i.e., the distribution factor (DFAX).  Alternatively, Exelon argues that adoption of the one-step method for calculating hub-to-bus basis differentials would eliminate the need for Market Sellers to correct PJM's erroneous correlation assumptions on a piecemeal basis.  Thus, Exelon requests that the Commission should require PJM to expand its use of FTR auction results to estimate hub-to-bus basis differentials for existing units.[201]

130.    Exelon contends that Market Sellers would be at a distinct disadvantage trying to correct PJM's assumptions after the fact, as they do not possess PJM's DFAX values or model.  Exelon states that PJM could effectuate the change to a one-step approach by

_____

accurately predict the realized congestion in the delivery year due to the uncertainty of the market conditions they serve to hedge.")).

[199] PJM Interconnection, L.L.C., Limited Protest of Exelon Corporation, Docket No. EL19-58-003, at 4-5, 15-18 (Sept. 2, 2020) (Exelon Limited Protest of Second Compliance Filing).

[200] Exelon Limited Protest of Second Compliance Filing at 16 (citing proposed Tariff sec. 5.10(a)(v-1)(C)(6); PJM Second Compliance Filing at 21-22).

[201] *Id.* at 15-18.

amending proposed Tariff section 5.10(a)(v-1)(3) through (5) to include references to "unit-specific node" in each instance in which a "Zone" is referenced, with appropriate language limiting such calculations to the development of unit-specific MOPR Floor Offer Prices and Market Seller Offer Caps, and eliminating proposed Tariff section 5.10(a)(v-1)(6).[202]

131.    Exelon also states that the IMM's one-step, historical approach proposal for PJM to use historical price relationships fails to comply with the mandate for PJM's E&AS Offset be forward-looking.  Exelon also argues that the Commission should endorse the use of forward FTR auction results to inform forward projections of the E&AS Offset, both at the zonal and nodal level.[203]

132.    In its answer, PJM agrees with Exelon that the use of hub-to-node FTR auction values is a reasonable means to estimate the basis differential for projecting forward prices of existing resources that seek a resource-specific E&AS Offset.[204]  PJM also agrees with Exelon that a one-step approach would increase measurement precision. Thus, while PJM continues to find that its two-step approach is reasonable, PJM states that it would be willing to implement a one-step approach on compliance, if directed by the Commission.[205]

### iii.    Commission Determination

133.    We find that PJM's proposal to use long-term FTR prices to estimate part of the locational differences to apply to the forward prices at the futures trading hubs is just and reasonable, and it complies with the May 2020 Order.[206]  We are unpersuaded by the arguments of the IMM and PICOs.  The IMM argues that the proposal is unreasonable due to the mismatch between the timing of the FTR auction and the BRA, which is a mismatch that PJM acknowledges.[207]  We agree with PJM's argument that the harm caused by the timing mismatch is outweighed by the facts that (1) long-term FTR auction

---

[202] *Id.* at 17-18.

[203] *Id.* at 15-16.

[204] PJM Answer to Second Compliance Filing at 5.

[205] *Id.* at 5-6 (citing Exelon Limited Protest of Second Compliance Filing at 15, 17).

[206] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[207] We recognize that PJM and IMM disagree on the precise magnitude of the mismatch, but that disagreement does not affect our reasoning here.

results reflect the market's expectation of future conditions; and (2) it is standard practice among market participants to rely on prices from long-term FTR auctions when conducting their own forecasts. Further, as to the second point, one reason the Commission directed PJM to adopt a forward-looking methodology was to be consistent with project valuation methods used by market participants.[208]

134.    We also are unpersuaded by PICOs' argument about whether the data provided by PJM shows that the monthly pattern in the FTR data aligns with the pattern in forward prices. We are persuaded by statements of PJM's affiant, Brattle, that "[i]t is the delivered price at any given location, not the basis differential, that determines the net energy revenues of a resource."[209] We agree with PJM that the proposed methodology to use congestion expectations from FTR data is a just and reasonable approach for constructing zonal price forecasts.

135.    The IMM argues that the participation levels of the long-term FTR auctions are much lower than the participation levels of the annual FTR auctions, and that long-term-auction participation at the three relevant hubs is a small fraction of total participation. Based on these facts, the IMM concludes that "broad assertions about the nature of the FTR market are irrelevant."[210] We disagree that assertions about the whole FTR market cannot also apply to a subset of the market. The IMM's observation that participation at the Selected Hubs is lower in comparison with broader participation levels does not necessarily mean that participation is too low to reflect trends.

136.    Similarly, we do not find persuasive the IMM's reliance on the assertion that long-term FTR prices poorly predict actual congestion. As PJM explains, the purpose of using FTR data is to capture congestion trends, not to calculate accurate estimates of congestion.[211] Finally, the IMM states that the long-term FTR auction was moderately concentrated at two of the three hubs and highly concentrated at one of the hubs for at least one of the last four auction planning years.[212] Brattle and S&L, on the other hand, claim that the long-term FTR auctions have been found competitive, with ownership

---

[208] May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[209] PJM Answer to Second Compliance Filing at 13 (citing Brattle Supp. Aff. ¶ 22).

[210] IMM Protest of Second Compliance at 11.

[211] PJM Second Compliance Transmittal, Brattle Aff. ¶ 55.

[212] IMM Protest of Second Compliance Filing at 11.

unconcentrated.[213]  Based on the record, we find there is insufficient evidence to find that the level of competitiveness of the auctions renders PJM's proposal unjust and unreasonable.

137.    The IMM argues that PJM should adopt the IMM's preferred approach for shaping forward prices—by using the historical distribution of LMPs—because this approach is consistent with PJM's opportunity cost calculator.  As we found regarding PJM's use of ICE data instead of Platts' data, we find that PJM is not bound to the methods already used by its opportunity cost calculator.  Furthermore, we find that PJM has supported its proposed use of FTR auction data as just and reasonable, and it complies with the May 2020 Order.[214]  As PJM argues, the IMM's alternative of using historical LMPs exacerbates the timing mismatch discussed above, does not reflect the market's expectation of future conditions, and would unnecessarily make this component of the analysis backward-looking.  As PJM also notes, the IMM does not provide analysis showing that historical LMPs yield a more accurate basis differential than FTR auction data.[215]  Therefore, we decline to require PJM to use historical LMPs instead of FTR data.

138.    Exelon argues that PJM unnecessarily uses two steps to derive the basis differential between hubs and busses for unit-specific forward energy revenue:  (1) using FTR data to perform hub-to-Zone adjustments and then (2) using historical price correlations to perform Zone-to-bus adjustments.  Exelon argues that PJM instead could perform hub-to-bus adjustments directly because FTR market data exists at every hub.  PJM agrees with Exelon that a one-step method would increase accuracy and, while continuing to find its two-step approach reasonable, states that it is willing to implement a one-step approach.  We agree with PJM that its two-step approach is reasonable.  We find that PJM does not need to change its approach and find PJM's proposal is compliant with the May 2020 Order.[216]

139.    We also are unpersuaded by Exelon's argument against PJM's assumption that the appropriate Zone for an existing unit is the Zone in which it is located.  Exelon argues that because some units have an electrical tie to a neighboring Zone that is stronger, PJM should map generator busses to Zones based on electrical proximity as measured by the

---

[213] PJM Second Compliance Transmittal at 16-17 (citing Brattle Aff. ¶ 54).

[214] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 320; *see also supra* notes 173-174.

[215] PJM Answer to Second Compliance Filing at 7.

[216] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 320; *see also supra* notes 173-174.

Document Accession #: 20201112-3074          Filed Date: 11/12/2020

DFAX. We find, however, that PJM's simplifying assumption is reasonable. Further, as Exelon recognizes, Market Sellers can correct any correlation assumptions they suspect are erroneous, even if such corrections may be challenging due to Market Sellers' lack of access to DFAX values or PJM's model, as Exelon suggests.

### g.    Natural Gas Futures Trading Hubs

### i.    PJM's Compliance Filing

140.    PJM states that fuel costs are a critical input to the energy and ancillary services net revenue estimates because they are the principal cost incurred by most resources to provide energy. PJM proposes to use fuel futures market prices in a similar manner to the way it proposes to use electricity futures market prices. PJM states that there are multiple futures markets for natural gas deliveries to PJM Region locations, but the liquidity of those markets varies for the 2024 time period used to match the energy futures prices.[217] PJM states that Brattle and S&L found six natural gas hubs with sufficient liquidity.[218] PJM states that the PJM Region also is served by three illiquid natural gas hubs.[219] PJM states that based on historical price correlations, each of these illiquid hubs can be mapped to one of the six liquid hubs; once mapped, forward prices for these illiquid hubs can be derived by multiplying the forward price of the liquid hub by the average ratio of the monthly price at the illiquid hub to the monthly price at the liquid hub over the most recent three years.[220] PJM states that the three illiquid hubs were actively traded in the historic period, permitting a reasonable assessment of price

---

[217] PJM states that this discussion focuses on natural gas prices because natural gas is the fuel of the CT Reference Resource assumed for setting the VRR Curve. PJM proposes to adjust the approach for other fuels as necessary. PJM Second Compliance Transmittal at 18.

[218] *Id.* at 18-19 (citing Brattle Aff. ¶¶ 29, 66 & fig. 4). The six hubs are Chicago, Transco Zone 6 (non-NY), Dominion South, Michcon, TETCO M3, and Columbia-Appalachia TCO.

[219] The three hubs are Transco Zone 6 (NY), TGP LA 500 Leg, and Transco Zone 5 Delivered. *Id.* at 19.

[220] *Id.* (citing Brattle Aff. ¶ 30).

correlations.[221] Thus, PJM proposes to use nine natural gas trading hubs—these three illiquid hubs as well as the six liquid hubs—to calculate gas costs.[222]

141.    PJM proposes to use a simple average of natural gas settlement prices for the most recent 30 trading days, for the same reasons it noted for the forward energy prices.[223] PJM states that it will assign prices from the nine natural gas futures trading hubs to the 20 PJM Zones using the hub-Zone mapping previously developed and recorded in PJM Manual 18.[224]

### ii.    **Comments and Protest**

142.    The IMM describes its own criteria for selecting the relevant natural gas pricing hubs for each Zone and lists those hubs.[225] The IMM states that PJM did not follow the same criteria, and neither PJM nor Brattle defined criteria and applied them. The IMM states that it uses the same hub mapping as PJM for all but three Zones: AEP, PPL, and PSEG. The IMM states that PJM uses forward prices from a different hub to calculate forward gas prices for the three Zones. The IMM argues that there is no reason for PJM to estimate forward prices for these three Zones because Platts and ICE provide the data.[226] The IMM argues that PJM is inconsistent in its use of forward data because it uses settlement prices calculated by ICE for some hubs, but not for all hubs. Effectively, the IMM contends, PJM is substituting Brattle's judgment about prices at these three pricing points for the judgment of Platts or ICE. The IMM argues that because natural gas pricing is Platts' core business and the markets use Platts' data, the mapping should use Platts' data.[227]

---

[221] *Id.*

[222] *Id.* at 20.

[223] PJM Second Compliance Transmittal at 20 (citing Brattle Aff. ¶ 16). PJM states that it will retrieve the forward gas price data 180 days before the relevant BRA and use data from the 30 preceding trading days at that time. *Id.* at 20 n.61.

[224] *Id.* at 20.

[225] IMM Protest of Second Compliance Filing at 18, 23 tbl 3.

[226] *Id.* at 18 & n.31 (citing S&P Global Platts, "Methodology and Specifications Guide M2MS—Gas Methodology").

[227] *Id.* at 18-19.

143.    The IMM explains that its other protests regarding PJM's use of natural gas forward prices are similar to its protests related to the use of electricity forward prices (e.g., PJM's use of ICE prices instead of Platts' prices without explanation).[228]

144.    In its answer, noting the IMM's objection to PJM's use of prices posted by ICE, PJM responds that Platts' prices use ICE pricing data as the starting point for its determination of forward price curves so both rely on the same underlying data sets.  PJM further explains that ICE pricing data is more straightforward and more transparent because it makes settlement prices for recent trading days publicly available, whereas Platts' data are available only to subscribers.[229]

### iii.    Commission Determination

145.    We find that PJM's proposal regarding the selection of natural gas pricing hubs is just and reasonable and complies with the May 2020 Order.[230]  The IMM argues that PJM did not explain its criteria and did not use the correct criteria for hub selection and pricing data; we disagree.  We find that PJM reasonably relies on the analysis of Brattle and S&L, including on the consultants' explanation of their methodology included in their report, to identify six natural gas hubs with sufficient liquidity.  We similarly find that PJM reasonably relies on the consultants' methodology for mapping three illiquid gas pricing hubs to one of the six liquid hubs based on historical price correlations.  Regarding the IMM's claim that its concerns as to PJM's choice of natural gas hubs is analogous to its concerns regarding electricity hubs, we note that we have addressed the IMM's arguments as to the electricity hubs, above.[231]

146.    We also disagree with the IMM that PJM's proposal to use ICE data instead of Platts' data for all hubs is not reasonable.  We find instead that PJM has supported its rationale for using ICE data over Platts', i.e. that its proposed use of ICE data has transparency benefits because ICE data is both publicly-available and underlies Platts' pricing data.  For these reasons, we find that PJM's proposal regarding its choice of pricing data is just and reasonable and we adopt PJM's proposal.

---

[228] *Id.* at 19-20.

[229] PJM Answer to Second Compliance Filing at 17-18 (citing Brattle Supp. Aff. ¶¶ 8-9).

[230] *See supra* notes 173-74; *see also* May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[231] *See supra* PP 102-105.

### h.  Alignment of Electricity Hubs with Natural Gas Hubs

### i.  Comments, Protest, and Answer

147.   PICOs argue that the energy and fuel prices that PJM proposes to use are mismatched.  PICOs note that PJM proposes to have the energy and ancillary services revenues for PJM's mid-Atlantic and eastern regions be simulated based on forward natural gas prices from eastern PJM but forward electricity prices from western PJM as adjusted based on the adjusted FTR auction results.  PICOs argue that as a result, should natural gas forward prices in eastern PJM reflect expectations of increasing pipeline constraints and higher prices during future winter months, the E&AS Offset would reflect such expectations for natural gas prices but likely would not reflect the corresponding expectation of higher electricity prices in those same areas.  PICOs state that such a misalignment would result in an understatement of the likely net revenues for CTs located in eastern PJM.[232]  To address this issue, PICOs contend that PJM should use additional, less liquid forward prices for the target year, subject to approval of the IMM. PICOs state that PICOs' affiant, Mr. Wilson, also recommends the use of prices for one or two years out when prices three years out are unavailable.[233]

148.   In its answer, PJM asserts that its proposed use of certain hubs for forward prices for electricity and natural gas prices is appropriate and allows PJM to calculate a reasonable estimate of an E&AS Offset.[234]  PJM responds to PICOs' protest by stating that according to Brattle, use of data from illiquid PJM hubs "is not a viable option" because it "introduces the potential for manipulation of those zonal prices with relatively small transactions, causing large distortions in the forward markets and in the capacity market parameters and outcomes."[235]  In other words, PJM argues, the benefits of aligning the electric Selected Hubs with the natural gas hubs are outweighed by the risk of using illiquid hubs.  PJM argues that because electricity prices in eastern PJM hubs have limited liquidity and are inconsistent year over year, it would be inappropriate to use these prices.[236]

---

[232] PICOs' Partial Protest of Second Compliance Filing at 18 (citing Wilson Aff. ¶¶ 40-44).

[233] Id. at 19 (citing Wilson Aff. ¶¶ 45-47).

[234] PJM Answer to Second Compliance Filing at 11.

[235] Id. at 12 (citing Brattle Supp. Aff. ¶ 18).

[236] Id. (citing Brattle Supp. Aff. ¶ 18).

149.    In response to PICOs' contention that PJM and the IMM could monitor prices from illiquid hubs, PJM states that this approach ignores the advantage of relying on futures prices in the first instance, which is that the futures prices incorporate market participants' views of various market factors.  PJM states that under PICOs' approach, PJM and the IMM would have to substitute their own subjective views.[237]

### ii.    Commission Determination

150.    We find the PJM proposal to be just and reasonable and compliant with the May 2020 Order.[238]  PICOs take issue with PJM's proposal to have the energy and ancillary services revenues for PJM's mid-Atlantic and eastern regions be simulated based on forward natural gas prices from eastern PJM but forward electricity prices from western PJM.  PICOs argue that this misalignment will result in an understatement of the likely net revenues for CTs located in eastern PJM.  PICOs therefore contend that PJM should use additional, less liquid forward prices for the target year, subject to approval of the IMM.  We disagree.  As PJM's affiant, Brattle, explains, the use of data from illiquid PJM electricity hubs "is not a viable option" because it "introduces the potential for manipulation of those zonal prices with relatively small transactions, causing large distortions in the forward markets and in the capacity market parameters and outcomes."[239]  We agree with PJM that the benefits of aligning the electric Selected Hubs with the natural gas hubs are outweighed by the risk of using illiquid hubs.  We also agree with PJM that mitigated prices from illiquid hubs would not reflect market participants' views on future conditions.

### i.    E&AS Offset for the PJM Region

### i.    PJM's Compliance Filing

151.    PJM's proposed Tariff language describes how PJM will determine the E&AS Offset for the PJM Region.[240]  PJM proposes to use historic pricing patterns from each of the three most recent years to produce three years of shaped hourly energy forward prices and shaped daily natural gas forward prices, and then to run the proposed Projected

---

[237] *Id.* at 13 (citing PJM Second Compliance Transmittal, Brattle Aff. ¶ 52).

[238] *See supra* notes 173-74; *see also* May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[239] PJM Answer to Second Compliance Filing at 12 (citing Brattle Supp. Aff. ¶ 18).

[240] Proposed Tariff, Attach. DD, sec. 5.10(a)(v-1)(A).

E&AS Dispatch Model separately for each of those years.[241]  Each of the three simulations uses forward hourly LMPs for the PJM Region, which are calculated using a load-weighted average of Zonal LMPs.[242]  PJM then proposes to average the revenues resulting for the three years to produce a single-year estimate that encompasses varying patterns in hourly energy prices and daily natural gas prices.[243]

## ii.    **Comments and Protests**

152.    The IMM asserts that PJM should use the average Net CONE across all Zones for the Regional Transmission Organization (RTO) Net CONE for both the RTO Variable Resource Requirement (VRR) Curve and the Capacity Performance nonperformance charge rate.  The IMM notes that PJM instead uses average RTO prices to define the dispatch of the CT Reference Resource used to define the RTO VRR Curve.  The IMM argues that because no resource in PJM faces RTO average prices, and thus no resource receives revenue based on an RTO average, the PJM RTO calculation is an artifact that has no relevance to actual E&AS Offsets and should not be used for any purpose.[244]

153.    The IMM argues that for cases in which the RTO Net CONE is used for external generation capacity resources, PJM should calculate net energy and ancillary services revenue based on the Zone where the resource is interconnected.[245]

## iii.    **Commission Determination**

154.    We find PJM's proposal to use a forward-looking E&AS Offset to be just and reasonable and compliant with the May 2020 Order.[246]  We have considered the IMM's argument that PJM should not use RTO average prices to define the dispatch of the reference resource used to define the RTO VRR Curve.  PJM's proposal to use RTO average prices is consistent with its prior approach and the existing Tariff.[247]  The IMM

---

[241] PJM Second Compliance Transmittal at 21.

[242] *Id.* at 21 n.65 (citing Proposed Tariff, Attach. DD, sec. 5.10(a)(v-1)(C)(7)).

[243] *Id.* at 21.

[244] IMM Protest of Second Compliance Filing at 25.

[245] *Id.* at 25.

[246] *See supra* notes 173-74.

[247] Intra-PJM Tariff, Attach. DD, § 5.10 Auction Clearing Requirements (28.0.0), § 5.10(a)(v)(A) ("The Office of the Interconnection shall determine the Net Energy and Ancillary Services Revenue Offset each year for  the PJM Region as (A) the annual

has not explained, nor can we deduce, why a change to the just and reasonable tariff on file is necessary to effectuate a forward-looking offset. This change also was not part of the Commission's compliance directives in the May 2020 Order, which did not require PJM to amend the use of RTO average prices in its methodology, and therefore is beyond the scope of this filing.[248] Moreover, we find that the IMM has not shown that PJM's existing tariff is unjust and unreasonable or that the IMM's proposal would lead to more accurate results. While the IMM is correct that no resource faces RTO average prices, it also is true that no resource would face an RTO average Net CONE calculated as the IMM proposes. Thus, it is not clear that the IMM's proposed approach would lead to significantly more accurate results than PJM's proposed approach. We, therefore, find PJM's proposal to be just and reasonable.[249]

155.    The IMM further argues that for cases in which the RTO Net CONE is used for external generation capacity resources, PJM should calculate net energy and ancillary services revenue based on the Zone where the resource is interconnected. For the same reasons discussed, above, we find that it is just and reasonable for PJM to use RTO average forward prices in calculating the RTO Net CONE applied to external generation capacity resources.

### j.    **Transparency of the Filing**

### i.    **PJM's Compliance Filing**

156.    PJM states that because the liquidity of trading hubs may change over time, the proposed Tariff language states that PJM will specify the hubs in PJM Manuals. PJM states that its approach recognizes that activity at other trading hubs is evolving. Therefore, PJM is not embedding the specific products and hubs in its Tariff at this time so it does not lock in a fixed set of trading hubs. This will eliminate the need for the Commission to determine the liquidity of individual trading hubs on a hub-by-hub basis in future proceedings.[250]

---

[248] average of the revenues that would have been received by the Reference Resource from the PJM energy markets during a period of three consecutive calendar years preceding the time of the determination."); *see also PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,029 (2019), *aff'd on reh'g*, 171 FERC ¶ 61,040 (2020).

[248] The IMM should have raised such an argument on rehearing of the May 2020 order and therefore its argument here constitutes a late-filed rehearing of that order.

[249] *See supra* notes 173-74.

[250] PJM Second Compliance Transmittal at 11 & n.29 (citing Proposed Tariff, Attach. DD, sec. 5.10(a)(v-1)(C)(1)). PJM argues that under the Commission's "rule of

## ii.     **Comments, Protests, and Answers**

157.    The IMM argues that PJM's proposal for calculating forward electricity prices lacks transparency.  The IMM argues specifically that PJM does not provide the details of the FTR calculations or the detailed results, nor does the filing specify the forward prices data points and source of such data points.  The IMM states that PJM did not define criteria for selecting relevant natural gas pricing hubs for each Zone.  The IMM also claims that it would not be possible to calculate the forward prices based on the Tariff language.[251]  The IMM argues that proposed Tariff language is extremely vague and provides PJM with significant discretion over decisions that can significantly affect PJM markets.  The IMM notes that PJM does not include the name of the Selected Hubs in the Tariff, referencing only the undefined term "liquid hubs," without explaining how liquid electricity hubs will be selected in the future, how many liquid electricity hubs will be included, or how these hubs will be mapped to specific Zones.  The IMM contends that identifying PJM's Selected Hubs only in the PJM Manuals provides PJM with inappropriate discretion to affect the calculation in significant ways.[252]

## iii.     **Commission Determination**

158.    We find that PJM's filing is just and reasonable and complies with the May 2020 Order.[253]

159.    The IMM argues that PJM's filing lacks transparency because PJM fails to provide (1) the details of the FTR calculations or the detailed results, (2) specification of the forward prices data points and source of such data points, (3) PJM's criteria for selecting the relevant natural gas pricing hubs.  We note that, contrary to the IMM's assertions,

---

reason," only matters that significantly affect rates, terms, and conditions of service, or that are reasonably susceptible to specification, must be included in the Tariff.  *City of Cleveland v. FERC*, 773 F.2d 1368, 1376 (D.C. Cir. 1985).  For this reason, PJM continues, it is well understood that "study assumptions and parameters are likely to change over time as planners gain experience in implementing the new planning procedures.  Thus, rigid specifications or formulas set out in the Tariff would likely lead to less reliable assessments due to the inability of planners to adapt to changing circumstances."  *Sw. Power Pool, Inc.*, 136 FERC ¶ 61,050, at P 37 (2011).

[251] IMM Protest of Second Compliance Filing at 3, 14.

[252] *Id.* at 8-10.

[253] May 2020 Order, 171 FERC ¶ 61,153 at P 320.

PJM's filing does provide some of the details and calculations listed by the IMM.[254] The IMM also claims that it would not be possible to calculate the forward electricity prices based on the Tariff language.[255] The IMM notes that the proposed Tariff language does not name the Selected Hubs and does not provide other hub-related details. The IMM contends that having the hubs identified only in the PJM Manuals provides PJM with inappropriate discretion to affect the calculation.[256] We disagree. PJM's compliance obligation is to describe adequately the methodology for calculating the forward-looking E&AS Offset in the Tariff. This need not include every implementation detail to be just and reasonable.[257] Because details such as the liquidity of electricity hubs may change over time, it is reasonable for PJM to specify such details in PJM Manuals. As PJM points out, the Commission has long understood that "study assumptions and parameters are likely to change over time as planners gain experience in implementing the new planning procedures. Thus, rigid specifications or formulas set out in the Tariff would likely lead to less reliable assessments due to the inability of planners to adapt to changing circumstances."[258]

### 5. Energy and Ancillary Services Offset Modeling Assumptions

#### a. Proposal Overview

160.    PJM proposes to replace the Peak-Hour Dispatch Model with the Projected E&AS Dispatch Model to simulate resource commitment and dispatch and settlement of resources' output schedules against shaped, forward-looking day-ahead and real-time energy and ancillary services prices.[259] PJM proposes to use the Projected E&AS Dispatch Model to optimize schedules for dispatchable resources (e.g., CT, CC, coal, and storage), and proposes to assume a certain level of output for other resources (nuclear, wind, and solar) that typically are not dispatched by PJM.[260]

---

[254] PJM Second Compliance Transmittal at 16-22 (citing Brattle Aff. ¶¶ 54-58 (FTRs), 59-65 (forward price data points and sources), and 66-68 (gas hub selection).

[255] IMM Protest of Second Compliance Filing at 3, 14.

[256] *Id.* at 8-10.

[257] *See supra* notes 173-74.

[258] *Sw. Power Pool, Inc.*, 136 FERC ¶ 61,050 at P 37.

[259] PJM Second Compliance Transmittal at 28.

[260] *Id.*

161.    The Projected E&AS Dispatch Model simulates whether a dispatchable resource will run in any hour of the day and for any contiguous periods by optimizing its energy and ancillary services commitment and dispatch in order to maximize its profit based on the input forward energy and ancillary service prices and forward fuel prices, subject to the constraints of the resource's operating parameters.[261]  To do so, the model compares a resource's energy offer against forward LMPs and ancillary services market-clearing prices.  The resulting dispatch schedule for the resource is used to estimate its future revenues.  PJM proposes to account for revenues from all market-based ancillary service products:  Synchronized Reserves, Non-Synchronized Reserves, Secondary Reserves, and Regulation.  PJM notes that the current, backward-looking E&AS Offset approach omits these ancillary services and considers only the cost-based revenues from providing reactive service.[262]

### b.    Use of Historic Versus Forward Reserve Prices

### i.    PJM's Compliance Filing

162.    PJM states that because there are no observable forward markets for ancillary services, PJM must rely on historical market prices for ancillary services.[263]  Thus, for Synchronized and Non-Synchronized Reserves, PJM proposes to employ historical prices in the Projected E&AS Dispatch Model, in which reserve prices will interact with the forward hourly LMPs, and commitment and dispatch projections for the resource will be made accordingly.[264]

163.    PJM states that PJM, Brattle, and S&L did begin to develop a process to estimate forward ancillary services prices.  PJM states that the primary method discussed was to scale historic reserve prices by the ratio of the forward energy prices to the historic energy prices.  PJM states that while in the long term such an approach may be suitable, under the current set of forward energy prices this approach would result in scaling down reserve prices by as much as 33%.  PJM states that such an outcome would be contrary to the expected increase in ancillary services market revenues relative to their historic levels following implementation of the reserve market reforms.  As a result, and in an effort to not introduce arbitrary bias into the new approach, PJM proposes to use unscaled, historic ancillary services market-clearing prices for the initial implementation.  PJM states that, over time, implementation of the reserve pricing reforms will allow PJM and its

---

[261] *Id.* at 28-29.

[262] *Id.* at 22 & n.72 (citing Tariff, Attach. DD, sec. 5.10(a)(v-1)(A)(b)).

[263] *Id.* at 23 & n.74 (citing Brattle Aff. ¶ 22).

[264] *Id.* at 23.

stakeholders to observe the relationship between ancillary service prices and forward energy prices.[265]

164.    PJM states that the forward price determination for ancillary services will, at a minimum, be re-evaluated in the next quadrennial review, which is slated to begin in spring 2021.  PJM states that in the near term—i.e., before resources and the market have time to adjust to the new reserve market rules and observe implementation of the ORDCs—PJM's approach provides a reasonable proxy for expected ancillary services revenues for the vast majority of resources, as it is expected that ancillary services will continue to comprise only a small fraction of a resource's annual revenues from PJM's energy and ancillary services markets.[266]

165.    PJM states that consistent with the existing Tariff, Market Sellers that rely heavily on ancillary services for annual revenues may seek to use an alternate approach through a resource-specific MOPR Floor Offer Price determination.  PJM explains that any Capacity Market Seller that wants a different ancillary services revenue estimate for its resource's E&AS Offset can seek a resource-specific exception and establish the resource's MOPR Floor Offer Price through that process.  For example, PJM states that under the resource-specific exception process, Market Sellers may propose to use different forward prices for ancillary services, but such prices must be from a publicly available source or be otherwise readily available (like through a subscription service) and be demonstrated to be more appropriate for use on a resource-specific basis than the methodology set forth in the proposal and in the current Tariff.[267]

## ii.    **Comments and Protests**

166.    CEA argues that PJM's proposed method for calculating the E&AS Offset is not forward-looking partly because PJM does not propose to estimate future revenues for Synchronized and Non-Synchronized Reserves, choosing instead to rely on historical prices for these two products.  More broadly, CEA argues that PJM's proposed E&AS Offset does not comply with the Commission's May 2020 Order.[268]  CEA contends that the lack of forward markets for ancillary services does not relieve PJM of its obligation to

---

[265] *Id.* at 24-25.

[266] *Id.* at 26-27.

[267] *Id.* at 27 & nn.87-88 (citing proposed Tariff, Attach. DD, §§ 5.14(h-1)(2)(A) & (B)(ii) and 5.14(h-1)(3)).

[268] PJM Interconnection, L.L.C., Comments of the Clean Energy Associations, Docket No. EL19-58-003, at 2-3 & n.11 (Sept. 2, 2020) (citing May 2020 Order, 171 FERC ¶ 61,153 at P 320) (CEA Protest of Second Compliance Filing).

develop the "forward-looking methodology" directed by the Commission to account for changes in ancillary services revenues stemming from market reforms.[269]  CEA argues that PJM's proposal also contrasts with its proposed method for calculating Regulation prices.  There, CEA notes, PJM proposes to "rely not only on historical Regulation prices but historical and projected energy prices as well to develop the forward [R]egulation prices."[270]

167.   PICOs argue that PJM's proposal to use historical reserve prices will understate revenues from ancillary services both now and in the future.[271]  PICOs' affiant, Mr. Wilson, argues that the proposal will understate future reserve revenues especially if excess capacity declines and energy price expectations rise in future years because reserve prices rise faster than energy prices.[272]  PICOs argue that Brattle's own data suggests that ancillary services prices are increasing at roughly three to six times the rate of energy prices.[273]  In addition, PICOs note that PJM's simulations show a tripling of annual average Synchronized and Non-Synchronized Reserve prices after implementation of the approved reserve market changes.[274]  To address the above issues, Mr. Wilson suggests that PJM "develop a functional relationship between energy price levels and operating reserve price levels for application within its simulation."  PICOs state that this functional relationship would recognize (1) that increases in energy prices result in

---

[269] CEA Protest of Second Compliance Filing at 3.

[270] Id. (citing Second Compliance Transmittal at 25).

[271] PICOs' Partial Protest of Second Compliance Filing at 15.

[272] PICOs' Partial Protest of Second Compliance Filing at 15 (citing Wilson Aff. ¶ 28).  Mr. Wilson describes this market behavior as follows: "When energy prices are low, there are many resources whose incremental energy production is not economic, so the opportunity cost to provide reserves is zero.  As energy prices rise, it becomes increasingly likely that reserve prices will reflect these opportunity costs.  At very high energy prices, energy and reserve prices may be relatively close, differing only by the fuel cost of the marginal provider of operating reserves."  PICOs' Partial Protest of Second Compliance Filing at 15 (citing Wilson Aff. ¶ 29).

[273] PICOs' Partial Protest of Second Compliance Filing at 15-16 (citing Wilson Aff. ¶ 42, fig. 2).  PICOs claims that according to the Brattle data, when energy prices are $20 to $30/MWh, Synchronized Reserve prices have clustered around $1/MWh, and as energy prices have increased to roughly $30 to $40/MWh (an increase of 66% to 75%), ancillary services rise to around $2 to $5/MWh, an increase of two to five times above the previous price.  Id.

[274] Id. at 16 (citing PJM Second Compliance Transmittal at 16, Brattle Aff. ¶ 23).

proportionately greater increases in operating reserve prices; and (2) that the reserve market changes will increase reserve prices.[275]

### iii. Commission Determination

168.    We find PJM's proposal to use historic prices for Synchronized Reserves and Non-Synchronized Reserves in its Projected E&AS Dispatch Model to be just and reasonable, and compliant with the May 2020 Order's directive that PJM "implement a forward-looking E&AS Offset that reasonably estimates expected future energy and ancillary services revenues."[276]  Parties argue that PJM's estimate of ancillary services revenues uses historical prices rather than future projections.  However, the Commission's directives were to use a new method for calculating the E&AS Offset that would reasonably estimate the total expected revenues from both energy and ancillary services.  PJM has proposed to use future energy price data available to project future energy revenues, which we accept as just and reasonable, as part of this order.[277]  We find that, given the lack of futures markets for reserves, or other means to reasonably estimate the actual reserve market impacts of PJM's reserve market reforms, PJM's proposed approach is a just and reasonable method to comply with the Commission's directive to reasonably estimate total expected future energy and ancillary services revenues.  Though commenters urge the Commission to require PJM to adopt an alternative method to estimate future reserves revenues, we are not persuaded that, based on the record in this proceeding, there is a superior alternative to PJM's proposal.  For example, applying a fixed scaling factor of some kind, like the one PJM considered and ultimately declined to adopt, would likely mischaracterize the hourly shape of future reserve prices and lead to poor estimates of resources' dispatch patterns.[278]  We also find merit in PJM's argument that scaling historical reserve prices by a ratio of forward energy prices to historical energy prices could lead to inaccurate reserve revenue estimates because the relationship between energy and reserve prices will likely change once the instant reserve market reforms are implemented.[279]

---

[275] *Id.* at 16-17 (citing Wilson Aff. ¶ 33).

[276] May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[277] *See supra* PP 102-105; 109.

[278] *See* Keech Reply Aff. in Docket Nos. ER19-1486-000 and EL19-58-000 at ¶¶ 15-16.

[279] Brattle Aff. ¶¶ 22-24.  We also note that PJM proposes to use forward Regulation prices because of the linear relationship with energy prices, which is unchanged by the reforms in this proceeding.  This contrasts with the reserve market

169.    In contrast, we find that PJM's proposal to limit its projection of forward prices to energy, which has liquid futures markets, and Regulation, which is unchanged by the instant proceeding, will result in a just and reasonable estimate of cumulative future energy and ancillary services revenues.  The simulations PJM conducted to support its reserve market reforms demonstrate that incremental energy revenues comprise the majority of revenue increases expected to result from the reforms.[280]

170.    We note PJM's commitment to re-examine its approach to estimating future reserve market revenues in future quadrennial reviews.[281]  We encourage PJM to work with its stakeholders to refine any methods to estimate future reserve market revenues after observing the actual effect of the pending reserve market reforms, as necessary.

171.    However, we require PJM to submit an informational filing to the Commission by August 31, 2023[282] analyzing the impact of the reserve market reforms on reserve price formation.  The report shall include:  (1) an analysis of Net E&AS revenues further broken down by resource type over the course of the 2022/2023 Delivery Year, as well as a seasonal breakdown and a peak hour/off-peak hour breakdown of the same data; (2) what correlation, if any, PJM has observed between reserve revenues and energy revenues; (3) similarly, what correlation, if any, PJM has observed between Regulation revenues and energy revenues; (4) a comparison of actual fuel prices observed over the 2022/2023 Delivery Year to the fuel price projections used in PJM's Projected E&AS Dispatch model for that year; and (5) a discussion of any other relevant data that may be used to forecast future reserve market revenues.

_____

changes, where PJM states it does not yet know the relationship between reserves prices and energy prices.  PJM Second Compliance Transmittal at 25.

[280] *See* PJM, Filing, Docket No. EL19-58-000, Affidavit of Adam Keech, at tbl. 4 (filed Mar. 29, 2019).  PJM forecasts that total market-wide energy revenues will increase by $366 million, and total market-wide reserve revenues will increase by $189 million.

[281] PJM Answer to Second Compliance Filing at 2-3 n.12.

[282] Noting that PJM's proposed reserve market reforms will be used in the development of a forward-looking E&AS Offset beginning with the BRA for the delivery year that commences June 1, 2022 and concludes May 31, 2023, we direct PJM to use the reserve pricing data from the 2022/2023 Delivery Year to inform its informational report.

### c.     Use of the 10% Adder in Modeled Offers

### i.     PJM's Compliance Filing

172.    Under PJM's proposal, the resource's modeled energy offer includes its marginal costs, the cost of a complete start and shutdown cycle, and, for CTs only, a 10% adder.[283] PJM explains that its proposal to apply the 10% adder to CTs' modeled energy offers carries forward the current assumptions used to develop the E&AS Offset, which the Commission found just and reasonable in its order accepting the 2018 quadrennial review of PJM's Variable Resource Requirement (VRR) Curve.[284] PJM's affiant, Brattle, supports applying the 10% adder to CTs' energy offers, arguing it is "appropriate for the CT to account for increased costs of matching gas supplies with flexible day-of changes in operations."[285] PJM contends that it would not necessarily be appropriate to include the adder for other resource types, particularly given the fact that the E&AS Offset for other resource types is not used in the development of the VRR Curve, but rather for the development of the MOPR Floor Offer Prices and Market Seller Offer Caps.[286] In its affidavit, the Brattle Group notes that CCs operate as baseload plants without substantially changing offer parameters for the real-time market, so applying an adder in this context would underestimate E&AS revenues and result in over-mitigation, with too high an offer floor.[287]

### ii.    Comments, Protests, and Answers

173.    EPSA asserts that PJM's overall approach makes economic sense and represents a reasonable way to forecast future energy and ancillary services revenues.[288] Regarding

---

[283] PJM Second Compliance Transmittal at 29-30.

[284] *Id.* at 30 (citing *PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,029, at P 128 (2019), *aff'd on reh'g*, 171 FERC ¶ 61,040, at P 31 (2020) ("We conclude that the adder is reasonable because taking into account a significant energy offer component improves accuracy of the EAS net revenue estimate and therefore helps to ensure just and reasonable Net CONE values.")).

[285] *Id.* at 30 (citing Brattle Aff. ¶ 35).

[286] *Id.* at 30-31.

[287] *Id.* at 31 (citing Brattle Aff. ¶ 35).

[288] PJM Interconnection, L.L.C., Comments of the Electric Power Supply Association, Docket No. EL19-58-003, at 4 (Sept. 2, 2020) (EPSA Comments on Second Compliance Filing).

PJM's proposal to include the 10% cost adder in CTs' modeled energy offers, EPSA's affiant, Dr. Paul M. Sotkiewicz, contends that PJM's approach is reasonable because CTs that are committed day-ahead could procure gas that is not ultimately needed in real-time if conditions change, causing the CT to incur imbalance penalties from the pipeline which need to be covered.[289]  Dr. Sotkiewicz argues that these additional costs should be accounted for and are reasonable for CTs to include through the 10% adder.[290]

174.    Exelon, the IMM, PICOs and PSEG all protest PJM's proposal to use the 10% adder, although they propose differing alternatives.[291]  Exelon and PSEG argue that the 10% cost adder should be included for all resources, consistent with the longstanding practice of allowing all resources to include a 10% cost adder in their cost-based offers for the energy market.[292]  PSEG contends that when PJM sought Commission approval for allowing generators to include a 10% adder in their energy market offers, PJM did not distinguish between technology types in applying the uncertainty principle, and the Commission should not allow PJM to do so here.[293]  Exelon further argues that PJM should include not only the overall 10% cost adder when modeling all resources' energy offers, but also the additional 10% fuel variance adder for all natural gas-fired resources, consistent with the existence of two separate adders in the Tariff.[294]

175.    The IMM and PICOs argue that the 10% cost adder should not apply to any resource.[295]  Specifically, the IMM argues that the market rules permit, but do not

---

[289] EPSA Comments on Second Compliance Filing, Attach. A, Aff. of Paul M. Sotkiewicz, Ph.D. (Sotkiewicz Aff.) ¶ 24.

[290] *Id.*, Sotkiewicz Aff. ¶ 24.

[291] Exelon Limited Protest of Second Compliance Filing at 8-11.  IMM Protest of Second Compliance Filing at 20-22.  PICOs' Partial Protest of Second Compliance Filing at 7-15.  PJM Interconnection, L.L.C., Protest of PSEG, Docket No. EL19-58-003, at 7-8 (Sept. 2, 2020) (PSEG Protest of Second Compliance Filing).

[292] PSEG Protest of Second Compliance Filing at 4, 7-8; Exelon Limited Protest of Second Compliance Filing at 8-11.

[293] PSEG Protest of Second Compliance Filing at 7-8.

[294] Exelon Limited Protest of Second Compliance Filing at 3, 11; Exelon Answer to Second Compliance Filing at 3-10 & n.9 (citing Operating Agreement, sched. 1, § 6.4.2; Operating Agreement, sched. 2, §§ 2.3(a)(iii), 6.4.2).

[295] IMM Protest of Second Compliance Filing at 20; PICOs' Partial Protest of Second Compliance Filing at 7-15.

require, use of the 10% cost adder in formulating cost-based offers and states that data show that CTs do not uniformly include a 10% cost adder.[296]  The IMM argues that PJM's choice to use the 10% cost adder to CTs' short-run marginal costs artificially reduces their net revenues.[297]  Similarly, PICOs argue that the 10% cost adder would underestimate a CT's E&AS net revenues.  PICOs submit evidence that PJM indicated, in the stakeholder process, that removal of the adder from the simulations increases dispatch of the CT Reference Resource by 40% and increases its net revenues by 43%.  PICOs' affiant, Mr. Wilson, claims these numbers translate to an increase in Net CONE of $30/MW-day (or 13% of PJM's indicative Net CONE under the proposal, $226/MW-day).  PICOs argue that without substantial evidence to justify the need for the 10% cost adder, its inclusion in the Tariff is unjust and unreasonable; thus, PICOs urge the Commission to reject PJM's blanket use of this adder for purposes of developing the E&AS Offset.[298]

176.    In its answer, PJM maintains that the application of the 10% cost adder for CTs and exclusion of such adder for other resources is reasonable.[299]  PJM specifically asserts that inclusion of the 10% cost adder for CTs is appropriate to account for the additional costs and risks associated with operating the CT Reference Resource in a manner that makes full use of its flexibility.[300]  These costs and risks, PJM adds, may include (1) additional fuel procurement costs due to being dispatched in real-time and needing to purchase gas at a premium or (2) the risk of gas imbalance costs a resource may incur if it is not run in real-time consistent with its day-ahead schedule.[301]

177.    In its answer, Exelon asserts that the IMM and PICOs raise the same arguments against the 10% cost adder that they previously raised, and the Commission rejected, in

---

[296] IMM Protest of Second Compliance Filing at 20-22.  The IMM notes that of all the CTs that cleared in the energy market in 2019 and the first two quarters of 2020, 40-50% were offered with incremental price-based offers less than their incremental cost-based offers.  *Id.* at 21.

[297] *Id.* at 21-22.

[298] PICOs' Partial Protest of Second Compliance Filing at 7-15 & n.28 (citing Wilson Aff. ¶ 26).

[299] PJM Answer to Second Compliance Filing at 9.

[300] *Id.* at 9-10.

[301] *Id.* at 10.

the most recent quadrennial review proceeding.[302] Exelon refutes the IMM's reliance on the recent past (i.e., in 2019 and first two quarters of 2020) for its position that between 40-50% of CTs have offered at levels that are less than the full offer cap allows, noting that the converse also is true—50-60% of offers from CTs in the 2019-2020 timeframe and 72% of CT offers in 2017 did reflect the 10% cost adder. Exelon states that, if the Commission were to direct PJM to model the Net E&AS Offset for the CT Reference Resource without the 10% cost adder, the Commission would have to distinguish precedent and disregard the offer behavior of the majority of CTs.[303] Exelon contends this would be a major flaw in the E&AS Offset methodology and difficult to sustain on judicial review. Exelon notes that market conditions can change, and the trend to which IMM and PICOs point could reverse easily; thus, Exelon argues there is no basis for the Commission to deviate from its previous conclusion citing the Quadrennial Update Order.[304]

178.    Exelon also refutes PICOs' argument that disregarding the 10% cost adder is justified by PJM's shift from the Peak Hour Dispatch model (focused on 16 peak hours a day (8:00 a.m.-11:00 p.m.) which also were the hours most likely for a CT to be committed) to the Projected E&AS Dispatch Model (all 24 hours considered). According to Exelon, under the new methodology, CTs remain most likely to be committed during the 16 peak hours, so elimination of the adder would not make a difference as to whether they are dispatched in non-peak hours (11:00 p.m. to 7:00 a.m.).[305]

179.    Exelon states that EPSA's affiant, Dr. Sotkiewicz, presents a compelling case for use of the 10% fuel variance adder, which applies to all natural gas-fired resources, not just CTs. Exelon asserts that, while the Tariff is silent with respect to the 10% fuel variance adder, it understands that PJM does not intend to reflect it in modeling. Exelon reiterates its argument that PJM should include both the 10% cost adder to total costs for all resources and the separate 10% fuel variance adder to fuel costs for natural gas resources.[306]

---

[302] Exelon Answer to Second Compliance Filing at 5.

[303] *Id.* at 5-7 & n.19 (citing IMM to Protest Second Compliance Filing at 21).

[304] *Id.* at 6-7 & n.20 (citing *PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,029 at P 129).

[305] *Id.* at 8.

[306] *Id.* at 8-10.

### iii.     Commission Determination

180.    We find that PJM's proposal to apply a 10% cost adder to the offers of only CT
resources in the Projected E&AS Dispatch Model is just and reasonable, and complies
with the May 2020 Order.[307]  We agree that this adder is reasonably applied for CTs
because it accounts for the additional costs and risks that may be incurred by operating
the CT Reference Resource in a manner that fully recognizes flexibility, which is not
limited only to peak hours or times of system stress.  Notably, parties disagree on
whether the 10% cost adder should be applied to *all* resources because all resources are
entitled to make use of the adder or to *no* resources because many resources do not
always make use of the adder.  We find that PJM has proposed a balanced approach.
PJM explains that it excluded the 10% cost adder for CCs and other resources that do not
significantly alter their operating schedules based on evolving conditions between the
day-ahead and real-time markets.  As PJM explains, the CT Reference Resource used in
the development of the VRR Curve includes a 10% cost adder, which provides the
cornerstone of the VRR Curve used to clear the capacity market.

181.    PJM also explains that the MOPR Floor Offer Prices must be constructed by
reasonably assuming that resources that are not facing the same costs and risks as the CT
Reference Resource would offer at their marginal cost without the 10% cost adder.  We
agree that including the 10% cost adder for other resource types could result in over-
mitigation and may not reflect the lower bound of a competitive offer.  No party has
made a showing that PJM's assumptions are inconsistent with how it operates its capacity
market.  We therefore decline to require PJM to make further modifications to the
Projected E&AS Dispatch Model regarding the use of the 10% cost adder.  Should PJM
and interested stakeholders wish to examine these assumptions, the next quadrennial
review process provides an appropriate forum to do so.

### d.     Accuracy of Modeled Regulation Revenues

### i.     PJM's Compliance Filing

182.    PJM states that, because energy prices are highly correlated with Regulation prices
and this relationship is not expected to change, PJM will use historical and projected
energy prices to develop forward Regulation prices.  Specifically, PJM proposes to derive
the hourly forward Regulation prices by multiplying historical real-time prices for
Regulation by the ratio of the future hourly real-time energy price to the historic hourly
real-time energy price, using prices from the PJM Western Hub.[308]  PJM proposes to use

---

[307] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[308] PJM Second Compliance Transmittal at 25-26 & nn.79-83 (citing Brattle Aff.
¶¶ 59-60, 64; proposed Tariff, Attach. DD, § 5.10(a)(v-1)(D)).

these Regulation prices in the Projected E&AS Dispatch Model Methodology to simulate whether a dispatchable resource would provide Regulation and how much Regulation revenue it would earn.[309]

## ii.    Comments and Protests

183.    PSEG, Exelon, the IMM, and P3 contend that PJM's price-taker approach to modeling E&AS revenues unreasonably overestimates revenue from the Regulation market. Specifically, the IMM argues that PJM's assumptions about ancillary services revenues and costs are not adequately defined, raising concerns about how the Regulation market was modeled.[310] Similarly, Exelon requests that the Commission direct PJM to modify its estimate of Regulation revenues to account for the impact that resources' participation in the relatively small Regulation market will have on the market clearing price.[311] Exelon also asks that the Commission require PJM to clarify the Tariff language specifying the modeling assumptions PJM will use to calculate Regulation revenues.[312] PSEG similarly points out that PJM's model fails to account for the small size of the Regulation market, and adds that CTs would only offer into the RegA market, which is smaller than the total Regulation market. PSEG contends that PJM's assumption that the CT Reference Resource and CC units would capture large portions of the RegA market without affecting the market price is not realistic or supported by any real data.[313] P3 requests that the Commission approve PJM's proposal but also urges PJM to examine its assumptions around provision of regulation by CTs and the expected capacity factor of CT units, noting that PJM's estimated capacity factor of 27% for the CT Reference Resource greatly exceeds the average 6.4% capacity factor observed in reality.[314]

---

[309] *Id.* at 28-29.

[310] IMM Protest of Second Compliance Filing at 24-25.

[311] Exelon Limited Protest of Second Compliance Filing at 4, 11-13. Exelon notes that the Regulation market has a total demand of just 525 MW in non-ramp hours and 800 MW in ramp hours, and PJM estimates that the CT Reference Resource would supply approximately 120 MW, or 10-15% of the entire market's supply. *Id.* at 12.

[312] Exelon Limited Protest of Second Compliance Filing at 14-15.

[313] PSEG Protest of Second Compliance Filing at 9.

[314] P3 Comments on Second Compliance Filing at 6-7.

184.    In its answer, PJM argues that its approach for estimating regulation revenues earned by the CT Reference Resource is reasonable.[315]  PJM clarifies that, in developing its model, it reviewed how CT resources actually participated in the Regulation market and found that participating CT resources offered up to 90% of their dispatchable range into the Regulation market.[316]  PJM also clarifies that, in determining the Regulation offer price of the CT Reference Resource, it strictly followed the guidelines set forth in PJM Manual 15 and set the Margin Adder, an adder onto the cost-based Regulation offer of up to $12/MWh, equal to $0/MWh as there were not additional costs that PJM believed needed to be quantified.[317]  PJM explains that even if it were to remove the ability of the CT Reference Resource to provide regulation, it would only increase Zonal Net CONE values by an average of 3.96%, demonstrating that "such a small effect is within the noise of so many other simplifications inherent in estimating Net CONE."[318]  Thus, PJM asserts that its proposed approach is just and reasonable.  However, PJM commits to continue evaluating Regulation modeling for the CT Reference Resource in the next quadrennial review, if not sooner.[319]  Lastly, PJM agrees that revenues from bilateral contracts can be a critical source of forward-looking net revenues, as the IMM asserts.  PJM explains that the proposed language in Tariff, Attachment DD, section 5.14(h-1)(2)(B)(ii), which is incorporated in Tariff, Attachment DD, section 6.8(d-1), includes "any unit-specific bilateral contract" for this purpose.[320]

185.    In its answer, Exelon alleges that PJM's failure to reflect the impact that a new resource providing Regulation would have on future prices in the relatively small Regulation market violates the Commission's directive that PJM's E&AS Offset be "forward looking."[321]  Exelon requests that the Commission direct PJM to take a two-step approach to revising its Regulation methodology:  include the full $12/MWh adder to the cost-based Regulation offer in the near term for the purposes of the next BRA without an assumption that the offer is that of a price-taker, and pursue longer-term model revisions to reflect how new Regulation supply would affect Regulation clearing prices on a

---

[315] PJM Answer to Second Compliance Filing at 18.

[316] *Id.* at 18-19.

[317] *Id.* at 19.

[318] *Id.* at 19-21.

[319] *Id.* at 22.

[320] *Id.*

[321] Exelon Answer to Second Compliance Filing at 16.

Document Accession #: 20201112-3074          Filed Date: 11/12/2020

prospective basis.[322]  Exelon proposes specific Tariff revisions to implement its requested short-term change, and requests that the Commission direct PJM to submit a compliance filing within 120 days proposing Exelon's requested long-term change.[323]

186.    In a subsequent answer, PSEG and Exelon reiterate their arguments that PJM's approach to modeling Regulation revenues is unjust and unreasonable, and jointly request that the Commission direct PJM to remove the Projected E&AS Dispatch Model's ability to optimize against the Regulation market.  Exelon states that it still believes that the alternative remedy suggested in its answer would be just and reasonable, but states that it has become convinced of the merits of PSEG's approach.[324]

### iii.    **Commission Determination**

187.    We find that PJM's approach to modeling regulation revenues is just and reasonable and complies with the May 2020 Order.  For purposes of the forward-looking E&AS Offset, PJM crafted a methodology that reasonably estimates future values of the various inputs, including revenue from the Regulation market.  Here, PJM states that energy prices and Regulation prices have historically been highly correlated, and it has no compelling evidence to suggest that relationship will change in the near future.[325]  PJM also reasonably assumes that a resource will offers its full capabilities, including its capability to provide Regulation service, into the markets in a way that maximizes its profit.[326]  Because the assumptions underlying PJM's estimate of future Regulation prices and how resources will respond to those prices are reasonable, we find PJM's approach to modeling Regulation revenues just and reasonable and complies with the May 2020 Order.[327]

188.    We also decline to adopt Exelon's request that PJM rerun its modeling with the $12/MWh adder included in the CT Reference Resource's Regulation offer, or the subsequent joint request of PSEG and Exelon that we direct PJM to remove the Projected

---

[322] *Id.* at 16-19.

[323] *Id.* at 19-20.

[324] PJM Interconnection, L.L.C., Motion for Leave to Answer and Answer of PSEG and Exelon, Docket No. EL19-58-003, at 1-5 (Oct. 2, 2020).

[325] PJM Second Compliance Transmittal at 25; Brattle Aff. ¶¶ 22, 25, 59; PJM Answer to Second Compliance Filing at 18-19.

[326] PJM Second Compliance Transmittal at 29-30.

[327] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 320.

E&AS Dispatch Model's ability to optimize against the Regulation market. We considered the alternatives proposed by Exelon and PSEG but decline to require PJM to adopt them. The alternative that PSEG offers, for example, proposes to ignore Regulation revenues for the CT Reference Resource entirely, an assumption that is unrealistic. We are unpersuaded by the alternatives that Exelon offers, such as including a $12/MWh adder in the CT Reference Resource's Regulation offer in the Projected E&AS Dispatch Model. PJM notes that it will rely on historical Regulation data, which PJM states has had a linear correlation with energy prices. Given this correlation, we do not see a need to require PJM to make modifications to its assumptions regarding future projections on Regulation revenues for the CT Reference Resource. We acknowledge parties' concerns about the limitations of the Projected E&AS Dispatch Model's price-taker approach when applied to a small market such as Regulation, but the protestors have not persuaded us that PJM's straightforward approach of allowing resources to respond to reasonably estimated forward Regulation prices is unjust and unreasonable and requires revision. We note PJM's commitment to continue evaluating its regulation modeling for the CT Reference Resource in the next quadrennial review, if not sooner, and consider alternative approaches that may result in further refinements.[328]

### e.  Treatment of Major Maintenance Costs in Modeled Offers

### i.  PJM's Compliance Filing

189.    PJM explains that, because a CT is assumed to start up and shut down much more often in the proposed Projected E&AS Dispatch Model than in the existing Peak-Hour Dispatch model, PJM proposes to amortize major maintenance costs across both start costs (expressed as $/start) and incremental output costs (expressed as $/MWh), resulting in the stated Variable Operation and Maintenance (VOM) cost being $1.95 per MWh and $11,732 per start.[329]

190.    In its affidavit, Brattle explains that the VOM costs are all derived from the 2018 quadrennial review, which "reported major maintenance costs of $23,464/start (in 2022 dollars)" and converted that cost per start figure "to $5.83/MWh by assuming an average capacity of 366 MW across CONE Areas and an average runtime of 11 hours per start." Brattle explains that, in contrast to the Peak-Hour Dispatch's "limited ability . . . to directly account for start costs," which necessitated the $/MWh value, the Projected E&AS Dispatch Model is "realistically flexible" and "showed very different dispatch patterns, with a range of duty-cycles averaging only half as many hours per start." Brattle explains that, as a result, it found that the Projected E&AS Dispatch Model

---

[328] PJM Answer to Second Compliance Filing at 22.

[329] PJM Second Compliance Filing at 34-35.

approach was "under-counting major maintenance costs" by using the $/MWh value. Brattle states that, by contrast, accounting for major maintenance only in start costs and not in VOM "resulted in the opposite problem: units ran far more total hours and far more hours-per-start because the per-MWh cost was lower," which Brattle found "unrealistic because running for so many hours causes additional wear and tear and incurs major maintenance costs that were not being recognized." Accordingly, PJM states that Brattle concluded that it is appropriate to separate these costs with 50% of major maintenance costs apportioned to startup costs (in $/start terms) and 50% apportioned to incremental energy costs (i.e., $/MWh).[330]

## ii.    Comments, Protests, and Answers

191.    The IMM asserts that major maintenance costs should not be in operating costs.[331] The IMM argues that such maintenance costs are not short-run marginal costs and that actual competitive offers in PJM therefore cannot be assumed to include major maintenance. The IMM also argues that PJM's Second Compliance Filing "arbitrarily divides major maintenance between start costs and incremental costs in order to calibrate the impact on net revenues."[332] The IMM specifically takes issue with PJM's argument in its Second Compliance Filing that PJM's analysis indicates that splitting the major maintenance costs between starts and run hours is suitable because it produces "a more reasonable dispatch simulation."[333] The IMM counters PJM's argument by concluding that the correct method for considering major maintenance costs is not to include such costs in the cost-based energy offer, but instead to include them in the calculation of Gross CONE.[334]

192.    In their respective answers in response to the IMM's arguments about the treatment of major maintenance costs, PJM and Exelon assert that such costs should be included in a resource's cost-based energy offer.[335] PJM explains that the Commission has previously determined that major maintenance costs are short-run costs of electric production and therefore appropriately included in a resource's cost-based energy

---

[330] *Id.* at 35-36 & nn.109-112 (citing Brattle Aff. ¶¶ 70-71).

[331] IMM Protest of Second Compliance Filing at 22.

[332] *Id.* at 22 & n.39 (citing PJM Second Compliance Filing at 34-36).

[333] *Id.* at 23 & n.40 (citing PJM Second Compliance Filing at 73).

[334] *Id.* at 23.

[335] PJM Answer to Second Compliance Filing at 16; Exelon Answer to Second Compliance Filing at 20.

offer.[336] PJM also explains that the Second Compliance Filing justifiably splits major maintenance costs between start costs and incremental costs, arguing that PJM's proposed approach is reasonable given that both starts and run hours cause wear-and-tear that accelerates the need for major maintenance.[337] PJM further explains that even long-term service agreements for major maintenance with original equipment manufacturers demonstrate that such costs are appropriately split between starts and run hours.[338] PJM concludes, as explained in the Second Compliance Filing, that Brattle's analysis indicates that splitting major maintenance costs between starts and run hours produces more reasonable dispatch simulations compared to the alternative methodologies of using either a pure hours-based approach or a pure starts-based approach.[339]

### iii.    Commission Determination

193.    We find that PJM's treatment of major maintenance costs is just and reasonable and complies with the May 2020 Order,[340] and we decline to direct any modifications to this component of PJM's methodology.  Specifically, we reject the IMM's assertions that major maintenance costs may not appropriately be included in a resource's cost-based offer because they do not represent a resource's short-run marginal costs.  To the contrary, the Commission has previously determined, as PJM notes in its answer, that major maintenance costs are appropriate to considered as short-run costs due to the impact of both starts and run hours on maintenance needs.[341] Consistent with that prior finding, we find that PJM's proposal to split major maintenance costs between start and run hours when calculating a forward-looking E&AS Offset represents a reasonable treatment of major maintenance costs.

---

[336] *Id.* at 16 & n.57 (citing *PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,030, at P 42 (2019)).

[337] *Id.* at 16 & n.59 (citing PJM Second Compliance Filing at 34-36).

[338] *Id.* at 16 & n.60 (citing PJM Second Compliance Filing, Brattle Aff. ¶ 72).

[339] *Id.* at 16-17.

[340] May 2020 Order, 171 FERC ¶ 61,153 at P 320.

[341] *See PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,030 at P 43.

Document Accession #: 20201112-3074     Filed Date: 11/12/2020

## 6.     MOPR Floor Offer Prices and Resource Outages

### a.     Calculating E&AS Offset for Use in Determining MOPR Floor Offer Prices

#### i.     PJM's Compliance Filing

194.    In its Second Compliance Filing, PJM proposes Tariff revisions related to determining MOPR Floor Offer Prices for Cleared Capacity Resources with a State Subsidy.[342]  PJM also specifies a few common, resource-specific default inputs and lists additional resource type-specific operating parameters required to properly perform each forward-looking E&AS Offset estimation.  PJM states that when developing the forward E&AS Offset for nuclear, wind, and solar resources it will use an assumed output model, which will also use forward energy and fuel prices, as applicable.[343]  PJM explains that use of the assumed output model for these resources is appropriate because PJM typically does not dispatch such resource types, and they generally do not ramp up or down their energy production in response to energy prices.[344]  PJM also specifies how the maximum output of resource types will be determined in the assumed output model.  For nuclear resource types, PJM will consider the resource's anticipated refueling schedule when determining availability.[345]  For solar and wind resource types, PJM will use the output profiles for the most recent three calendar years, as available,[346] and for battery storage resources, PJM will use the resource's nameplate capacity rating (on a MW/MWh basis).[347]

#### ii.     Comments, Protests, and Answers

195.    CEA argues that PJM's proposed E&AS Offset results in unjust, unreasonable, and unduly discriminatory MOPR Floor Offer Prices for wind and solar resources in part because of PJM's proposal to use historical prices for Synchronized and Non-

---

[342] PJM Second Compliance Transmittal at 41.

[343] *Id.* at 5.

[344] *Id.* at 28.

[345] *Id.* at 43 (citing proposed Tariff, Attach. DD, § 5.14(h-1)(2)(B)(ii)(g)).

[346] *Id.* (citing proposed Tariff, Attach. DD, § 5.14(h-1)(2)(B)(ii)(h)).

[347] *Id.* (citing proposed Tariff, Attach. DD, § 5.14(h-1)(2)(B)(ii)(i)).

Synchronized Reserves.[348] CEA argues that historically natural gas resources have earned a substantial portion of their revenues from these two reserve products. Therefore, CEA argues, PJM's proposed E&AS Offset calculation, by using historical prices, is improperly weighted heavily in favor of natural gas resources in comparison with other resources, which will earn a greater share of future energy and ancillary service revenues after the reserve market reforms take effect.[349] CEA argues that this unduly discriminatory treatment is shown by the changes in Net CONE values (which are the equivalent of default MOPR Floor Offer Prices proposed by PJM) by resource class from what PJM proposed in March 2020 compared to what PJM proposes in its compliance filing.[350]

196.    CEA notes that PJM rejected scaling historic reserve market clearing prices by the ratio of the forward energy prices to the historic energy prices because, under the current set of forward energy prices, this would result in scaling down reserve market clearing prices. CEA notes that PJM concluded that "[s]uch an outcome would be contrary to the expected increase in ancillary services market revenues relative to their historic levels following implementation of the market reforms adopted in the [May 2020 Order]."[351] CEA argues that following the same rationale, the Commission should reject E&AS Offset values that significantly reduce the E&AS Offset (and raise default MOPR prices) for wind and solar resources because the co-optimization of PJM's energy and reserve markets is expected to result in increased E&AS Offset values and decreased default MOPR prices for wind and solar resources—the exact opposite result from what PJM has proposed.[352]

197.    In general, CEA argues that until electricity futures prices fully reflect PJM's reserve market changes, PJM's proposed E&AS Offset methodology will underestimate

---

[348] CEA Protest of Second Compliance Filing at 3-5.

[349] *Id.* at 4-5. CEA suggests that the advantage of natural gas resources under the proposal is enhanced by the fact that the current E&AS Offset accounts for no ancillary services except for reactive service. CEA Protest at 4 & n.16 (citing Second Compliance Transmittal at 22).

[350] *Id.* at 6 & tbl. 1 (showing that Net CONE for four types of solar and wind resources will increase under the proposal by 5.4% to 21.7%, while the Net CONE for combined-cycle resources will decrease by 23.7%); *id.* at 6 n.19 (citing PJM Interconnection, L.L.C., Compliance Filing, Docket Nos. EL16-49, et al., at tbl. 1 (Mar. 18, 2020); PJM Informational Filing at Attach. A (Default Net CONE Summary)).

[351] *Id.* at 6-7 (citing Second Compliance Transmittal at 24).

[352] *Id.* at 7.

future energy revenues of all resources, resulting in artificially higher default MOPR Floor Offer Prices for all resources. Thus, CEA contends, the Commission in the meantime should direct PJM to estimate the impact that the co-optimization between the energy and reserve markets will have on energy market prices and then calculate a forward-looking E&AS Offset by scaling the futures prices according to that estimation.[353]

198.    In its answer to CEA's allegation that PJM's proposal unjustly favors natural gas resources, PJM argues that its approach merely recognizes inherent operating characteristics of each resource type.  PJM states that natural-gas-fired and storage resource types will, by default, be credited with revenues for Synchronized Reserve, Non-Synchronized Reserve, and Regulation revenues, because such resources can provide these products upon request.  By contrast, PJM states, solar and wind resources are ineligible to provide these reserve products by default and will only be allowed to offer them upon receiving resource-specific approval.  PJM states that to the extent a solar or wind resource anticipates receiving revenues from market-based ancillary services in a respective delivery year, it may submit a request for a resource-specific MOPR exception.[354]

199.    In response to CEA's view that PJM should scale electricity futures prices using simulated prices, PJM contends that because the liquid futures markets "determine a settlement price for each contract on each business day," the market-determined prices have had ample time to consider and internalize the effect on energy market prices of the reserve market changes approved in the May 2020 Order.[355]  PJM also argues that its approach is consistent with the May 2020 Order's guidance to use "project[ed] valuation methods used by market participants."[356]  PJM contends that market participants regularly use energy prices determined by liquid futures markets instead of an artificial

---

[353] *Id.* at 7-8.  CEA suggests that PJM could update the simulations it performed in support of its initial filing in this proceeding.  CEA states that PJM could use its proposed E&AS Offset methodology but then scale the energy market revenue portion of the E&AS Offsets by the change estimated in the updated simulation results.  *Id.*

[354] PJM Answer to Second Compliance Filing at 15 n.53 (citing PJM First Compliance Transmittal at 3-6).

[355] *Id.* at 14-15 (citing PJM Second Compliance Transmittal, Brattle Aff. ¶ 46).

[356] *Id.* at 15 (citing May 2020 Order, 171 FERC ¶ 61,153 at P 320).

estimation of future energy prices. PJM notes, for example, that Brattle explained that it relied on market-based forward prices "in commercial application."[357]

### iii.    **Commission Determination**

200.    We disagree with CEA's argument that PJM's proposed E&AS Offset results in unjust, unreasonable, and unduly discriminatory MOPR Floor Offer Prices for wind and solar resources. While CEA argues that PJM's proposed E&AS Offset calculation will favor natural gas resources until wind and solar resources begin earning a greater share of revenues under the reserve market reforms, we agree with PJM that its approach merely recognizes the different operating characteristics of the resource types, which are not similarly situated in this regard. Furthermore, as PJM notes, owners of solar and wind resources who do anticipate receiving ancillary services revenues can submit a request for a resource-specific MOPR exception.

201.    We also reject CEA's argument that the Commission should direct PJM to estimate the impact that the reforms will have on energy prices and then scale the futures prices according to that estimation. We agree with PJM and find that futures prices reflect the market's incorporation of forthcoming market design changes, including those at issue in this proceeding, thereby obviating the need for adjustments. This finding is further supported by the fact that market participants regularly use futures prices instead of an artificial estimation of future energy prices in their own calculations. We find PJM's justification for using futures prices to be reasonable and consistent with the May 2020 Order's guidance to use methods employed by market participants.[358]

202.    CEA notes that PJM chose not to scale historic reserve prices to create forward reserve prices partly because the adjustment would have resulted in lower reserve prices, contrary to the expected increase in reserve prices due to the reserve market reforms. CEA argues that following a similar rationale the Commission should reject calculations that reduce the E&AS Offset (and raise the default MOPR price) for wind and solar resources because, unlike other resources, wind and solar resources generally cannot participate in the reserve market. CEA therefore argues PJM should increase the energy prices for wind and solar resources because the reserve market reforms are expected to result in increased E&AS Offset values for these resources due to higher energy prices. We do not find CEA's rationale persuasive. The reasoning we apply above in accepting PJM's proposal to use historic reserve prices is not simply that scaling historic reserve prices would reduce the E&AS Offset. Rather, we find that PJM's scaling methodology for energy prices, which is based on future prices, already takes into account the effect of

---

[357] *Id.* at 16 (citing PJM Second Compliance Transmittal, Brattle Aff. ¶ 37).

[358] May 2020 Order, 171 FERC ¶ 61,153 at P 320.

the reserve reforms on energy prices; any further adjustment would therefore bias the estimation of future ancillary services revenues.[359]

### b.    Modeling Resource Outages

### i.    PJM's Compliance Filing

203.    PJM explains in its Second Compliance Filing that for nuclear resource types PJM will consider the resource's "anticipated refueling schedule" when determining resource availability for the purpose of estimating its E&AS Offset.[360]

### ii.    Comments, Protests, and Answers

204.    Exelon and PSEG protest the assumptions on nuclear outages for the use of calculating the E&AS Offset for nuclear resources.  Exelon requests that the Commission direct PJM to revise the nuclear resource's anticipated refueling schedule when determining availability for the purposes of estimating the E&AS Offset because failing to do so would inject excessive variability in Market Seller Offer Caps for a particular nuclear station from year to year depending on whether the facility has one or two units scheduled to be on outage.  Exelon also requests that the Commission direct PJM to use the average projected number of days for refueling outages over a forward-looking three-year period and create an average number of outage days per year that can then be used in the projected E&AS dispatch methodology when calculating the E&AS Offset.[361]  The IMM also supports using class average equivalent availability factors for nuclear resources to ensure that "lumpy" refueling outages do not skew the results.[362]

205.    Similarly, PSEG requests that the Commission direct PJM to revise the proposed Tariff's default Avoidable Cost Rate (ACR) calculation and adjustment mechanism affecting nuclear resources.[363]  PSEG explains that directing PJM to use the class-average Equivalent Demand Forced Outage Rate (EFORd) in calculating the adjusted default ACR for a nuclear resource will be more closely representative of a generic nuclear unit and will also address a timing mismatch around expected refueling outages that could

---

[359] *See supra* P 168.

[360] PJM Second Compliance Transmittal at 43 (citing proposed Tariff, Attach. DD, §§ 5.14(h-1)(2)(B)(ii)(g)).

[361] Exelon Limited Protest of Second Compliance Filing at 5-6.

[362] IMM Protest of Second Compliance Filing at 6.

[363] PSEG Protest of Second Compliance Filing at 1.

skew revenue expectations.[364]  PSEG argues that because nuclear resources do not have refueling outages every year, unit-specific data would produce significant year-on-year variations that are not representative of nuclear unit economics.[365]  PSEG asserts that the generic impact of refueling outages is more appropriately captured by the availability factor calculation found at proposed Tariff, Attachment DD, section 5.14(h-1)(2)(A)(i), which uses "the annual average equivalent availability factor of all PJM nuclear resources."[366]

206.    PSEG also proposes certain other changes to PJM's proposed Tariff language that would remove consideration of:  (1) offers submitted in the day-ahead and real-time markets by nuclear resources and (2) using resource-specific operating parameters for nuclear resources.  PSEG explains that avoiding the use of offers submitted in the day-ahead energy market and real-time energy market as originally included in PJM's proposed Tariff language reflects the fact that nuclear resources are price-takers.[367]  PSEG also explains that a number of the resource-specific operating parameters outlined to be considered by PJM in the ancillary services revenue determination methodology set forth in Tariff, Attachment DD, section 5.14(h-1)(2)(A)(i) through (ix), are ill-suited to represent nuclear resources.[368]  Lastly, PSEG requests that the Commission direct PJM to revise the proposed Tariff to provide for the use of EFORd by resource class—rather than on a unit-specific basis—to determine the E&AS Offset for all resource types.

207.    In its answer, Exelon states that the Commission should address certain discrete corrections that are needed to PJM's proposal, including the use of unit-specific or class-average outage rates for nuclear resources.[369]  Exelon reiterates that in its limited protest it demonstrated that the shift away from a rolling three-year historic average to a forward-looking E&AS Offset based on projected revenues accentuates the impact of the individual refueling outages and will lead to inaccurate Market Seller Offer Caps for nuclear resources, especially in light of the importance of energy market revenue to nuclear units.[370]  Exelon renews its earlier request that the Commission direct PJM to

---

[364] *Id.* at 4-5.

[365] *Id.* at 6.

[366] *Id.*

[367] *Id.* at 5.

[368] *Id.* at 3.

[369] Exelon Answer to Second Compliance Filing at 2.

[370] *Id.* at 21.

average, on a unit-specific basis, the projected number of days for refueling outages over a forward-looking three-year period, and create an average number of days per year that will then be used to calculate the E&AS Offset using the Projected E&AS Dispatch Model methodology.[371]  However, Exelon notes that PSEG's and the IMM's suggestion to use the class-average equivalent availability factor of all PJM resources would also remedy the flaw in PJM's proposal.[372]

208.   In its answer, PJM explains that although it proposed initially to use a nuclear resource's "anticipated refueling schedule" when determining resource availability for the purposes of estimating a resource's E&AS Offset, PJM agrees with commenters that support an alternate methodology.[373]  PJM explains that using the anticipated refueling schedule for nuclear resources in a given year, as it initially proposed, may result in significant variations year-over-year.[374]  Instead, PJM supports commenters' proposal that PJM should use the average equivalent availability factor of all PJM nuclear resources to represent a resource's refueling outage.  PJM agrees with commenters that using an average equivalent availability factor instead of a resource-specific anticipated refueling schedule can avoid yearly variations in expected energy and ancillary services revenues and may result in more accurate refueling outage projections.[375]

### iii.   Commission Determination

209.   We agree with commenters that PJM should use the average equivalent availability factor of all PJM nuclear resources to represent a nuclear resource's projected refueling outage.  Using an average equivalent availability factor instead of a resource-specific anticipated refueling schedule not only may avoid yearly variations in expected E&AS revenues, but also may result in more accurate refueling outage projections.  We decline to grant Exelon's request that the Commission direct PJM to average, on a unit-specific basis, the number of refueling outage days per year to be used to calculate the E&AS Offset using the Projected E&AS Dispatch Model methodology.  We find that using a nuclear class-average equivalent availability factor for all PJM nuclear resources will achieve the improvements in accuracy sought by commenters.  We direct PJM to

---

[371] *Id.*

[372] *Id.* at 21-22.

[373] PJM Answer to Second Compliance Filing at 4.

[374] *Id.*

[375] *Id.*

Document Accession #: 20201112-3074          Filed Date: 11/12/2020

make a further compliance filing within 15 days of the date of this order to modify the Tariff, Attachment DD, section 5.14(h-1)(2)(B), as set forth in Appendix B.

210.    We disagree with PSEG that PJM should be directed to make certain other changes to its proposed Tariff language to remove consideration either of offers submitted in the day-ahead and real-time energy market by nuclear resources or using resource-specific operating parameters for nuclear resources.  Although nuclear resources typically operate as price-takers in PJM's energy markets, we find that PJM's proposed Tariff language, which includes consideration of offers submitted in the day-ahead and real-time markets for all resources, including nuclear resources, is reasonable.  We also disagree with PSEG that PJM should be required to allow the use of EFORd by resource class—rather than on a unit-specific basis—to determine the E&AS Offset for all resource types.  We find, for the reasons explained above, that the infrequent nature of nuclear refueling presents a unique challenge to estimating the forward-looking E&AS revenues for such resources.  We therefore decline to require PJM to make further Tariff changes modifying the procedures by which it proposes to account for resource outage status.

### c.    Customized E&AS Offset Revenue Values

### i.    PJM's Compliance Filing

211.    As noted above, PJM proposes a common forward-looking E&AS Offset estimating method, with three main components: using publicly available energy and fuel price data, modeling a resource's expected revenue based on runtime, and estimating revenues from both market-based and cost-based ancillary services.[376]  PJM explains in its compliance filing that it will adapt and apply that general method both to determine resource-type default MOPR Floor Offer Prices and resource-specific exemptions to the MOPR Floor Offer Prices.[377]  PJM also states that the resulting simulated generation pattern and the corresponding revenues net of operating costs for each day of the delivery year yield the projected energy revenue portion of the E&AS Offset for each resource type's reference resource.[378]

212.    PJM's compliance filing proposes that a resource-specific E&AS Offset calculation will be required for any Capacity Market Seller that seeks to obtain a

---

[376] PJM Second Compliance Filing at 7.

[377] *Id.* at 7-8.

[378] *Id.* at 33.

resource-specific exception from the default MOPR Floor Offer Price.[379]  PJM elaborates that the IMM will develop the default E&AS Offset values for all resources that seek a resource-specific exception and for cleared Capacity Resources with State Subsidy using a set of standard inputs based on resources' actual operating parameters, cost data, pricing points.[380]  PJM states that the Projected E&AS Dispatch Model or assumed output models, as applicable for the resource type, will be used as the standard model in developing the E&AS Offset values using these inputs.

213.    PJM proposes a limit on the use of the resource-specific E&AS Offset calculation. PJM states that Capacity Market Sellers may only seek a customized E&AS Offset value under the resource-specific exception process if they are also seeking a resource-specific Gross CONE or ACR.[381]  PJM clarifies that under this restriction Capacity Market Sellers may not rely on the default Gross CONE or ACR value and seek only a resource-specific E&AS Offset value (based on non-standard inputs) to arrive at the applicable MOPR Floor Offer Price.  PJM asserts that this limit will ensure that Capacity Market Sellers "cannot pick and choose values that are most favorable in determining a MOPR [Floor Offer] Price."[382]  PJM notes that if a Capacity Market Seller believes its resource-specific MOPR Floor Offer Price should be less than the applicable default value, then it must demonstrate the resource-specific actual costs and projected revenues to arrive at the resource-specific MOPR Floor Offer Price.[383]

## ii.    **Comments and Protests**

214.    PSEG requests that the Commission direct PJM to revise the proposed Tariff to specify that electing to use a customized E&AS Offset value will not force the use of resource-specific Gross CONE or ACR.[384]  PSEG argues that the calculation of a unit-specific Gross CONE or ACR is a significant and time-consuming undertaking that requires consideration of many factors, whereas determining a unit-specific E&AS Offset normally should not be nearly as complex or time-consuming.[385]  PSEG also argues that

---

[379] *Id.* at 44.

[380] *Id.*

[381] *Id.*

[382] *Id.*

[383] *Id.*

[384] PSEG Protest of Second Compliance Filing at 1-2.

[385] *Id.* at 11.

Document Accession #: 20201112-3074          Filed Date: 11/12/2020

there is no reason why the cost calculation and revenue calculation should be linked. PSEG concludes that PJM's proposed limit on the use of resource-specific E&AS Offset determinations creates a significant and unjustified burden on a resource that is willing to accept the default Gross CONE or ACR value but believes that the default revenue calculation is not realistic.[386]  PSEG asserts that a resource owner may reasonably be willing to accept the Gross CONE or ACR value while wishing to seek a unit-specific determination for the E&AS Offset.[387]

### iii.    Commission Determination

215.    We disagree with PSEG that PJM should be required to revise the proposed Tariff to specify that electing to use a customized E&AS Offset value will not force the use of a resource-specific Gross CONE or ACR.  We find that PJM has explained clearly that the intent of its proposed limitation is to prevent Capacity Market Sellers from selectively using values that are most favorable in determining a MOPR Floor Offer Price.[388]

216.    As PSEG notes, the calculation of a unit-specific Gross CONE or ACR value may be a more time-consuming undertaking than only the calculation of a unit-specific, forward-looking E&AS Offset.  In addition, a resource owner may be willing to accept a default Gross CONE or ACR value while nevertheless having a legitimate reason, such as being party to a power purchase agreement, for requesting that PJM determine the resource's forward-looking E&AS Offset on a resource-specific basis.  Nevertheless, we find that absent further documentation that PJM's proposed limit on the use of the resource-specific exception process presents an unreasonable barrier to market participation for any resource, we find that PJM's limit is both compliant with the Commission's directives in the May 2020 Order and represents a reasonable limit on the ability of Capacity Market Sellers to make use of the resource-specific exception process. We decline to require modifications to PJM's proposed Tariff revisions on this issue.

### 7.    Effective Date and Implementation Schedule

### a.    Compliance Directives

217.    In the May 2020 Order, the Commission directed PJM to propose an effective date for implementation of the reserve market replacement rate and the forward-looking

---

[386] *Id.*

[387] *Id.* at 11-12.

[388] PJM Second Compliance Filing at 44.

E&AS Offset, as well as any necessary software changes, as early as practicable.[389]  PJM was further directed to harmonize the implementation schedule with other ongoing revisions in Docket Nos. EL16-49-000, et al., and to minimize any auction delays.[390]

### b.    PJM's Compliance Filing

218.    PJM proposes an effective date of May 1, 2022, for the reserve market reforms accepted in the May 2020 Order and set forth in PJM's First Compliance Filing.[391]

219.    PJM proposes to implement the forward-looking E&AS Offset beginning in the BRA for the delivery year starting June 1, 2022.[392]

220.    PJM requests that the Commission assign the same effective date to the Tariff revisions implementing the forward-looking E&AS Offset that are submitted in the PJM Second Compliance Filing and to the pending changes to the Minimum Offer Price Rule proceeding in Docket Nos. EL16-49, et al.  According to PJM, the same effective date for both sets of revisions would allow the forward-looking E&AS Offset to be used for all capacity auctions for the 2022/2023 Delivery Year and subsequent delivery years.

221.    PJM explains that it has complied with the May 2020 Order's directive to establish an effective date as early as practicable because "the reserve market changes are complex and will take significant effort for PJM to develop requirements, code the software changes, and conduct extensive testing and quality assurance, putting implementation likely sometime between January 1, 2022, and June 1, 2022."[393]

### c.    Comments, Protests, and Answers

222.    Although it supports the May 2020 Order reforms and PJM's First Compliance Filing, PSEG opposes PJM's proposed May 1, 2022, effective date for the reserve market revisions.[394]  PSEG urges the Commission to "direct PJM to provide a detailed timeline

---

[389] May 2020 Order, 171 FERC ¶ 61,153 at P 2.

[390] Id.

[391] PJM First Compliance Transmittal at 1.

[392] Id.

[393] Id. at 14.

[394] PJM Interconnection, L.L.C., Comment and Limited Protest of PSEG, Docket No. EL19-58-002, at 1, 3 (Jul. 28, 2020) (PSEG Limited Protest of First Compliance Filing).

on each of the proposed reforms approved in the May 2020 Order and proposed in the [First Compliance Filing], including a reasonable implementation date for each."[395] PSEG requests that where faster implementation of any aspect of the May 2020 Order or First Compliance Filing incrementally relieves the current unjust and unreasonable market conditions, it should not be delayed.[396]

223.   While noting that the substance of the Tariff changes proposed in PJM's First Compliance Filing complies with the requirements of the Commission's May 2020 Order, P3/EPSA object to PJM's proposed delay in implementation of the reserve market reforms as inconsistent with the May 2020 Order directive for an implementation schedule as early as practicable.[397]  P3/EPSA request that the Commission direct PJM to implement the reserve market reforms by May 21, 2021, or, at the latest, October 15, 2021.  P3/EPSA argue that delaying the reforms until May 1, 2022, will perpetuate continued application of market rules found unjust and unreasonable by the Commission in its May 2020 Order.  P3/EPSA request that the Commission require PJM to submit a progress report on software implementation efforts by May 21, 2021, if PJM's proposed implementation schedule is not rejected and revised.  P3/EPSA state that PJM must explain in that progress report why implementation will continue to be delayed another year if PJM still proposes to delay implementation until May 1, 2022.[398]

224.   OPSI urges the Commission to approve PJM's May 1, 2022, effective date for the reforms accepted in the May 2020 Order and set forth in the First Compliance Filing, and PJM Load Coalition urges an effective date of June 1, 2022, over the objections of PSEG and P3/EPSA.  According to OPSI, PSEG and P3/EPSA seek to replace PJM's judgment as to the amount of time required for implementation of the proposed E&AS Offset.[399]

---

[395] PSEG Limited Protest of First Compliance Filing at 6.

[396] Id. at 5.

[397] PJM Interconnection, L.L.C., Comments of the PJM Power Providers Group and the Electric Power Supply Association, Docket No. EL19-58-002, P3/EPSA Comments on First Compliance Filing at 1, 4-8 (Jul. 27, 2020) (P3/EPSA Comments on First Compliance Filing).  They point to a survey that 63% of PJM stakeholders in the Market Implementation Committee supported implementation as soon as possible.  Id. at 7.

[398] P3/EPSA Comments on First Compliance Filing at 1-2, 4-9.

[399] PJM Interconnection, L.L.C., Answer of The Organization of PJM States, Inc., Docket No. EL19-58-002, at 2-3, 5 (Aug. 10, 2020) (OPSI Answer to First Compliance Filing).

225.    PJM urges the Commission to reject the request of P3/EPSA to implement the reserve market changes adopted by the May 2020 Order no later than October 15, 2021, because the alternative date would fall within the winter season, require PJM management to rebalance and reprioritize other projects, and would be inconsistent with the May 2020 Order to harmonize the date with the ongoing revisions in Docket Nos. EL16-49-000, et al.[400]  According to PJM, because the revisions are complex and extensive, requiring software coding and extensive testing and quality assurance performance, an effective date of May 1, 2022, is the optimal date for the reserve market changes to go into effect.  PJM explains that the proposed effective date will allow PJM to go live during a shoulder period, which typically has milder weather and lower system strain.  PJM states that the software implementation period is longer than the originally anticipated 14-month period due to its inability to start work in April 2019.  As a result, PJM states it moved forward with implementing other priority projects, including its storage participation model and fast-start pricing changes.  PJM explains that it must also conduct thorough testing, as the software and system changes in this proceeding are more complex than originally expected.  Therefore, PJM states a May 1, 2022, effective date will provide time to address any unanticipated issues during implementation.[401]

226.    The IMM requests that the Commission approve implementation of certain reforms sooner than May 2022.  According to the IMM, the removal of the $7.50/MW margin and the unsupported Synchronized Reserve VOM cost require no implementation time and would provide immediate benefits.  The IMM notes that real-time adjustments to ramp rates already are being implemented by PJM on a separate timeline.  The IMM also argues that there is an immediate need to change the definition of the reserve sub-Zone due to dramatic changes in congestion patterns on the PJM system in recent years to support reliability.[402]

### d.      **Commission Determination**

227.    We find that PJM's implementation schedule is compliant with the May 2020 Order.[403]  We accept PJM's reserve market reforms accepted in the May 2020 Order and as discussed herein, effective May 1, 2022.  We find that PJM has complied with the May 2020 Order's directives to propose an effective date as early as practicable that would

---

[400] PJM Answer to First Compliance Filing at 8-10.

[401] PJM First Compliance Transmittal at 13-15 & n.38.

[402] IMM Protest of First Compliance Filing at 14-15.

[403] *See* May 2020 Order, 171 FERC ¶ 61,153 at P 2.

allow it sufficient time to implement the compliance revisions and to harmonize that date with the revisions in Docket No. EL16-49-000, et al.

228.    Although the Commission has found PJM's current reserve market unjust and unreasonable, the Commission needs to be cognizant of the practical necessities of implementing such a complex reform of its market, as well as the computer software changes and testing needed to implement that reform, without market disruption.[404]  PJM has indicated that it requires sufficient time to develop, implement, test, and perform quality assurance for the required revisions.  We agree with PJM that its proposal to use a shoulder period for its go-live date is reasonable in order to help minimize issues that may otherwise occur during more extreme conditions.  For the reasons discussed above, we find PJM's proposed implementation schedule complies with the May 2020 Order and therefore accept it.

229.    The Tariff revisions accepted in PJM's Second Compliance Filing herein, including the revision set forth in Appendix B, will be effective as of the date of this order.

### 8.     Reporting Requirements and Future Refinements

#### a.     PJM's Compliance Filing

230.    In its Second Compliance Filing, PJM states that implementation of the reserve pricing reforms will allow PJM and its stakeholders to observe the relationship between ancillary service prices and forward energy prices.  PJM states that its use of historic ancillary service revenues is a reasonable first step in implementing the Commission's requirements, subject to re-examination and refinements in future quadrennial review proceedings.  PJM explains that, at a minimum, the forward price determination for ancillary services will be evaluated in the next quadrennial review that commences in the Spring of 2021.[405]

---

[404] *See Aera Energy LLC v. FERC*, 789 F.3d 184 (D.C. Cir. 2015) (recognizing that the effective date of the replacement rate need not coincide with the finding that the prior rate is unjust and unreasonable under the parallel provision, section 5, of the Natural Gas Act).

[405] PJM Second Compliance Transmittal at 25-26.

231.    PJM states it will reevaluate and update, as necessary, the energy efficiency programs underlying its methodology of the energy savings component of Net CONE, as part of each quadrennial review.[406]

### b.    Comments, Protests, and Answers

232.    EPSA urges the Commission to expeditiously accept PJM's Second Compliance Filing as compliant with the May 2020 Order, subject to the condition of an informational filing, as discussed below.[407]  EPSA explains that it will be essential for PJM to monitor the forward-looking E&AS Offset to ensure that it is performing as intended.  In addition, EPSA urges the Commission to require PJM to conduct various near-term, medium-term, and long-term analyses, with information posted on PJM's website and included in future filings with the Commission.[408]

233.    EPSA requests that the Commission condition its acceptance on PJM's submittal of an informational filing after conducting its first BRA with the forward-looking E&AS Offset.[409]  EPSA states this interim review will allow an opportunity to make corrections prior to the BRAs for the 2024/2025 and 2025/2026 Delivery Years, and possibly the BRA for the 2023/2024 Delivery Year.[410]  EPSA notes that many of the implementation details are in manuals and not in the Tariff.[411]  EPSA argues that PJM, stakeholders, and the Commission must have an opportunity to timely assess whether the E&AS Offset approach is working or refinements are needed.[412]  EPSA contends that a review is consistent with long-standing Commission policy and in accord with the Commission's recognition of its responsibility to determine whether an RTO/ISO tariff interpretation is reasonable.[413]

234.    EPSA urges the Commission to make clear that PJM's review of the E&AS Offset in the quadrennial review should include all aspects of the approach and not limited

---

[406] *Id.* at 50.

[407] EPSA Comments on Second Compliance Filing at 2-3.

[408] *Id.* at 2, 4, 6-11.

[409] *Id.* at 2.

[410] *Id.* at 9.

[411] *Id.* at 7.

[412] *Id.* at 7-8.

[413] *Id.* at 8.

elements as identified in PJM's Second Compliance Filing, such as the shape of the VRR Curve.[414]

235. EPSA's affiant, Dr. Sotkiewicz, describes the analyses that should be conducted on the operation of the E&AS Offset methodology and shared with PJM's stakeholders (e.g., through posting on PJM's website) and included in future filings with the Commission.[415]

236. In the near term, EPSA also suggests that PJM run the new model for a CT using actual energy and fuel prices for the 2018/2019 and 2019/2020 Delivery Years and compare the results to actual run hours and net E&AS revenues to control for differences between forward prices and actual prices and isolate differences in modeled versus actual outcomes. EPSA suggests that PJM run the new model for the CT Reference Resource using realized power and fuel prices for the 2018/2019 and 2019/2020 Delivery Years to derive the net E&AS revenues, as well as the run hours and number of starts, and compare them to the existing CTs to provide a comparison of the effect of differences in efficiency, size, and operating characteristics of the reference unit and existing CT.[416]

237. In the medium term, EPSA suggests that PJM calculate hypothetical forward-looking E&AS Offset values for the 2021/2022 Delivery Year using historic forward prices at different points in time in order to compare those values with each other and with actual, realized E&AS revenues.[417]

238. In the longer term, EPSA suggests that PJM provide an examination of historic forward prices corresponding with the timing of past BRAs and delivery years and track the changes in those prices leading up to the delivery years.[418]

239. EPSA also requests that the Commission make clear that future challenges to PJM's implementation of the proposed principles will not be deemed to be collateral attacks on its order accepting PJM's compliance filing.[419] Similarly, P3 requests that the Commission remain open to the further refinements for the E&AS Offset calculations and

---

[414] *Id.*

[415] *Id.* at 9-11; *see also* Sotkiewicz Aff. ¶¶ 25-36.

[416] *Id.* at 9-10; Sotkiewicz Aff. ¶¶ 26-28.

[417] *Id.* at 10-11; Sotkiewicz Aff. ¶¶ 32-33.

[418] *Id.* at 11; Sotkiewicz Aff. ¶¶ 35-36.

[419] *Id.* at 2.

not consider targeted refinements as collateral attacks on the Commission's order in this proceeding.[420]

240.    P3 further asserts that greater transparency would benefit the unit-specific review process for E&AS revenues that is conducted for the purpose of calculating the forward-looking E&AS Offset.  P3 states that the Commission should consider directing PJM to submit, in a separate proceeding, either an informational filing or Tariff revisions that seek to enhance transparency associated with the unit-specific review process.[421]

241.    In addition to the 120-day compliance filing Exelon proposes, as described above,[422] Exelon supports EPSA's request to direct PJM to make an informational filing after the auction for the 2022/2023 Delivery Year to facilitate a better understanding of how the new E&AS Offset methodology is functioning prior to the next quadrennial review.[423]

242.    Similarly, Exelon requests that the Commission condition its acceptance on the use of the new E&AS Offset methodology for all pre-auction activities that require the E&AS Offset in order to harmonize implementation.[424]  Exelon explains that failure to align these two procedural schedules could result in PJM's using the existing, backward-looking E&AS Offset methodology to calculate and post auction-related information in violation of the Commission's findings in the May 2020 Order that continued use of the existing methodology would be unjust and unreasonable in light of the ORDC-related reforms.[425]

243.    While they do not support delaying the BRA for the 2022/2023 Delivery Year, PICOs propose that certain aspects of the E&AS Offset are flawed and should be reviewed and revised in a compliance filing by January 31, 2021.  PICOs state that the E&AS Offset underestimates revenues from ancillary services now and in the future.  In addition, PICOs state that the E&AS Offset methodology is undermined by the misalignment of forward prices for natural gas and electric energy due to mismatched

---

[420] P3 Comments on Second Compliance Filing at 8.

[421] *Id.* at 7-8.

[422] *See supra* PP 185-186.

[423] Exelon Answer to Second Compliance Filing at 2, 22.

[424] Exelon Limited Protest of Second Compliance Filing at 2-3, 6-8; *see also* Exelon Answer to Second Compliance Filing at 1-2 & n.3, 22.

[425] Exelon Limited Protest of Second Compliance Filing at 3.

energy and fuel price information that can lead to estimates less accurate than the current historical average approach.[426]  They request that the Commission direct PJM and stakeholders to expeditiously develop and file no later than January 31, 2021, a proposal to reflect: (1) a functional relationship between energy price levels and operating reserve price levels, and (2) broader use of forward price information and improved alignment of gas and electric pricing.  According to PICOs, corrections need to be made for the BRA for the 2023/2024 Delivery Year.[427]

244.  In its answer, Exelon responds to PICOs' ancillary service revenue arguments and states that their predictions seem unfounded and should be rejected as unsubstantiated. Exelon states that there is the possibility of increases in excess capacity to the extent states will procure capacity to satisfy their clean energy policies that is not counted in the capacity market.[428]

245.  PJM proposes to continue to review its E&AS Offset approach with stakeholders and submit proposed changes, if appropriate, for the Commission's consideration as part of the next quadrennial review.[429]  Acknowledging that there may be alternative methods to estimate the projected E&AS Offset that also may be just and reasonable, PJM submits that other potential approaches be reviewed as part of the next quadrennial review, which commences in the spring of 2021.  PJM notes the PICOs' proposal that PJM revise the E&AS Offset in a compliance filing by January 31, 2021, is an unrealistic deadline as alternative approaches take time to be developed and for the Commission to review and accept.[430]  However, PJM states that reviewing any alternatives to its approach as part of the quadrennial review would provide sufficient time to work with its stakeholders to determine if changes are warranted.  PJM further states this would allow PJM to gain experience with the current E&AS Offset while avoiding any further delay of the upcoming BRAs.[431]

---

[426] PICOs' Partial Protest of Second Compliance Filing at 3-4, 17-19.

[427] *Id.* at 4, 19-20.

[428] Exelon Answer to Second Compliance Filing at 20.

[429] PJM Answer to Second Compliance Filing at 3 n.12.

[430] *Id.*

[431] *Id.* at 2-3 & n.12.

c.    **Commission Determination**

246.    Except as noted above in section 5(b)(iii), we do not find it necessary at this time to direct PJM to provide, to the Commission and stakeholders on its website, in reports, or in additional filings, any other additional information on implementation of the reforms.[432]  PJM has committed to evaluate implementation and other issues and identify any needed refinements as part of its next quadrennial review, which commences in the spring of 2021,[433] and we encourage PJM and stakeholders to do so as part of that process.  Similarly, we reject requests to require additional compliance filings, as requested by the PICOs, as we agree with PJM that the PICOs' proposed timeline is unrealistic and places an unnecessary burden on PJM mere months before the start of the next quadrennial review.

247.    With respect to commenters' requests that future proposed refinements to the E&AS Offset should not be considered collateral attacks on the Commission's orders in this proceeding, we decline to pre-judge any such future filings.

The Commission orders:

(A)    PJM's tariff records in the First Compliance Filing and the unchanged tariff records from the Docket No. EL19-58-000 are hereby accepted, effective as of May 1, 2022.

(B)    PJM's Second Compliance Filing is accepted, to become effective the date of this order, subject to PJM making a compliance filing regarding the nuclear refueling issue, within 15 days of the date of this order, as discussed in the body of this order.

(C)    PJM is hereby directed to submit a further compliance filing containing Appendix B to this order, within 15 days of the date of this order, as discussed in the body of this order.

---

[432] *See supra* PP 168-171.

[433] PJM Second Compliance Transmittal at 25-26, 50; PJM Answer to Second Compliance Filing at 2-3 n.12.

Document Accession #: 20201112-3074    Filed Date: 11/12/2020

(D)    PJM is hereby directed to submit an informational report, as discussed in the body of this order.

By the Commission.  Commissioner Glick is dissenting in part.

( S E A L )


                                        Nathaniel J. Davis, Sr.,
                                          Deputy Secretary.

**Appendix A**

**Tariff Records Accepted
PJM Interconnection, L.L.C.
Intra-PJM Tariffs**

**Tariff Records Accepted Effective May 1, 2022**

Docket No. ER19-1486-000

OATT Definitions – A - B, 14.0.0
OATT Definitions – C-D, 19.0.0
OATT Definitions – E - F, 23.0.0
OATT Definitions – L – M - N, 22.0.0
OATT Definitions – O – P - Q, 22.1.0
OATT Definitions – R - S, OATT Definitions – R - S, 19.0.0
OATT Attachment K Appendix Sec 1.5A Economic Load Resp, 10.0.0
OATT Attachment K Appendix Sec 1.7 General, 20.0.0
OATT Attachment K Appendix Sec 1.10 - Scheduling, 35.0.0
OATT Attachment K Appendix Sec 1.11 - Dispatch, 5.0.0
OATT Attachment K Appendix Sec 2.2 General, 10.0.0
OATT Attachment K Appendix Sec 2.5 Calculation of Real-time, 7.0.0
OATT Attachment K Appendix Sec 2.6 Calculation of Day-ahead, 3.0.0
OATT Attachment K Appendix Sec 3.2 - Market Buyers, 46.0.0

Docket No. EL19-58-000

OA Definitions A - B, 7.0.0
OA Definitions C - D, 21.0.0
OA Definitions E - F, 15.0.0
OA Definitions I - L, 15.0.0
OA Definitions M - N, 13.0.0
OA Definitions O - P, 18.0.0
OA Definitions Q - R, 12.0.0
OA Definitions S – T, 15.0.0
OA Schedule 1 Sec 1.5A Economic Load Response Participant, 10.0.0
OA Schedule 1 Sec 1.7 General, 20.0.0
OA Schedule 1 Sec 1.10 - Scheduling, 35.0.0
OA Schedule 1 Sec 1.11 - Dispatch, 5.0.0
OA Schedule 1 Sec 2.2 General, 10.0.0
OA Schedule 1 Sec 2.5 Calculation of Real-time Prices., 7.0.0
OA Schedule 1 Sec 2.6 Calculation of Day-ahead Prices., 3.0.0
OA Schedule 1 Sec 3.2 - Market Buyers, 44.0.0

Docket No. EL19-58-002

<u>OATT Attachment K Appendix Sec 1.5A Economic Load Resp, 11.0.0</u>
<u>OATT Attachment K Appendix Sec 1.7 General, 22.0.0</u>
<u>OATT Attachment K Appendix Sec 1.10 - Scheduling, 37.0.0</u>
<u>OATT Attachment K Appendix Sec 1.11 - Dispatch, 6.0.0</u>
<u>OA Schedule 1 Sec 1.5A Economic Load Response Participant, 11.0.0</u>
<u>OA Schedule 1 Sec 1.7 General, 22.0.0</u>
<u>OA Schedule 1 Sec 1.10 - Scheduling, 37.0.0</u>
<u>OA Schedule 1 Sec 1.11 - Dispatch, 6.0.0</u>

**Tariff Records Accepted Effective the Date of This Order**

Docket No. EL19-58-003

<u>OATT Definitions – E - F, 29.0.0</u>
<u>OATT Definitions – O – P - Q, 25.0.0</u>
<u>OATT ATTACHMENT DD.5.10 Auction Clearing Requirements, 27.0.0</u>
<u>OATT ATTACHMENT DD.5.14 Clearing Prices and Charges, 28.0.0</u>
<u>OATT ATTACHMENT DD.6. MARKET POWER MITIGATION, 25.0.0</u>

# Appendix B

Revisions to Proposed Tariff, Attachment DD, section 5.14(h-1)(2)(B):

(ii) The net energy and ancillary services revenue is equal to forecasted net revenues which shall be determined in accordance with the applicable resource type net energy and ancillary services revenue determination methodology set forth in Tariff, Attachment DD, section 5.14(h-1)(2)(A)(i) through (ix) and using the subject resource's operating parameters as determined in accordance with the PJM Manuals based on (a) offers submitted in the Day-ahead Energy Market and Real-time Energy Market over the calendar year preceding the time of the determination for the RPM Auction; (b) the resource-specific operating parameters approved, as applicable, in accordance with Operating Agreement, Schedule 1, section 6.6(b) and Operating Agreement, Schedule 2 (including any Fuel Costs, emissions costs, Maintenance Adders, and Operating Costs); (c) the resource's EFORd; (d) Forward Hourly LMPs at the generation bus as determined in accordance with Tariff, Attachment DD, section 5.10(a)(v-1)(C)(6); and (e) the resource's stated annual revenue requirement for reactive services; plus any unit-specific bilateral contract. In addition, the following resource type-specific parameters shall be considered; (f) for combustion turbine, combined cycle, and coal resource types: the installed capacity rating, ramp rate (which shall be equal to the maximum ramp rate included in the resource's energy offers over the most recent previous calendar year preceding the determination for the RPM Auction), and the heat rate as determined as the resource's average heat rate at full load as submitted to the Market Monitoring Unit and the Office of the Interconnection, where for combined cycle resources heat rates will be determined at base load and at peak load (e.g., without duct burners and with duct burners), as applicable; (g) for nuclear resource type: ~~anticipated refueling schedule~~ <u>an average equivalent availability factor of all PJM nuclear resources to account for refueling outages</u>; (h) for solar and wind resource types: the resource's output profiles for the most recent three calendar years, as available; and (i) for battery storage resource type: the nameplate capacity rating (on a MW / MWh basis).

To the extent the resource has not achieved commercial operation, the operating parameters used in the simulation of the net energy and ancillary service revenues will be based on the manufacturer's specifications and/or from parameters used for other existing, comparable resources, as developed by the Market Monitoring Unit and the Capacity Market Seller, and accepted by the Office of the Interconnection.

A Capacity Market Seller intending to submit a Sell Offer in any RPM Auction for a Cleared Capacity Resource with State Subsidy based on a net energy and ancillary services revenue determination that does not use the foregoing methodology or parameter inputs stated for that resource type shall, at its election, submit a request for a resource-specific MOPR Floor Offer Price for such Capacity Resource pursuant to Tariff, Attachment DD, section 5.14(h-1)(3) below.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                    Docket Nos.    EL19-58-002
                                                              EL19-58-003

(Issued November 12, 2020)

GLICK, Commissioner, *dissenting in part*:

1.      I dissented from the underlying orders in this proceeding, which approved PJM's proposal to execute a sweeping overhaul of its energy and ancillary services market.[1] Those orders abdicated the Commission's responsibility to protect consumers from unjust and unreasonable rates and were fundamentally arbitrary and capricious.[2] Today we address PJM's compliance filings implementing the Commission's directives in those prior orders. Accordingly, I dissent in part from this order because, for the reasons supplied in my previous statements, it implements a rate that is unjust and unreasonable.[3]

2.      While I disagreed with the Commission's determinations in the underlying orders, I did note one lone bright spot: the decision to require PJM to move to a forward-looking energy and ancillary services offset (E&AS Offset) when calculating the net cost of new entry in the capacity market.[4] Moving to a forward-looking E&AS Offset helps to ensure that PJM's various markets work in concert and that expected increases in energy and ancillary services revenues are reflected in the capacity market.

---

[1] *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,153 (2020) (May 2020 Order) (Glick, Comm'r, dissenting at PP 1-2, 17, 29); *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,123 (2020) (Rehearing Order) (Glick, Comm'r, dissenting at PP 1-2) (stating that PJM's proposal "abandons basic principles of competitive markets in favor of a byzantine administrative pricing regime").

[2] May 2020 Order, 171 FERC ¶ 61,153 (Glick, Comm'r, dissenting at PP 2, 18, 30, & n.52) (explaining that the result of this proceeding is an unjustified windfall to inflexible generators); Rehearing Order, 173 FERC ¶ 61,123 (Glick, Comm'r, dissenting at PP 14-15, 24).

[3] May 2020 Order, 171 FERC ¶ 61,153 (Glick, Comm'r, dissenting at PP 17-27); Rehearing Order, 173 FERC ¶ 61,123 (Glick, Comm'r, dissenting at PP 14-22).

[4] Rehearing Order, 173 FERC ¶ 61,123 (Glick, Comm'r, dissenting at P 22).

3.      The Commission, however, forced PJM to complete this unprecedented, highly technical exercise in an impossibly short period of time.[5]  The reason for that rush is readily apparent:  Implementing the forward-looking E&AS Offset is a necessary pre-requisite to running PJM's much-delayed capacity auction for the 2022-2023 delivery year.  The responsibility for that delay lies squarely at the feet of this Commission and we owe it to all stakeholders to proceed with running that auction as soon as reasonably possible.[6]

4.      Accordingly, while PJM's E&AS Offset is by no means perfect, I believe that it is good enough to remove this issue from the list of roadblocks standing between PJM and, finally, running its auction.  In addition, PJM has pledged to revisit its new forward-looking E&AS Offset in its next quadrennial review, which begins this coming spring.[7]  During that review, I expect PJM, its consultants, and its stakeholders to take a hard look at the new E&AS Offset—especially in light of actual data from its implementation in the next auction—and to strive to fix any problems it uncovers.

For these reasons, I respectfully dissent in part.

_____

Richard Glick
Commissioner

_____

**[5]** *See* PJM Interconnection, L.L.C., Motion for Extension of Time and Shortened Comment Period, Docket No. EL19-58-000, at 3 (filed June 25, 2020) (describing the Commission's compliance deadline as "ambitious" and explaining that more time allows for "detailed engagement with stakeholders and the Market Monitor, which . . . .will translate into a better designed and better supported proposal being presented for Commission consideration").

**[6]** *Calpine Corp. v. PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,051 (2019) (Glick, Comm'r, concurring at PP 4-5); *see Calpine Corp. v. PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,239 (2019) (Glick, Comm'r, dissenting); *Calpine Corp. v. PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,034 (2020) (Glick, Comm'r, dissenting).

**[7]** PJM Answer at 2-3 ("PJM acknowledges that there may be alternative methods to estimate the projected E&AS Offset that may also be just and reasonable, but submits that other potential approaches be reviewed as part of the next quadrennial review, which commences in the Spring of 2021.  This will allow sufficient time to consider such alternative approaches with the benefit of experience with the current E&AS Offset, while avoiding any further delay of the upcoming Base Residual Auctions (BRAs).") (internal citations omitted).

Document Content(s)

EL19-58-002.DOCX......................................................1

# EXHIBIT B

174 FERC ¶ 62,027
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                                    Docket No.   EL19-58-005

NOTICE OF DENIAL OF REHEARINGS BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(January 14, 2021)

Rehearings have been timely requested of the Commission's order issued on November 12, 2020, in this proceeding. *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134 (2020). In the absence of Commission action on the requests for rehearing within 30 days from the date the requests were filed, the requests for rehearing (and any timely requests for rehearing filed subsequently)[1] may be deemed denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2020); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the rehearing requests of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper. As provided in 18 C.F.R. § 385.713(d), no answers to the rehearing requests will be entertained.

Kimberly D. Bose,
Secretary.

---

[1] *See San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs. Into Mkts. Operated by Cal. Indep. Sys. Operator & Cal. Power Exch.*, 95 FERC ¶ 61,173 (2001).

Document Content(s)

EL19-58-005.DOCX.......................................................1

# EXHIBIT C

174 FERC ¶ 61,180
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
                       Neil Chatterjee, James P. Danly,
                       Allison Clements, and Mark C. Christie.


PJM Interconnection, L.L.C.                    Docket No.  EL19-58-005


ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued March 9, 2021)

1.      On May 21, 2020, the Commission issued an order addressing comprehensive revisions to PJM Interconnection, L.L.C.'s (PJM) reserve market.[1]  Among other things, the Commission found unjust and unreasonable provisions of PJM's Open Access Transmission Tariff (Tariff) governing the determination of the energy and ancillary services offset (E&AS Offset) used in PJM's capacity market, established a forward-looking EA&S Offset as the just and reasonable replacement rate, and directed PJM to make a compliance filing to implement that replacement rate.  PJM submitted two filings to comply with the Commission's directives in the May 2020 Order.  On November 12, 2020, the Commission issued an order accepting those compliance filings.[2]  Exelon Corporation (Exelon) and PSEG[3] (collectively, Exelon/PSEG) and the Public Interest and Customer Organizations (PICOs) filed requests for rehearing of the Compliance Order.[4]

_____

[1] *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,153, at P 2 (May 2020 Order), *order on reh'g*, 173 FERC ¶ 61,123 (2020).

[2] *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134 (2020) (Compliance Order).

[3] PSEG is comprised of:  PSEG Power LLC, PSEG Energy Resources & Trade LLC, and Public Service Electric and Gas Company.

[4] The PICOs are comprised of:  American Municipal Power, Inc., American Public Power Association, Delaware Division of the Public Advocate, District of Columbia Office of the People's Counsel, Maryland Office of the People's Counsel,

2.      Pursuant to *Allegheny Defense Project v. FERC*,[5] the rehearing requests filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 313(a) of the Federal Power Act (FPA),[6] we are modifying the discussion in the Compliance Order and continue to reach the same result in this proceeding, as discussed below.[7]

## I.   **Background**

3.      On March 29, 2019, PJM submitted filings pursuant to FPA sections 205 and 206,[8] asserting that the reserve market provisions in its Tariff and Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. (Operating Agreement) are unjust and unreasonable, and proposing revisions to the Tariff and Operating Agreement as a

---

Natural Resources Defense Council, New Jersey Division of Rate Counsel, Pennsylvania Office of Consumer Advocate, PJM Industrial Customer Coalition, the Sierra Club, and the Sustainable FERC Project.

[5] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[6] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[7] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the Compliance Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[8] 16 U.S.C. §§ 824d-824e.  PJM filed the proposed revisions to the PJM, Intra-PJM Tariffs, Operating Agreement, pursuant to section 206 of the FPA in Docket No. EL19-58-000 and filed pursuant to section 205 of the FPA to include the same revisions to the PJM, Intra-PJM Tariffs, Tariff, Attach. K-App., in Docket No. ER19-1486-000.  "Because PJM does not have unilateral authority to file revisions to its Operating Agreement pursuant to section 205, its section 205 filing was subject to the requirements of section 206 of the FPA."  Compliance Order, 173 FERC ¶ 61,134 at P 4 n.5; *see also* May 2020 Order, 171 FERC ¶ 61,153 at P 1 n.1.; PJM Interconnection, L.L.C., Enhanced Price Formation in Reserve Markets of PJM, Docket No. EL19-58-000 (Mar. 29, 2019) (PJM March 2019 Transmittal); PJM Interconnection, L.L.C., Enhanced Price Formation in Reserve Markets of PJM, Docket No. ER19-1486-000 (Mar. 29, 2019).

just and reasonable replacement rate.[9]  In the May 2020 Order, the Commission largely accepted PJM's proposed replacement rate for the reserve market provisions, subject to modifications in a compliance filing.[10]  The Commission also found unjust and unreasonable provisions of the Tariff governing the determination of the E&AS Offset used in PJM's capacity market, established a forward-looking E&AS Offset as the just and reasonable replacement rate, and directed PJM to submit a compliance filing to implement the directed replacement rate.[11]  The Commission accepted PJM's two compliance filings[12] in the Compliance Order, subject to a further compliance filing. The Commission established an effective date of May 1, 2022 for PJM's reserve market reforms and also accepted, subject to further compliance, PJM's proposed calculation of the forward-looking E&AS Offset effective June 1, 2022.[13]

4.      As relevant to the instant rehearing requests, the Commission accepted PJM's proposal to reflect the 10% adder available for total production costs[14] only in the modeled offers of combustion turbine (CT) resources in forecasting E&AS dispatch and net revenues "because it accounts for the additional costs and risks that may be incurred by operating the CT Reference Resource in a manner that fully recognizes flexibility, which is not limited only to peak hours or times of system stress."[15]  The Commission also accepted PJM's proposal to use historical prices to forecast operating reserve and

---

[9] May 2020 Order, 171 FERC ¶ 61,153 at P 1.

[10] *Id.* P 2.

[11] May 2020 Order, 171 FERC ¶ 61,153 at P 2.

[12] *See* PJM Interconnection, L.L.C., Docket No. EL19-58-002 (Jul. 6, 2020) (First Compliance Transmittal); PJM Interconnection, L.L.C., Docket No. EL19-58-003 (Aug. 5, 2020) (Second Compliance Transmittal).

[13] Compliance Order, 173 FERC ¶ 61,134 at P 3.  With respect to the Second Compliance Transmittal, the Commission required PJM to file modifications to its Tariff to revise the methodology for modeling energy revenues of nuclear resources, with resource outages based on class averages.  *Id.*  The Commission subsequently accepted PJM's compliance filing implementing this directive.  *PJM Interconnection L.L.C.*, Docket No. EL19-58-004 (Jan. 4, 2021) (delegated order).

[14] The 10% adder is an allowable component of cost for all generating resources. *See* Operating Agreement, Sched. 2, § 1.1(c).

[15] Compliance Order, 173 FERC ¶ 61,134 at PP 180-81.

Document Accession #: 20210309-3073          Filed Date: 03/09/2021

Regulation[16] dispatch and revenues.[17]  On rehearing, and with differing views, PSEG/Exelon and PICOs allege error with respect to the Commission's findings on these issues.  In addition, PICOs allege that the Commission erred in establishing May 1, 2022, as the effective date for the reserve market reforms that were accepted in the May 2020 Order.  We address each of these issues below.

## II.    **Discussion**

### A.    **Application of the 10% Adder**

5.     In the Compliance Order, the Commission accepted as just and reasonable PJM's proposal to reflect the 10% adder only in the modeled offers of CT resources in the Projected E&AS Dispatch Model.[18]  The Commission recognized that PJM's balanced approach reflects exclusion of other resources "that do not significantly alter their operating schedules based on evolving conditions between the day-ahead and real-time markets."[19]  The Commission also explained that "the CT Reference Resource used in the development of the [Variable Resource Requirement (VRR)] curve includes a 10% cost adder."[20]  On rehearing, PICOs oppose application of the 10% adder to CTs or any other resource, whereas Exelon/PSEG argue that PJM should reflect the 10% adder in the modeled offers of all resources.  Furthermore, Exelon/PSEG argue that the Commission erred in failing to address their argument that PJM should reflect a separate, additional 10% fuel variance adder in the modeled offers of all natural gas resources.  We sustain the Commission's determination accepting PJM's proposal with respect to the 10% adder in the modeled offers, as discussed below.  We also decline to grant the request to direct PJM to include an additional 10% fuel variance adder in the modeled offers of all natural gas resources in its Projected E&AS Dispatch Model.

### 1.    **Rehearing Requests**

6.     PICOs object to the application of the 10% adder to the modeled offers of CTs.  PICOs argue the Commission's acceptance of PJM's proposal to apply the 10% adder to all CT offers is unsupported and will ultimately underestimate net E&AS revenues.

---

[16] Capitalized terms used but not defined herein are defined in the PJM Tariff and Operating Agreement.

[17] *Id.* PP 168-71, 187-88.

[18] Compliance Order, 173 FERC ¶ 61,134 at P 180.

[19] *Id.*

[20] *Id.*

PICOs contend that the record contains no evidence that the reference CT would apply the 10% adder to its energy market offers by default and allege that the Commission failed to address evidence from other parties contesting PJM's theory as to why a CT might include the 10% adder.[21]

7.    PICOs disagree with the Commission's conclusion that the 10% adder should be reflected in modeled CT offers based on the "additional costs and risks that may be incurred by operating the CT Reference Resource in a manner that fully recognizes flexibility, which is not limited only to peak hours or times of system stress."[22]  PICOs argue that this reasoning relies on a hypothetical and is unsupported.[23]  PICOs contend that the Commission did not capture the essence of their arguments opposing use of the adder and "failed entirely to engage the technical arguments and data in the [Affidavit of James F. Wilson (Wilson Affidavit)]."[24]  PICOs also claim that the Commission ignored actual data presented by the PICOs and the Independent Market Monitor for PJM (IMM), showing that CTs do not apply the adder by default, but also offer below their marginal cost half of the time.[25]

8.    PICOs also allege that PJM's inclusion of the 10% adder in modeled CT offers rests on a mischaracterization of a 2018 Report prepared by The Brattle Group and submitted as part of the quadrennial review of PJM's VRR curve.[26]  According to PICOs, that report does not support the default application of the 10% adder without further investigation as to whether it actually is used.[27]  Therefore, PICOs assert that, if the Commission does not reject inclusion of the 10% adder in modeled CT offers on rehearing, the Commission should direct PJM to conduct a data analysis to determine

---

[21] PICOs Rehearing Request at 9.

[22] *Id.* (citing Compliance Order, 173 FERC ¶ 61,134 at P 180).

[23] *Id.* at 10-11.

[24] *Id.* at 14.

[25] *Id.* at 10-11.

[26] The Brattle Group, Fourth Review of PJM's Variable Resource Requirement Curve (Apr. 19, 2018) (2018 Brattle Report).  The 2018 Report is included as Exhibit 2 to Attachment G of PJM's PJM Quadrennial Review of VRR Curve Shape and Key Parameters, Attachment G, which was filed on October 12, 2018 in Docket No. ER19-105-001.

[27] PICOs Rehearing Request at 10.

whether and how often the adder is currently being employed by CTs prior to its incorporation into PJM's Projected E&AS Dispatch Model.[28]

9.     In contrast, Exelon/PSEG assert that PJM should reflect the 10% adder in the modeled offers of all resources.  Exelon/PSEG state that PJM's current tariff allows for two distinct 10% adders:  (1) the 10% adder on the entire incremental cost-based offer from generators of all fuel types to reflect costs that are difficult to quantify; and (2) a 10% fuel variance adder on the fuel cost portion of the cost-based offer from natural gas resources to reflect the variability associated with fuel index prices.  Exelon/PSEG contend that the Commission erred in accepting PJM's proposal to apply the 10% adder to only CT offers and in failing to apply the additional fuel variance adder to the modeled offers of natural gas resources in forecasting net E&AS revenues.  Without broader application of these adders, Exelon/PSEG posits that the net E&AS Offset "will be overstated and will result in resources being forced to offer into [the PJM capacity market] at Market Seller Offer Caps that are understated and not just and reasonable."[29]

10.     Exelon/PSEG argue that the Commission departed from precedent, which, according to Exelon/PSEG, stands for the proposition that both the 10% adder and the fuel variance adder are just and reasonable approximations of resource costs and acceptable components of cost-based incremental energy offers.[30]  Exelon/PSEG reiterate arguments from prior pleadings claiming that in Order No. 831, the Commission found that a 10% adder for difficult to quantify costs is permitted, with certain parameters, and did not limit this finding to CTs.[31]  Exelon/PSEG also refer to the recent quadrennial review of PJM's VRR curve, where, according to Exelon/PSEG, the Commission held that the inclusion of the 10% adder would increase the accuracy of the E&AS Offset.[32]

11.     Exelon/PSEG allege that the Commission has not justified its acceptance of PJM's proposed treatment of the 10% adder and fuel variance adder.  Exelon/PSEG take issue with the Commission's finding that including the 10% adder for other

---

[28] *Id.* at 13-14.

[29] Exelon/PSEG Rehearing Request at 6.

[30] *Id.* at 6-8.

[31] *Id.* at 7 (citing *Final Rule on Offer Caps in Mkts Operated by Regional Transmission Organizations & Ind. Sys. Operators*, Order No. 831, 157 FERC ¶ 61,115, at P 207 (2016)).

[32] *Id.* (citing *PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,084, at P 128 (2019), *aff'd on reh'g*, 171 FERC ¶ 61,040 (2020)).

Document Accession #: 20210309-3073     Filed Date: 03/09/2021
Docket No. EL19-58-005                                                                      - 7 -

resource types could result in "over-mitigation" and "may not reflect the lower bound of a competitive offer."[33] Exelon/PSEG claim that the Commission ignored Exelon's arguments that failure to include the 10% adder would result in lower Market Seller Offer Caps and the very same "over-mitigation" that the Commission was ostensibly trying to avoid.[34]

12.    Exelon/PSEG argue that the Commission "appears to believe that analysis of the 'assumptions' behind PJM's proposal should be deferred until the next quadrennial review process."[35] Exelon/PSEG argue that the Commission instead has the burden to establish a just and reasonable rate in this section 206 proceeding, and not in some future proceeding.[36]

## 2.    Commission Determination

13.    We sustain the Commission's determination accepting PJM's proposal to reflect the 10% adder in the modeled offers of only CT resources within its Projected E&AS Dispatch Model as just and reasonable and compliant with the May 2020 Order.[37] PJM's proposal is consistent with its current inclusion of the 10% adder in the modeled offers of the CT Reference Resource in setting the VRR Curve.

14.    As an initial matter, we note that PICOs' rehearing arguments opposing the adder are repetitive of arguments that the Commission previously considered, and found unpersuasive, in the last quadrennial review of PJM's VRR Curve.[38] There, as in the Compliance Order, the Commission accepted as just and reasonable PJM's proposal to reflect the 10% adder in the modeled offers of the CT Reference Resource for purposes of calculating the E&AS Offset.[39] We find no basis to depart from that finding here. Earlier in this proceeding, PICOs argued that the Commission's decision in the quadrennial review was not controlling because PJM's new model considers

---

[33] *Id.* at 1, 8 (citing Compliance Order, 173 FERC ¶ 61,134 at P 181).

[34] *Id.* at 10.

[35] *Id.* at 12.

[36] *Id.*

[37] Compliance Order, 173 FERC ¶ 61,134 at P 180.

[38] *PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,029, at PP 128-129 (2019), *reh'g denied*, 171 FERC ¶ 61,040, at P 31 (2020).

[39] *Id.*

Document Accession #: 20210309-3073          Filed Date: 03/09/2021

dispatch in all hours, not just in peak hours.[40]  The Commission responded to this argument in the Compliance Order by explaining that the 10% adder is reasonably applied "because it accounts for the additional costs and risks that may be incurred by operating the CT Reference Resource in a manner that fully recognizes flexibility, *which is not limited only to peak hours or times of system stress.*"[41]  Moreover, as Exelon observes, the fact that PJM now models all 24 hours in a day under its Projected E&AS Dispatch methodology does not change the fact that CTs are still most likely to be committed during the 16 peak hours.[42]

15.     We continue to find adequate evidence in the record to demonstrate that including the 10% adder results in a just and reasonable approximation of the costs for a CT unit. CT units typically operate on peak and rely on natural gas that is generally purchased in the spot market when natural gas prices are most likely to be the most volatile.  The 10% adder reasonably accounts for the difficulty in forecasting the price of natural gas that will be paid by the CT unit and thus takes into account the distinct possibility that reference prices used for estimating CT cost-based offers may not accurately reflect the natural gas prices paid by the CT unit.[43]  Even if CTs do not always apply the adder to their actual offers, it is appropriate to include the adder in PJM's model to reflect volatility in the actual fuel costs CTs may incur compared to the reference natural gas price assumed in PJM's model.  In that regard, 50-60% of CTs that cleared the energy market in the 2019-2020 time frame submitted competitive, unmitigated offers, at prices

---

[40] PICOs September 2, 2020 Partial Protest of and Comments on Second Compliance Transmittal at 14.

[41] Compliance Order, 173 FERC ¶ 61,134 at P 180 (emphasis added).  PICOs' characterization of the "additional costs and risks" as "hypothetical" also misses the point.  As the Commission explained in its order accepting PJM's quadrennial update, the issue is not whether the 10% adder should be included in the Tariff but, rather, whether it should be included in the E&AS Offset calculation.  *PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,084 at P 129.

[42] Exelon September 17, 2020 Answer at 8.

[43] *See PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,029 at P 121 (PJM states that the same uncertainties that underlie energy market offers, including assumptions regarding the applicable gas index hub, Day-ahead versus intra-day gas arrangements, and assigned Locational Marginal Pricing, would confront the Reference Resource if it were preparing an energy market offer).

Document Accession #: 20210309-3073     Filed Date: 03/09/2021

greater than or equal to their cost-based offers.[44]  This evidence shows that including the 10% adder in the modeled offers of CT units reasonably reflects the competitive offer behavior of CT units.  For the preceding reasons, we continue to find that the 10% adder as applied to modeled offers of CT units is just and reasonable.  Accordingly, we deny PICOs' request to direct PJM to conduct further data analysis to determine whether and how often the adder is currently being employed.[45]

16.     As the Commission explained in the Compliance Order, PJM reasonably excluded the 10% adder from the modeled offers of combined cycle units and other resources, such as coal units, because, unlike CTs, those resources "do not significantly alter their operating schedules based on evolving conditions between the day-ahead and real-time markets."[46]  Combined cycle units operate more frequently than CT units and, as PJM concluded, have more stable fuel costs.  Exelon/PSEG failed to provide evidence similar to that discussed above for CT units that their competitive offers equal their cost-based offers plus 10%.  Similarly, other non-CT units, such as coal units, procure fuel well in advance of the operating day through long-term contracts and have much more stable fuel prices than CT units.  Because these other resources do not face the same risks and challenges as CTs, we continue to find that PJM appropriately limited the application of the 10% adder to CTs.

17.     Exelon/PSEG cite to Schedule 2 of the PJM Operating Agreement, which provides a 10% fuel cost adder to all resources in determining mitigated offer caps for offers into the energy market, as support for their argument that limiting the 10% adders only to CT resources for purposes of calculating the E&AS Offset is unjust and unreasonable.[47]  We disagree that the broader application of the cost adder for the purposes of mitigation in the energy market should dictate that a similarly broad application must be applied to the E&AS Offset in the capacity market.  The cost adder in Schedule 2 is designed to approximate the maximum amount a unit may offer during the relatively rare situations in which the unit is subject to energy market

---

[44] IMM September 2, 2020 Comments Filing at 21 ("Of all the CTs that cleared in the energy market in 2019 and the first two quarters of 2020, between 40 and 50 percent were offered with incremental price-based offers less than their incremental cost-based offers.").

[45] See supra P 8; PICOs Rehearing Request at 13-14.

[46] Compliance Order, 173 FERC ¶ 61,134 at P 180.

[47] Exelon/PSEG Rehearing Request at 6.

Document Accession #: 20210309-3073      Filed Date: 03/09/2021

mitigation.[48]  In contrast, the E&AS Offset is designed to approximate the actual net revenue that different resource types receive from the energy market.  As discussed above, PJM reasonably explained that because CT resources operate infrequently, and mostly during peak periods when their fuel costs may vary, the use of the 10% adder better approximates the variable nature of the actual costs these resources will incur to produce energy.  On the other hand, combined cycle resources and other resources provide baseload energy, operating during many more hours, and PJM reasonably concluded that their actual costs are better approximated by not including the 10% adder.  PJM's proposal to limit application of the adder to CTs in the E&AS offset calculation improves accuracy because it is more likely to reflect the actual offer behavior in the energy market.

18.      Contrary to Exelon/PSEG's argument on rehearing, the Commission did not depart from precedent in declining to expand application of the 10% adder to resources other than CTs for purposes of calculating the E&AS Offset.  As discussed above, in the most recent quadrennial review, the Commission accepted PJM's proposal to include the 10% adder in calculating the E&AS Offset.  However, that proceeding was focused on the Reference Resource – a CT – which is used to derive the VRR Curve; the Commission did not approve use of the 10% adder for combined cycle units or other resources in calculating the E&AS Offset.  Also, the fact that the Commission has, in Order No. 831, permitted the use of a an adder above cost to capture difficult to quantify costs in cost-based energy offers above $1,000/MWh[49] does not compel application of this adder in the context of the Projected E&AS Dispatch Model.[50]  Consistent with the discussion above, the E&AS Offset seeks to estimate expected offer behavior by individual resources and not their maximum allowable energy offers.  While the Commission, in the November Compliance Order, found that inclusion of the 10% adder reflects *expected* offer behavior for CTs, we are not persuaded that it reasonably reflects the *expected* offer behavior of other resources.

---

[48]*See* Operating Agreement, Schedule 1, § 6.4.  In 2019, in PJM's real-time energy market resources were offer capped in 1.7% of all hours, representing 1.3% of total MWh.  *See* Monitoring Analytics, LLC, *2019 State of the Market Report for PJM Volume 2:  Detailed Analysis* at p. 203, tbls. 3-94 and 3-95 (Mar. 12, 2020).

[49] Order No. 831, 157 FERC ¶ 61,115 at P 207.

[50] In fact, notwithstanding the availability of the adder for all resources in the energy market, via Schedule 2, prior to the 2018 quadrennial review, no adder had been applied to the calculation of the E&AS Offset.  *See* Public Interest Organizations' September 2, 2020 Protest, Wilson's Aff. ¶¶ 16-17.

19.     In the Compliance Order, the Commission reiterated PJM's statement that including the 10% adder for other resource types could improperly raise certain resources' MOPR Floor Offer Prices above competitive levels.[51]  Exelon/PSEG challenge this finding as "myopic" and claim that the Commission should also have considered the effect of its decision on Market Seller Offer Caps.[52]  According to Exelon/PSEG, failure to include the 10% adder for other resources will result in lower Market Seller Offer Caps, which will also result in over-mitigation.[53]  We find that PJM's proposal is just and reasonable not based on PJM's over-mitigation argument, but because it more reasonably reflects the expected offer behavior of CTs as compared to other resources.  In any event, to the extent Market Sellers can establish that they are entitled to offer higher than the offer cap or lower than the offer floor, they can continue to use the option of submitting their unit-specific costs.[54]

20.     We also decline to grant Exelon/PSEG's request to direct PJM to include an additional 10% fuel variance adder in the modeled offers of all natural gas resources in its Projected E&AS Dispatch Model.  Exelon/PSEG mistakenly claim that the Compliance Order reflects "confusion" between the 10% fuel variance adder and the 10% adder.[55]  We disagree that the Tariff contains any explicit fuel variance adder.  While Exelon/PSEG claim that the PJM Operating Agreement reflects a Commission-approved fuel variance adder to account for the variability associated with fuel index prices, none of the Operating Agreement sections they cite reflects any automatic fuel variance adder.[56]  We note that section 2.3(a)(iii) of Schedule 2 of the Operating Agreement, cited by Exelon/PSEG as support, simply provides that a Market Seller's Fuel Cost Policy must "[p]rovide a detailed explanation of the basis for and

---

[51] Compliance Order, 173 FERC ¶ 61,134 at P 181.

[52] Exelon/PSEG Rehearing Request at 8.

[53] *Id.* at 10.

[54] PJM September 17, 2020 Answer at 11 n.34 ("To the extent a Market Seller seeks to include the ten percent cost adder for purposes of the avoidable cost rate in calculating the Market Seller Offer Cap, such Market Seller may continue to include the adder in a unit-specific review to avoid any potential over-mitigation.").

[55] *See* Exelon/PSEG Rehearing Request at 10.

[56] *See* Exelon/PSEG Rehearing Request at 6 & Exelon September 2, 2020 Protest of Second Compliance Transmittal at 8 (citing Sec. 2.3(a)(iii) of Sched. 2 of the Operating Agreement); Exelon/PSEG Rehearing Request at 8 n.16 (citing the definition of Fuel Cost in Operating Agreement, Sched. 1, § 6.4.3).

Document Accession #: 20210309-3073     Filed Date: 03/09/2021

reasonableness of any applicable adders included in determining fuel costs."[57] Further, while section 6.4.3 of Schedule 1 of the Operating Agreement defines Fuel Cost as the "applicable fuel cost as estimated by the Office of the Interconnection at a geographically appropriate commodity trading hub, plus 10 percent,"[58] it does not support Exelon/PSEG's argument that an additional fuel variance adder should be applied to each and every modeled offer for natural gas resources. This section provides an equation for Maximum Allowable Incremental Cost that is used by PJM to screen offers over $1,000/MWh against fuel price indices, but does *not* provide rules setting forth the components a Market Seller can include in its cost-based energy offers.[59] Those rules are laid out in Schedule 2 of the Operating Agreement, which does not mention any fuel variance adder other than the overall 10% adder.[60] For the reasons discussed above, we conclude that PJM supported its decision to limit application of the 10% adder to CTs and to not include any additional adders to account for fuel variance costs.

21.     Finally, contrary to Exelon/PSEG's rehearing arguments,[61] the Commission's statement that the next quadrennial review provides an appropriate forum to re-examine PJM's assumptions[62] does not mean that the Commission has deferred either analysis of the assumptions, or the establishment of a just and reasonable rate. As discussed in the Compliance Order, and sustained herein, PJM's proposed application of the adder is just and reasonable.[63]

---

[57] Operating Agreement, Sched. 2, § 2.3(a)(iii). We note that this section functions to prohibit any fuel cost adder unless the Market Seller has justified such an adder, contrary to Exelon/PSEG's assertion that the Operating Agreement allows such an adder for all natural gas resources by default.

[58] *Id*. Sched. 1 § 6.4.3 ("Verification of Cost-Based Offers Over $1,000/Megawatt-hour").

[59] *See id; see also PJM Interconnection, L.L.C.*, 161 FERC ¶ 61,153, at P 41(2017).

[60] *See* Operating Agreement, Sched. 2 ("Components of Cost").

[61] *See* Exelon/PSEG Rehearing Request at 12.

[62] Compliance Order, 173 FERC ¶ 61,134 at P 181.

[63] *Id.* P 180.

## B.      Accuracy of Modeled Regulation Revenues

22.      In the Compliance Order, the Commission accepted as just and reasonable PJM's approach to modeling projected net revenue from Regulation in the E&AS Offset. The Commission accepted PJM's proposal to use scaled historical Regulation prices, i.e., multiplying historical real-time prices for Regulation by the ratio of the future hourly real-time energy price to the historic hourly real-time energy price, using prices from the PJM Western Hub.[64] We sustain the Commission's determination, as discussed below.

### 1.      Exelon/PSEG Rehearing Request

23.      Exelon/PSEG allege that the Commission erred in accepting PJM's proposal to rely on scaled historic Regulation prices within the Projected E&AS Dispatch Model to calculate the E&AS Offset.[65] They contend that this "backward-looking calculation" is inconsistent with the Commission's specific directive to establish a forward-looking E&AS Offset.[66] Exelon/PSEG further contend that historic Regulation prices are not an accurate predictor of future prices given the small size of the Regulation market where, according to Exelon/PSEG, a new CT entrant that consistently clears the Regulation market would depress the market clearing price.[67] Exelon/PSEG argue that this depressive effect disrupts the assumed linear correlation between energy and Regulation prices that underlies PJM's estimate of future Regulation prices.[68]

24.      Exelon/PSEG allege that the Commission failed to consider the actual offer behavior of CTs, which, according to Exelon/PSEG, do not receive any Regulation revenues at all because they bid at levels exceeding the market clearing price.[69] Accordingly, Exelon/PSEG argue PJM has not supported its assumption that the new entrant CT will be a price-taker and earn significant revenues from the Regulation market.[70] Exelon/PSEG instead posit that the Regulation prices faced by a new CT

---

[64] *Id.* PP 182, 187-88.

[65] Exelon/PSEG Rehearing Request at 2, 14-17.

[66] *Id.* at 14

[67] *Id.* at 15.

[68] *Id.* at 14-1, Specification of Error No. 5.

[69] *Id.*

[70] *Id.* at Specification of Error No. 6.

entrant that clears the Regulation market will be lower than the prices one would expect based on the historical relationship between Regulation and energy prices.[71]

25.     Finally, Exelon/PSEG argue that PJM's proposal cannot be justified on the ground that Regulation revenues have a de minimis effect on the market, noting that the information contained in PJM's August 19, 2020 supplemental filing shows more than a de minimis effect.[72]

## 2.     Commission Determination

26.     We continue to find that PJM's approach to modeling Regulation revenues is just and reasonable.  Contrary to the rehearing arguments of Exelon/PSEG, the use of scaled historical prices to estimate future Regulation prices is consistent with the directive in the May 2020 Order to use a forward-looking E&AS Offset.  PJM reasonably proposed to use historical Regulation prices as one component of its estimate of future Regulation prices because, as PJM explained, there is no observable forward market for ancillary services, which include both Regulation and operating reserves.[73]  Given the lack of a forward market for ancillary services, we find, based on the record evidence in this proceeding, that it is appropriate for PJM to use historical data for this particular component of the E&AS Offset calculation.  For the foregoing reasons, we reiterate our finding that PJM reasonably leveraged the historical linear correlation between energy prices and Regulation prices to estimate future Regulation prices based on the ratio of historic to future energy prices.

27.     Under FPA section 206, whether initiated by a complaint or *sua sponte*, the Commission has the burden to establish a just and reasonable rate to replace the rate it has found unjust and unreasonable.[74]  The Commission need not adopt the best or perfect rate, as long as the Commission has explained its choice and chosen a just and reasonable rate.[75]  Here, the Commission justified its approval of PJM's proposed methodology for

---

[71] *Id.* at 15.

[72] *Id.* at 16 (citing PJM Informational Filing with Indicative Values for Energy and Ancillary Services Offset, Aug. 19, 2020, at attach. A).

[73] Compliance Order, 173 FERC ¶ 61,134 at P 162 (citing PJM Aug. 5, 2020 Compliance Filing at 23 & n.74 (citing Brattle Aff. ¶ 22)).

[74] *Md. Pub. Serv. Comm'n v. FERC*, 632 F.3d 1283, 1285 n.1 (D.C. Cir. 2011); *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 353 (D.C. Cir. 2014).

[75] *See United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1169 (D.C. Cir. 1996) (per curiam) ("FERC correctly counters that the fact that AEPCO may have proposed a reasonable alternative to SFV rate design is not compelling.  The existence of a second

calculating Regulation revenues based on two PJM assumptions that the Commission found to be reasonable: (1) that energy prices and Regulation prices have historically been highly correlated, and there is no compelling evidence suggesting that this relationship will change in the near future; and (2) that a resource will offer its full capabilities, including its capability to provide Regulation service, into the markets in a way that maximizes its profits.[76]  Exelon/PSEG challenge these assumptions on rehearing and argue that, due to the small size of the Regulation market, a new CT entrant that consistently clears the Regulation market would in turn cause a depressive effect on the market clearing price and disrupt any assumed linear relationship.[77]  We are unpersuaded by these objections and continue to find that PJM's proposed approach is just and reasonable.[78]  Exelon/PSEG have provided no data or analysis to demonstrate how much Regulation prices would decline.  Further, any potential changes in the relationship between Regulation prices and energy prices can continue to be examined for future Projected E&AS Dispatch Models.[79]  The alternatives Exelon/PSEG offer[80] would

---

reasonable course of action does not invalidate an agency's determination."); *see also ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 955 (D.C. Cir. 2007) ("We need not decide whether the Commission has adopted the best possible policy as long as the agency has acted within the scope of its discretion and reasonably explained its actions."); *Cities of Batavia v. FERC*, 672 F.2d 64, 84 (D.C. Cir. 1982) ("[T]he billing design need only be reasonable, not theoretically perfect.").

[76] Compliance Order, 173 FERC ¶ 61,134 at P 187 (citing PJM Aug 5, 2020 Compliance Filing at 25, 29-30; Brattle Aff. ¶¶ 22, 25, 59).  The Commission relied on these two assumptions as reasonable and did not, as PSEG/Exelon suggest, justify its acceptance of the proposal based on the *de minimis* size of the Regulation market.

[77] See *supra* P 23.

[78] *See* Compliance Order, 173 FERC ¶ 61,134 at P 117 n.175 ("Because PJM may make a section 205 filing to revise these Tariff provisions, we find it reasonable to accept PJM's proposal over alternatives if PJM's proposal is just and reasonable.").

[79] We note that, in the Compliance Order, we acknowledged PJM's commitment to evaluate its Regulation modeling for the CT Reference Resource in the next quadrennial review, if not sooner, and consider alternative approaches that may result in further refinements.  *See Id.* P 188.

[80] As discussed in the Compliance Order, Exelon proposed to include a $12/MWh adder to the CT offer, and PSEG and Exelon had both subsequently requested that the Commission direct PJM to remove the Projected E&AS Dispatch Model's ability to optimize against the Regulation market.  *Id.* PP 185-86.  The Commission declined to adopt those alternatives.  *Id.* P 188.

artificially inflate CTs' Regulation offers in the Projected E&AS Dispatch Model, contrary to expected offer behavior, and we are unpersuaded that PJM should adopt them.[81]

28.     Exelon/PSEG are also incorrect in claiming that the Commission failed to consider the offer behavior of actual CTs when evaluating PJM's proposal.  The Commission considered PJM's explanation, including record evidence demonstrating that PJM reviewed how CTs actually participated in the Regulation market, and found that CT resources offered up to 90% of their dispatchable range into the Regulation market.[82] This review further supports the assumptions relied upon by PJM in developing its Projected E&AS Dispatch Model and the Commission's action in reviewing PJM's proposal.

### C.     Use of Historic Versus Forward Reserve Prices

29.     In the Compliance Order, the Commission accepted PJM's proposed modeling of net revenue from operating reserves in the E&AS Offset calculation.  Specifically, the Commission found that PJM's proposal to use unscaled historical prices for operating reserves was just and reasonable, and compliant with the directives from the May 2020 Order.[83]  We sustain the Commission's determination, as discussed below.

### 1.     PICOs' Rehearing Request

30.     PICOs argue that PJM's E&AS Offset methodology underestimates revenue from operating reserves by relying on historic prices that do not reflect PJM's then-pending reserve market reforms.  PICOs allege that the Commission failed to engage with the technical arguments and data presented in the Wilson Affidavit, which had challenged PJM's proposed assumptions of ancillary services prices within its Projected E&AS Dispatch Model.[84]  PICOs reiterate arguments from their protest that using historical

---

[81] Exelon had requested that PJM rerun its modeling with a $12/MWh adder included in the CT offer, while PSEG had proposed to ignore Regulation revenues entirely.  The Commission declined to adopt either of these proposals.  *Id.* P 188.

[82] PJM Sept. 17, 2020 Answer at 18-19; Compliance Order, 173 FERC ¶ 61,134 at P 182.

[83] Compliance Order, 173 FERC ¶ 61,134 at P 168.

[84] PICOs Rehearing Request at 14.  PICOs' rehearing request at times refers generically to "ancillary service revenues" but specifically focuses on operating reserves revenue and does not mention Regulation.

Document Accession #: 20210309-3073    Filed Date: 03/09/2021

operating reserve prices "will greatly understate future operating reserve revenues, especially if excess capacity declines and energy price expectations rise in the future."[85]

31.    According to PICOs, when energy prices rise, operating reserve prices will not rise proportionally but will instead rise at a faster rate because the primary cost of providing operating reserves is the foregone opportunity to provide energy.[86]  PICOs claim that the Wilson Affidavit showed how The Brattle Group's own data indicate that ancillary services prices are increasing at roughly three to six times the rate of energy prices.[87] PICOs also argue that, due to changes in the Operating Reserve Demand Curve accepted in this proceeding, operating reserve prices will be higher in the future.[88] PICOs claim that PJM's own simulations reveal a tripling of annual average Synchronized Reserve and Non-Synchronized Reserve prices based on the reserve market reforms ordered in this proceeding.[89] PICOs suggest that, to remedy the underestimation of ancillary services revenues as a result of these reforms, PJM should adjust its simulations to develop a "functional relationship" between energy price levels and operating reserve price levels using two guiding principles:  (1) increases in energy prices result in proportionately greater increases in operating reserve prices; and (2) reserve pricing changes are designed to increase operating reserve prices and revenues compared to historical averages.[90] According to PICOs, these changes to PJM's simulations are required to correctly reflect ancillary service revenue estimates and prevent double-recovery of revenue that the Commission sought to address by requiring a forward-looking E&AS Offset in this proceeding.[91]

32.    PICOs contend that PJM "appears to concede to PICO's arguments" regarding future reserve prices by stating that it will review other potential approaches as part of its next quadrennial review.[92]  However, PICOs maintain that this is insufficient because

---

[85] *Id.* (quoting Wilson Aff. ¶ 28).

[86] *Id.* at 14-15 (citing Wilson Aff. ¶ 29).

[87] *Id.* (citing Wilson Aff. at 30, fig. 1 (Slide 6 from The Brattle Group July 30, 2020 MIC Special Session presentation at PJM)).

[88] *Id.* at 15.

[89] *Id.* (citing Brattle Aff. ¶ 23).

[90] *Id.* at 16 & n.66.

[91] *Id.* at 16 & n.67.

[92] *Id.*

"the Commission has an obligation to fix the rate now, not wait until PJM attempts to fix the rate in the next quadrennial review."[93]

## 2. Commission Determination

33.    We sustain the Commission's determination accepting PJM's proposal to use historic operating reserves prices in its Projected E&AS Dispatch Model. As discussed in the Compliance Order, the Commission selected PJM's proposed approach as a just and reasonable replacement rate given the lack of a futures markets for reserves and uncertainty regarding the actual reserve price impacts of PJM's reserve market reforms.[94] PJM explained that, given the lack of an observable forward market for reserves and the addition of a new 10-minute reserve product in the day-ahead market, it was imperative "to not introduce arbitrary bias into the new approach" and therefore it "proposed to use unscaled, historic ancillary services market clearing prices for the initial implementation," noting that scaling historic reserve market clearing prices by the ratio of the forward energy prices to the historic energy prices "would result in scaling *down* reserve market clearing prices by as much as 33 percent in some cases."[95] The Commission agreed, noting that the application of a fixed scaling factor, as was done for Regulation, would likely mischaracterize the hourly shape of future reserve prices and lead to poor estimates of resources' dispatch patterns and inaccurate reserve revenue estimates.[96] Accordingly, the Commission concluded that, based on the record in this proceeding, there is no "superior alternative to PJM's proposal,"[97] which supports our conclusion that PJM complied with the directive in the May 2020 Order to "implement a forward-looking E&AS Offset that reasonably estimates expected future energy and ancillary services revenues" based on PJM's use of future energy price data

---

[93] *Id.* at 17.

[94] Compliance Order, 173 FERC ¶ 61,134 at P 168.

[95] PJM August 5, 2020 Compliance Filing at 24 & n.77 (citing Brattle Aff. at tbl. 2.)

[96] Compliance Order, 173 FERC ¶ 61,134 at P 168 (citing Keech Reply Aff. in Docket Nos. ER19-1486-000 and EL19-58-000 at ¶¶ 15-16).

[97] *Id.* The Commission also explained that reserves are just one component of the overall E&AS Offset, and as PJM's simulations demonstrate, incremental energy revenues comprise the majority of revenue increases expected to result from the reserve market reforms. *Id.* P 169 (citing PJM March 2019 Transmittal, Aff. of Adam Keech, at tbl. 4).

available to project future energy revenues.[98]  PICOs' affiant Wilson theorized that
reserves will rise faster than energy prices in the future or that reserve prices will increase
based on changes to the Operating Reserves Demand Curve and urged the Commission
to direct PJM to develop a "functional relationship" consistent with that theory.[99]  As
discussed in the Compliance Order, the future relationship between reserve prices and
energy prices cannot be predicted with precision.[100]  The data affiant Wilson relies upon
to theorize that operating reserve prices will rise at a faster rate than energy prices reflect
historic price trends and may not reflect the effect of PJM's reserve market reforms.[101]
While affiant Wilson asserts that the reserve market reforms will increase operating
reserve prices, neither affiant Wilson nor PICOs demonstrate how a "functional
relationship" would be used to accurately reflect this increase without introducing other,
potentially significant, calculation errors.[102]  Accordingly, we are not persuaded by
PICOs' arguments that PJM must revise its simulations as they suggest.

34.      In the Compliance Order, the Commission encouraged PJM to work with its
stakeholders to refine any methods to estimate future energy and reserve market revenues
after observing the actual effect of the pending reserve market reforms and directed the
submission of an informational filing analyzing such effects.[103]  This is not a concession
that the Commission was approving a temporary, unjust and unreasonable rate, as PICOs
allege.[104]  To the contrary, for the reasons discussed in the Compliance Order and
sustained herein, the Commission found that PJM's proposal with respect to estimating
energy and ancillary services revenues was just and reasonable as proposed, while

---

[98] *Id.* P 168 (quoting May 2020 Order, 171 FERC ¶ 61,153 at P 320); *see id.*
PP 102-105, 109.

[99] PICOs Rehearing Request at 15 (citing Wilson Aff. ¶¶ 29, 30).

[100] Compliance Order, 173 FERC ¶ 61,134 at n.276 (citing PJM Aug. 5, 2020
Compliance Filing at 25 ("PJM states it does not yet know the relationship between
reserve prices and energy prices.")).  *See also* PJM Aug. 5, 2020 Compliance Filing,
Attachment C, Brattle Aff. ¶¶ 22-25 ("[Ancillary Service] prices have historically been
highly correlated with energy prices . . . However, PJM's planned Reserve Pricing
Reforms will change the relationship between energy and the prices of synchronized and
non-synchronized reserves . . . .").

[101] *See* Wilson Aff. ¶¶ 30-31.

[102] *Id.* ¶ 32.

[103] *Id.* PP 170-171.

[104] *See supra* P 32.

acknowledging PJM's commitment to reviewing any modeling assumptions once better data was available.[105]

### D. Effective Date

35.     In the May 2020 Order, the Commission directed PJM to propose an effective date for implementation of the reserve market replacement rate and the forward-looking E&AS Offset, as early as practicable, while harmonizing implementation schedule with other ongoing revisions in Docket Nos. EL16-49-000, et al.[106] PJM proposed an effective date of May 1, 2022, for the reserve market reforms and stated that it would implement the forward-looking E&AS Offset beginning in the Base Residual Auction (BRA) for the Delivery Year starting June 1, 2022.[107] The Commission accepted these proposed effective dates in the Compliance Order.[108]

### 1. PICOs' Rehearing Request

36.     PICOs allege that the Commission erred in accepting PJM's proposed effective date of May 1, 2022, which, according to PICOs, "does not completely capture the transfer of value between PJM's capacity market and PJM's energy market and does not completely prevent customers from being overcharged for electricity."[109] PICOs argue that implementing the reserve market changes before June 1, 2022, which is the first day that is not already covered by a cleared BRA, will cause customers to be overcharged for the month of May 2022.[110]

### 2. Commission Determination

37.     We sustain the Commission's determination accepting PJM's proposed effective date of May 1, 2022 for the reserve market reforms. PJM provided ample support for its choice of a May 1, 2022 effective date and explained why this date is optimal as compared to June 1, 2022.[111] Specifically, PJM stated that "[t]he relatively mild weather

---

[105] *Id.* PP 168-169.

[106] May 2020 Order, 171 FERC ¶ 61,153 at P 2.

[107] PJM July 6, 2020 Compliance Filing at 1.

[108] Compliance Order, 173 FERC ¶ 61,134 at PP 227-28.

[109] PICOs Rehearing Request at 18.

[110] *Id.*

[111] *See supra* P 27 & notes 74-75.

that can be reasonably expected in May will provide necessary system flexibility to cover any issues that may arise in the first month of implementation."[112] By contrast, PJM explained that a June 1, 2022 effective date is "more likely to present operational risks, as the weather in June is typically hotter than in May, creating more stress on the system and reducing flexibility that may be needed for smooth implementation."[113]

38.      Despite PICOs' claim that a May 1, 2022 effective date will "cause customers to be overcharged for costs/revenues associated with the month of May 2022,"[114] PICOs do not include an explanation for why they believe such overcharges would occur. The capacity prices from the already-run BRA are just and reasonable because, as the Commission explained in the May 2020 Order, "nothing in this record indicates that the previously cleared capacity auctions were not conducted in accordance with the then effective Tariff."[115]  And, as the Commission has found, the changes to PJM's ancillary services market are just and reasonable.[116]  By claiming that there will be a "brief interim period in May 2022 which will leave in place rates that are unjust and unreasonable,"[117] PICOs implicitly assume that the reserve market changes are unjust and unreasonable if not accompanied by a retroactive adjustment to the capacity market.  PICOs provide no support for this assumption, which is contrary to Commission precedent indicating that prospective revisions to the energy market are not rendered unjust and unreasonable simply because such changes may not correspond with the basis upon which just and reasonable capacity market prices were determined three years earlier.[118]  Accordingly, we are unpersuaded by PICOs' rehearing arguments on this point.

---

[112] PJM July 6, 2020 Compliance Filing at 14.  *See also* Compliance Order, 173 FERC ¶ 61,134 at P 228 ("We agree with PJM that its proposal to use a shoulder period for its go-live date is reasonable in order to help minimize issues that may otherwise occur during more extreme conditions.").

[113] PJM July 6, 2020 Compliance Filing at 14-15.

[114] *Id.* at 6, 17.

[115] May 2020 Order, 171 FERC ¶ 61,153 at P 322.

[116] *Id.* PP 97-99, *order on reh'g*, 173 FERC ¶ 61,123 at P 73 (adopting as just and reasonable PJM's proposed replacement rate for reserves).

[117] PICOs Rehearing Request at 20.

[118] *PJM Interconnection, L.L.C.*, 150 FERC ¶ 61,020, at P 38 (2015) ("[t]he tariff provisions revise offers solely in the energy market and are prospective, as of the date of this order….  The fact that PJM runs a capacity market with three-year

Docket No. EL19-58-005                                          - 22 -

<u>The Commission orders</u>:

      In response to the requests for rehearing, the Compliance Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.  Chairman Glick is concurring with a separate statement attached.

                      Commissioner Clements is dissenting in part with a separate statement attached.

                      Commissioner Christie concurring with separate statement attached.

( S E A L )

                                    Kimberly D. Bose,
                                       Secretary.

---

commitments does not freeze all changes to PJM's tariff for the three-year period covered by the auction.").

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                        Docket No.      EL19-58-005

(Issued March 9, 2021)

GLICK, Commissioner, *concurring*:

1.      I concur in today's order. Although PJM's approach to the forward-looking E&AS offset "is by no means perfect," it enables PJM to move forward with its long-delayed, much-needed capacity auction for the 2022-2023 delivery year.[1] Commissioner Clements's partial dissent makes a number of good points about the harm caused by an inflated Net Cost of New Entry (Net CONE) value.[2] I share her general concerns about PJM's approach to Net CONE, although I believe that the real problem lies with PJM's misguided choice of the reference resource to calculate Net CONE, rather than in how it implemented the forward-looking E&AS Offset in this proceeding.[3] In any case, PJM would be well-served to seriously consider Commissioner Clements's arguments when it goes back to the drawing board for its quadrennial review of the Variable Resource Requirement Curve this spring.[4]

---

[1] *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134 (2020) (Compliance Order) (Glick, Comm'r, dissenting in part at P 4).

[2] *PJM Interconnection, L.L.C.*, 174 FERC ¶ 61,180 (2021) (Order) (Clements, Comm'r, dissenting in part). I also share her skepticism about the unjustified use of percentage adders and the effect of those adders on customers' rates. *See, e.g., Cal. Indep. Sys. Operator Corp.*, 171 FERC ¶ 61,172 (2020) (Glick, Comm'r, dissenting).

[3] *PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,029 (2019) (Glick, Comm'r, dissenting), *order on reh'g*, 171 FERC ¶ 61,040 (2020) (VRR Curve Rehearing) (Glick, Comm'r, dissenting at PP 2, 5) ("For many years now, the PJM capacity market has procured too much capacity at too high a price. The root of that problem is PJM's excessively high Net Cost of New Entry (Net CONE) parameter. . . . The main problem with PJM's proposed Net CONE value—and, thus, with its entire filing to establish the [Variable Resource Requirement Curve] Curve—is its choice of Reference Resource.").

[4] Compliance Order, 173 FERC ¶ 61,134 (Glick, Comm'r, dissenting in part at P 4) (noting PJM's pledge to revisit its new forward-looking E&AS Offset methodology and parameters in its next quadrennial review).

2.     Unlike that review, however, today's order does not write on a blank slate.  For three years now, the Commission has meddled with one aspect of PJM's capacity market after another.  I have dissented at nearly every turn, arguing that the Commission's actions represent "truly bad public policy" and will produce rates that are patently unjust and unreasonable.[5]  Making matters worse, those efforts have fundamentally undermined the capacity market's ability to promote certainty and produce the reliable price signals guiding resource entry and exit that are supposed to be its principal purpose.  Consider where we find ourselves:  This May, PJM is slated to conduct what is nominally a three-year forward auction for a delivery period that begins less than a year from the date of the auction.[6]

3.     With that in mind, now is not the time to once again pull the rug out from underneath the auction for the 2022-2023 delivery year.[7]  That is especially so as the arguments on rehearing, including the arguments regarding PJM's use of a 10% adder and the reliance on historical reserve prices to forecast future expected reserve revenues, were all previously raised, considered, and rejected.[8]  Furthermore, I see nothing in the record that identifies a superior alternative to PJM's proposal to use historical reserve

---

[5] *Calpine Corp. v. PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,035 (2020) (Glick, Comm'r, dissenting at P 1); *see Calpine Corp. v. PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,239 (2019) (Glick, Comm'r, dissenting); *Calpine Corp. v. PJM Interconnection, L.L.C.*, 163 FERC ¶ 61,236 (2018), *order on reh'g*, 171 FERC ¶ 61,035 (Glick, Comm'r, dissenting); *Calpine Corp. v. PJM Interconnection, L.L.C.*, 163 FERC ¶ 61,236 (Glick, Comm'r, dissenting); *PJM Interconnection, L.L.C.*, 167 FERC ¶ 61,029 (Glick, Comm'r, dissenting), *order on reh'g*, VRR Curve Rehearing, 171 FERC ¶ 61,040 (Glick, Comm'r, dissenting); *see also Old Dominion Elec. Coop. v. PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,149 (2020) (Glick, Comm'r, concurring at P 5) (expressing doubt that the approach of "procuring more and more year-round blocks of undifferentiated capacity" is a "sustainable or efficient approach" to ensuring reliability).

[6] The auction for the 2022-2023 delivery year should have been run in May 2019. It is now scheduled to run in May 2021, with results posted in June 2021.  The delivery year commences June 1, 2022.

[7] *See* Order, 174 FERC ¶ 61,180 (Christie, Comm'r, concurring at P 1).  Relevant parameters for the May auction have been calculated by PJM and its Market Monitor and made available to market participants on its website.  *See* Capacity Market (RPM), *2022-2023* (2021), https://www.pjm.com/markets-and-operations/rpm.aspx.

[8] Order, 174 FERC ¶ 61,180 at PP 13-15 (discussing 10% adder), PP 33-34 (discussing use of historical reserve prices to forecast future reserve revenues); *see* Compliance Order, 173 FERC ¶ 61,134 at PP 162-171 (historical reserve prices), PP 172-181 (10% adder).

Document Accession #: 20210309-3073   Filed Date: 03/09/2021
Docket No. EL19-58-005           - 2 -

prices as the basis for projecting future reserve revenues.[9]  Were such an alternative available, I agree that it would merit a hard look.  But as it is not, we must provide PJM with the certainty it needs to finally run the upcoming auction and then, with that behind us, turn to remedying the more fundamental problems that the Commission has created over the course of the last three years.

        For these reasons, I respectfully concur.

_____

Richard Glick
Chairman

---

     [9] Compliance Order, 173 FERC ¶ 61,134 at P 168 (rejecting request to require PJM to adopt an alternative method to estimating future reserve revenues, because the record lacked a proposal superior to PJM's proposal).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                    Docket No.  EL19-58-005

(Issued March 9, 2021)

CLEMENTS, Commissioner, *dissenting in part*:

1.      As is the case with several other proceedings during these early days of my Commission tenure, my involvement in this proceeding originates near the end of a longer, comprehensive consideration of the issues – here, the design of several aspects of PJM's reserve market.  As a result of this late involvement, I now consider the justness and reasonableness of only the aspects of PJM's reserve market design that remain under consideration as a result of requests for rehearing in this docket.

2.      As relates to these remaining issues, I must dissent in part on today's order because I disagree that it is clear that PJM's application of a 10% adder to combustion turbine resources (CTs) and use of historical reserve prices are assumptions that will yield just and reasonable capacity rates.  I recognize that these technical details are challenging and do not always lend themselves to easy answers.  But our acceptance must nonetheless be supported by record evidence, and here I find that evidence lacking.

3.      Approval of the application of a 10% adder to CT offers and use of historical reserve prices are assumptions with the potential for material real-world consequences. These assumptions feed into the net cost of new entry (Net CONE) value that affects all critical parameters of the capacity market.  An inflated Net CONE value can lead to artificially high capacity quantities and prices, results that can harm consumers.

4.      As an initial matter, I agree with the Commission's decision in its May 2020 order to find that the reserve market changes adopted in this proceeding render the preexisting energy and ancillary services (E&AS) offset in PJM's capacity market unjust and unreasonable.  PJM's energy, ancillary services and capacity markets are meant to work in tandem to compensate suppliers for providing electric service to PJM customers.  The capacity market is designed to be responsive to expectations of E&AS revenues in the delivery year three years hence.  When those expectations are thrown out of whack, such as with a major market reform like the reserve changes in this proceeding, a correction may be warranted to ensure capacity market rates are not artificially high.  The shift to a forward-looking E&AS offset was such a correction, and it was warranted.

5.      The calculation of the E&AS offset is complex and involves numerous assumptions.  I acknowledge there may be multiple just and reasonable methods for calculating it.  The Commission can offer some deference to PJM's expertise so long as

Document Accession #: 20210309-3073     Filed Date: 03/09/2021

its choices result in just and reasonable rates as supported by record evidence. On rehearing here, however, parties again point to a paucity of record evidence supporting the 10% adder PJM applies to offers from CTs in its new dispatch model.

6.        In support of its compliance proposal, PJM argues that CTs may face additional fuel procurement costs as a result of being dispatched in real-time, and that such risks may not be limited to peak hours. But, as Public Interest and Customer Organizations (PICOs) point out, PJM's new dispatch model assesses all hours of the year, such that PJM's assumptions about resource offers should be reasonable across all of those hours. Yet real-world evidence from the Independent Market Monitor for PJM (Market Monitor) and PICOs indicates that CT offers are frequently below their cost-based level, including 40-50% of the time in 2019-2020.[1]  PICOs also point to a PJM simulation showing that if CTs included a 10% adder in their offers during all hours, their run hours would decline by 29% and their revenues would decrease by 30% compared to offering without the adder.[2]  These arguments suggest that PJM's assumption that CTs will include the 10% adder during all hours of the year is contrary to the financial interests of the owners of those resources and likely is not a reasonable assumption.

7.        PJM also argues the 10% adder is appropriate because it is applied to the reference resource CT in constructing the capacity market demand curve. But, as PICOs argue, PJM has changed the model used to calculate the E&AS offset from one that looks only at peak hours to a new model that looks at dispatch in all hours.[3]  An adder that was arguably reasonable when examining only peak hours, during which fuel procurement costs may be higher, is not necessarily reasonable when examining all hours of the year, particularly in light of the information cited above that consistently offering at 10% above cost would be contrary to a CT owner's financial interest.

8.        I also find support lacking for PJM's proposal to use historical reserve prices as a stand-in for projected reserve prices in its forward-looking E&AS offset. I recognize the practical challenges in seeking to project revenues when no futures prices for a product exist. Nonetheless, PJM's new operating reserve demand curves clearly and purposefully assign a positive value to reserves in excess of the minimum reserve requirement, most of which had a zero valuation under the previous curve. One can reasonably expect the reserve market price to be positive in far more hours of the year once the new curves are implemented in 2022. It also appears a strong possibility, then, that reserve revenues for many resources will be greater under these changes. This intuitive conclusion is

---

[1] Market Monitor September 2, 2020 Protest at 21; PICOs September 2, 2020 Protest, Ex. A at 10 n.13.

[2] PICOs September 2, 2020 Protest, Ex. A at 9.

[3] *Id*. at 14.

Document Accession #: 20210309-3073          Filed Date: 03/09/2021

supported by Brattle Group data, cited by PICOs, suggesting that, as a general rule, when energy prices rise, reserves prices rise at an even faster rate. So again, PJM's assumption appears to underestimate E&AS revenues.

9.     I find protestors' arguments and evidence on these points compelling, and PJM offers little in rebuttal. I therefore find insufficient evidence in the record to assuage my concern that the 10% adder and use of historical reserve prices will lead to an understated assumption of E&AS revenues.

10.     These questionable assumptions would be less concerning if their impact on capacity prices was not so great. The E&AS offset is a major determinant of Net CONE, and Net CONE affects every aspect of the capacity auction, including the demand curve and market power mitigation. PICOs assert that PJM's 10% adder assumption translates to a but-for increase in Net CONE of roughly $30/MW-day, which is nearly 12% of the recently posted RTO-wide Net CONE of $260.50/MW-day for the 2022/2023 Base Residual Auction.[4] These estimates translate to significant additional capacity costs to customers.

11.     I appreciate the context in which I dissent. PJM and market participants have expressed a commercial and operational urgency to running the delayed 2022/2023 capacity auction as soon as practicable. But that factor does not lessen our responsibility to ensure that the capacity rates that emerge from that auction are just and reasonable. The parameters I highlight here are just two among many in the capacity market, but they have significant impacts on the rates ultimately borne by consumers. PJM will soon be filing with the Commission updates to its capacity market parameters as part of its quadrennial review. The contents of that filing will include a broader set of considerations about capacity market design, including, as Chairman Glick's concurrence notes, the choice of reference resource. I look forward to reviewing that filing carefully when it comes before us.

> For these reasons, I respectfully dissent in part.

_____
Allison Clements
Commissioner

_____

[4] PJM Interconnection, L.L.C., *2022/2023 RPM Base Residual Auction Planning Period Parameters* (Feb. 2021), https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/2022-2023/2022-2023-planning-period-parameters-for-base-residual-auction-pdf.ashx.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                    Docket No.      EL19-58-005

(Issued March 9, 2021)

CHRISTIE, Commissioner, *concurring*:

1.      I was not a member of the Commission when the issues in this docket were originally considered and may have viewed them differently; however, at the current point in time we face the reality of the PJM capacity market calendar.  So while I have similar concerns about the application of an adder expressed by Commissioner Clements in her partial dissent, I am convinced any such changes at this stage would threaten – or indeed obstruct – the ability of PJM to conduct the Base Residual Auction as scheduled this May, which is essential for reliability purposes.

2.      This order does serve to illustrate that the PJM capacity market is not a true market, but is, instead, an administrative construct whose very complexity is inconsistent with transparency.  It further highlights the importance of considering these issues in a general proceeding about which I have been vocal in both requesting that these proceedings take place and supporting the Chairman's announcement of the commencement of such discussions in the March 23, 2021 Technical Conference in Docket No. AD21-10.

        For these reasons, I respectfully concur.

_____
Mark C. Christie
Commissioner

Document Content(s)

EL19-58-005.DOCX...........................................................1